**William Harry, MEECE, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

No. 2006–SC–000881–MR.

Supreme Court of Kentucky.

June 16, 2011.

Rehearing Denied Oct. 27, 2011.

640

Kathleen Kallaher Schmidt, Appeals Branch Manager, Donna Lynn Boyce, Appellate Branch Manager, Thomas More Ransdell, Assistant Public Advocate, Department of Public Advocacy, Frankfort, KY, Counsel for Appellant.

Jack Conway, Attorney General of Kentucky, William Robert Long, Jr., Assistant Attorney General, Criminal Appellate Division, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Justice SCOTT.

## I. Introduction

William Harry Meece (Meece) appeals from the judgment of the Warren Circuit Court sentencing him to consecutive twenty-year terms of confinement (for a total of forty years) on two convictions of robbery and burglary, both of the first degree, and to death for each of three convictions for murder.

According to evidence introduced at trial, Meece shot and killed Joe Wellnitz, his wife, Beth, and their son Dennis in their home in Columbia, Adair County, Kentucky in the early morning hours of February 26, 1993, at the behest, and with the assistance of, their daughter, Meg Wellnitz Appleton (Wellnitz). The murders occurred during the commission of a robbery and burglary (both in the first degree) and were otherwise committed for profit.

In February 2003—ten years after the murders—an Adair County Grand Jury

indicted Meece and Wellnitz by separate, consecutive indictments for the burglary, robbery, and murder of the Wellnitz family. Thereafter, the Commonwealth elected to try Meece first.

Meece's first trial began in November 2004, but ended with the tender of his guilty plea (following voir dire) upon the Commonwealth's recommendation of a sentence of life without parole for twenty-five years. This plea, however, was later set aside upon Meece's motion and new counsel were then appointed. Thereafter, the parties agreed to a transfer of venue to the Warren Circuit Court. Trial was rescheduled for August 21, 2006 and concluded with the sentencing verdict on September 18, 2006. He was convicted and sentenced as indicated.

## II. Standard of Review of Unpreserved Issues in Death Penalty Appeals

Meece seeks review of forty-five listed issues, "some of which comprise numerous sub-issues, and many of which were not preserved for review pursuant to RCr 9.22 or 9.54." *Sanders v. Commonwealth*, 801 S.W.2d 665, 668 (Ky.1990). "Indeed, more than a few ... were not even *raised* below." *Id.*

▮▮▮▮ Thus, in other instances they would be treated as unpreserved. However, "[w]here the death penalty has been imposed, we nonetheless review allegations of these quasi errors."

> [If] the so-called error occurred, we begin by inquiring: (1) whether there is a reasonable justification or explanation for defense counsel's failure to object, *e.g.*, whether the failure might have been a legitimate trial tactic; [but] (2) if there is no [such] reasonable explanation, [we then address] whether the unpreserved error was prejudicial, i.e., whether the circumstances in totality are persuasive that, minus the error, the defendant may

not have been found guilty of a capital crime, or the death penalty may not have been imposed. All unpreserved issues are subject to this analysis.

*Id.* (internal citations omitted); *See also Johnson v. Commonwealth*, 103 S.W.3d 687, 691 (Ky.2003).

"The rationale for this rule is fairly straightforward. Death is unlike all other sanctions the Commonwealth is permitted to visit upon wrongdoers." *Rogers v. Commonwealth*, 992 S.W.2d 183, 187 (Ky. 1999). Thus, the invocation of the death penalty requires a more expansive standard of review than is normally necessary in the criminal justice process. *Id.; See also* KRS 532.075(2) ("The Supreme Court shall consider ... any errors enumerated by way of appeal.").

▮▮▮ Preserved errors are reviewed under normal standards. As noted in *Brown v. Commonwealth*, "preserved evidentiary and other non-constitutional errors will be deemed harmless under RCr 9.24 and *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), if we can say with fair assurance that the judgment was not substantially swayed by the error." 313 S.W.3d 577, 595 (Ky.2010). "Our inquiry is not simply 'whether there [is] enough [evidence] to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.'" *Brown v. Commonwealth*, 313 S.W.3d 577, 595 (Ky.2010) (*quoting Kotteakos*, 328 U.S. at 765, 66 S.Ct. 1239). "As to those preserved constitutional errors which are subject to harmless error review, they must be shown to be 'harmless beyond a reasonable doubt' in order to be deemed harmless." *Id.*

▮▮▮ Moreover, we review a trial court's evidentiary rulings for an abuse of discretion. *Penman v. Commonwealth*,

194 S.W.3d 237, 245 (Ky.2006). "The test for abuse of discretion is whether the trial [court's] decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English,* 993 S.W.2d 941, 945 (Ky.1999).

■ On appellate review of a trial court's denial of a motion to suppress, we apply the two-step process set out in *Ornelas v. United States,* 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996), and adopted by Kentucky in *Adcock v. Commonwealth,* 967 S.W.2d 6 (Ky.1998). We review the trial court's findings of fact under the substantial evidence standard. *Id.* at 8. Under this standard, the trial court's findings of fact will be deemed conclusive if supported by substantial evidence. RCr 9.78. Finally, we conduct a *de novo* review of the trial court's application of the law to the established facts to determine whether its ruling was correct as a matter of law. *Welch v. Commonwealth,* 149 S.W.3d 407, 409 (Ky.2004).

### III. Analysis

#### A. Evidentiary Issues—Evidence Admitted at Trial

*1. Meece's Videotaped Statements of November 15 and December 15, 2004*

*a. KRE 410—the Statements*

■ Meece first contends that the trial court should have suppressed his two videotaped statements made subsequent to his entering into and executing a plea agreement with the Commonwealth on November 15, 2004.[1] Following an evidentiary hearing, the trial court overruled Meece's motion to prohibit the introduction of these statements. Pertinent facts follow.

On November 15, 2004, several days into jury selection during his first trial, Meece entered into, and executed, a plea agreement with the Commonwealth, under the terms of which the Commonwealth would recommend that Meece be sentenced to life without the possibility of probation or parole for twenty-five years (LWOP–25) and Meece agreed to give truthful statements regarding his involvement in the Wellnitz family murders and to testify against his co-defendant, Wellnitz.[2] According to his testimony at trial, Meece entered into the plea bargain as a subterfuge to get a new trial and new attorneys.

Immediately following the execution of the plea agreement, Meece gave his first video statement detailing his involvement in the Wellnitz murders. This statement established that Meece entered the Wellnitz family home in the early morning hours of February 26, 1993, and shot and killed the Wellnitz family at the encouragement of, and with the assistance of, their daugh-

---

**1.** Even with the plea agreements, prior to each of these statements Meece was given his *Miranda* warnings, including the admonition that anything he said could and would be used against him. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**2.** Meece contends that an extended visit with his children was an additional condition. However, the extended visit was not referenced in the plea agreement, was not mentioned in the extensive statement Meece gave right after the agreement was signed on No-

vember 15, 2004, and the trial court found, after a hearing, that Meece's "visitation with his children [was] not part of the plea agreement."

> Moreover, in his second statement, given on December 15, 2004, Meece acknowledged that the Commonwealth's only obligation was to encourage his attorney to facilitate the visit and not to do anything to hinder the visit. He thereafter acknowledged "[t]o the best of my knowledge, you fulfilled your end."

ter, Meg Wellnitz Appleton (Wellnitz).[3] The statement also detailed the circumstances under which Wellnitz purchased a Browning Hi–Power 9mm pistol for him from Sports Unlimited in Lexington, Kentucky. Meece gave his second video statement on December 15, 2004, also detailing Wellnitz's involvement in the murders.[4]

Following execution of the plea agreement and following his statement of November 15, 2004, Meece entered a formal guilty plea in the trial court. At the time of the plea, the trial court informed Meece that "the agreement is conditioned upon you providing a truthful, recorded statement," and on "cooperating fully with the Commonwealth in the prosecution" of Wellnitz. Meece was also told that "[i]f for any reason [you fail] to abide by the terms set forth, I have just read, said failure shall be grounds to set aside the Commonwealth's offer on a plea of guilty and this matter shall proceed to trial by jury." Thereafter, the court proceeded with the plea colloquy and asked Meece if he was satisfied with the services of his attorney and Meece replied "I believe my complaints with my original representation, Ms. Niemi, are well recorded on the record."[5]

The court then asked Meece if he was pleading guilty due to threats, promises, or pressure from others, and Meece responded, "I believe the pressure should be obvious, but I am pleading guilty of my own free will." Following the full colloquy, the court found Meece intelligently, knowingly, and voluntarily waived his rights, and that there was a factual basis for the plea of guilty. The court did not, however, formally accept the plea, but set final sentencing for February 22, 2005.

Several months later, Meece—asserting the visitation with his children had been delayed and terminated early—moved to withdraw his guilty plea.[6] Thereafter, the judge ordered a competency evaluation and, after a hearing, ruled that he was competent to stand trial and allowed the withdrawal of the guilty plea.

Following the withdrawal, Meece filed a pro se motion to suppress the two video statements of November 15 and December 15, 2004. He was joined in this motion by his new counsel. The matter was heard by the court on July 31, 2006, after which the trial court ruled that the post-plea statements given by Meece on November 15 and December 15, 2004 were admissible. These statements were introduced by the Commonwealth against Meece at trial.[7]

Consistent with his arguments at trial, Meece contends that KRE 410, as inter-

---

3. He also attempted to implicate his ex-wife, Regina Meade, who prompted his later investigation (and indictment) and testified against him at trial. In this respect, Commonwealth's Attorney Wright advised the court during a discovery hearing that, as far as he could tell, Meade had little if any criminal involvement in the actual crime.

4. These two statements are to be distinguished from a prior proffer of evidence to the Commonwealth made to solicit the plea negotiations by Meece's then attorney concerning Wellnitz's purchase of the pistol. This issue will be addressed separately.

5. There had been differences between the two as evidenced by his pro se motion practice.

6. He testified at trial that he never intended to live up to his plea agreement—it was just a way to get another trial with new counsel.

7. In addition to his own admissions of guilt, the Commonwealth also presented to the jury the December 31, 2004 videotaped statement of Wellnitz. During this statement, Wellnitz explained how the weapon used to kill her family was obtained by herself and Meece and further incriminated herself and Meece for killing her parents and brother. Meece's ex-wife, Regina Meade, also gave testimony that incriminated him in the murders of the Wellnitz family.

preted by this court in *Roberts v. Commonwealth*, 896 S.W.2d 4 (Ky.1995), prohibited the admission of his November 15 and December 15, 2004 statements.[8] KRE 410 provides:

Except as otherwise provided in this rule, evidence of the following is not, in any civil or criminal proceeding, admissible against the defendant who made the plea or was a participant in the plea discussions:

(1) A plea of guilty which was later withdrawn;

(2) A plea of nolo contendere in a jurisdiction accepting such pleas;

(3) Any statement made in the course of *formal plea proceedings*, under either state procedures or Rule 11 of the Federal Rules of Criminal Procedure, regarding either of the foregoing pleas; or

(4) Any statement made *in the course of plea discussions* with an attorney for the prosecuting authority which do not result in a plea of guilty or which result in a plea of guilty later withdrawn.

However, such a plea or statement is admissible (i) in any proceeding wherein another statement made in the course of the same plea or plea discussions has been introduced and the statement ought in fairness be considered contemporaneously with it, or (ii) in a criminal proceeding for perjury or false statement if the statement was made by the defendant under oath, on the record and in the presence of counsel.

(Emphasis added).

In *Roberts, supra*, the appellant was a suspect in a series of armed robberies. After his arrest, he "was worried about being charged as a persistent felony offender (PFO) and requested [the detective] to contact the Commonwealth's Attorney's office." *Id.* at 5. "Specifically, Roberts feared that his PFO status would enhance his punishment to an 'astronomical' number of years." *Id.* The detective then contacted the Commonwealth's Attorney's office which assured the detective that the appellant "would not be charged with PFO [in the first degree] if he gave a complete, detailed and truthful statement concerning the robberies in question which could be corroborated by a police investigation." *Id.* This assurance was then conveyed by the detective to the appellant "on

---

8. Meece further asserts that *Roberts'* application to the circumstances at hand is also supported by *United States v. Ventura–Cruel*, 356 F.3d 55, 62–65 (1st Cir.2003); *United States v. Young*, 223 F.3d 905 (8th Cir.2000); *State v. Nelson*, 108 Wash.App. 918, 33 P.3d 419 (2001); and *Bowie v. State*, 135 S.W.3d 55 (Tex.Crim.App.2004).

However, it should be noted that in *Ventura–Cruel*, the government revoked the plea agreement, with the court noting, "that different considerations may come into play if the defendant withdraws his guilty plea or the defendant breaches the plea agreement." 356 F.3d at 63 n. 10. *Young*, on the other hand, involved only a "plain error" review of the district court's conclusion, since the prosecution had not raised the issue in the district court. 223 F.3d at 908 ("But because the government did not raise the issue in the District Court, we review only for plain error."). *Nelson*, like the old

Federal Rules considered under *Robertson, infra*, was based upon the Washington Rules of Evidence, ER 410, which states "statements made in connection with, and relevant to, any of the foregoing pleas or offers, is not admissible...." Such language is *much more inclusive* than our language under KRE 410.

In *Bowie*, the confession was made in open court as a part of the formal plea under the Texas "timely pass for plea" procedure. Thus, the statement made to the court was properly suppressed under Rule 410(3). 135 S.W.3d at 57–61 ("It would defeat the purpose of Rule 410 to exclude evidence of the plea but admit all of the defendant's statements and concessions made during a formal plea proceeding [in court] when that plea is later withdrawn.") *Bowie* did not involve the application of KRE 410(4), which is at issue in this case.

the taped statement and [the appellant] stated he understood the terms and conditions." *Id.* He then "proceeded to confess to eight robberies," but denied committing any others. *Id.* A subsequent investigation indicated that the appellant had been involved in four other robberies about which he had not been truthful, nor had he been truthful about the location of the gun used in the robberies. *Id.*

■ Relying upon *United States v. Robertson,* 582 F.2d 1356, 1365 (5th Cir. 1978), we defined plea discussions as "discussions in advance of the time for pleading with a view to an agreement whereby the defendant will enter a plea in the hope of receiving certain charge or sentence concessions."[9] *Roberts,* 896 S.W.2d at 5. In addition, we adopted the two-prong test set out in *Robertson* to be applied by the trial court in determining whether a discussion is a plea discussion, to wit:

1. Whether the accused exhibited an actual subjective expectation to negotiate a plea at the time of the discussion
AND
2. Whether the accused's expectation was reasonable given the totality of the objective circumstances.

*Roberts,* 896 S.W.2d at 6 *(citing Robertson,* 582 F.2d at 1366). "To determine whether a discussion should be characterized as a plea negotiation and as inadmissible, the trial court should carefully consider the totality of the circumstances." *Robertson,* 582 F.2d at 1366. "[U]nder a totality of the circumstances approach, an accused's subsequent account of his prior subjective mental impressions cannot be considered the sole determinative factor." *Id.* In this

respect, we noted that "[t]he intent is to protect the accused's subjective expectations while protecting against subsequent, self-serving claims by the accused." *Roberts,* 896 S.W.2d at 6. Given that the appellant in *Roberts* accepted the Commonwealth's plea offer by the sole act of then giving the statement concerning his participation in eight of the robberies, we held his statement met the two-part test established in *Robertson* and was a statement "made in the course of plea discussions" and was therefore protected by KRE 410. *Roberts,* 896 S.W.2d at 6.

Here, however, Meece and the Commonwealth discussed, negotiated, and executed a formal plea agreement *prior* to his statements. This contrasts with Meece's contention at the suppression hearing on July 31, 2006, that he believed that these two post-plea statements were part and parcel of the plea negotiations. Moreover, at this hearing, Meece and the Commonwealth stipulated:

(1) That the written plea offer and motion to enter a plea of guilty have been prepared and signed by all parties prior to Meece making any statement; [and]
(2) No additional plea discussions or negotiations regarding any term of the plea agreement were had after the written plea offer and motion to enter a plea of guilty were executed by the parties.

Meece also conceded these facts during examination under oath. Specifically, he agreed that the plea agreement was signed prior to his having made the November 15, 2004 statement. He also conceded that he was informed of his *Miranda* warnings prior to making either statement. On

**9.** It should be noted that the Court in *Robertson* was construing FRE 11(e)(6) and FRE 410 *at a time* when their language rendered inadmissible "any statement made '*in connection with, and relevant to*' an offer to plead guilty." *Robertson,* 582 F.2d at 1364 (emphasis added). In 1979 and 1980, these provisions were amended, consistent with our KRE 410(4), to refer to statements "made in the course of plea *discussions.*" *See United States v. Marks,* 209 F.3d 577, 582 (6th Cir.2000) (emphasis added); *United States v. Jones,* 469 F.3d 563, 567 (6th Cir.2006).

cross-examination, he conceded that all negotiations regarding the plea ended after he signed the plea agreement and prior to the giving of any statement.

██ "Suppressing evidence of such negotiations serves the policy of insuring a free dialogue only when the accused and the government actually engage in plea negotiations: 'discussions in advance of the time for pleading with a view to an agreement whereby the defendant will enter a plea in the hope of receiving certain charge or sentence concessions.' " *Robertson*, 582 F.2d at 1365. Moreover, the policy underlying KRE 410 (and its federal counterpart) is to allow a defendant to freely negotiate a plea agreement without fear that any statements he makes to solicit a plea agreement "will [later] be used against him." *United States v. Lloyd*, 43 F.3d 1183, 1186 (8th Cir.1994) (*quoting United States v. Knight*, 867 F.2d 1285, 1288 (11th Cir.1989)). "However, once a plea agreement has been reached, statements made thereafter are not entitled to the exclusionary protection embodied in [the rule]." *Id.; See also United States v. Jones*, 469 F.3d 563, 567 (6th Cir.2006) ("The case law is clear that statements made to authorities pursuant to cooperation plea agreements are not protected because they are not 'made in the course of plea discussions.' "); *United States v. Marks*, 209 F.3d 577, 582 (6th Cir.2000) ("[S]tatements made after a plea agreement is finalized are not 'made in the course of plea discussions.' ") (*citing United States v. Watkins*, 85 F.3d 498, 500 (10th Cir.1996)); *United States v. Davis*, 617 F.2d 677, 685 (D.C.Cir.1979) ("Excluding testimony made after and pursuant to the agreement would not serve the purpose of encouraging compromise.")

Here, the evidence supports the trial court's findings from the July 31, 2006 hearing that Meece and the Commonwealth entered into the plea agreement on November 15, 2004, they signed the plea agreement prior to the statements of November 15, 2004 and December 15, 2004, the plea agreement was finalized prior to Meece making the statements, and no plea discussions took place after the agreement was signed. Thus, the court concluded that the post-plea statements were admissible and not made in the course of plea discussions, relying on *United States v. Marks, supra.* We agree.

Moreover, considering the totality of the circumstances, we reach the same result applying the *Robertson* test adopted under *Roberts*, even though *Robertson* was decided on differing and more expansive language. *See, supra,* n. 7. Allowing Meece the benefit of the doubt as to whether he exhibited an actual subjective expectation to negotiate a plea at the time of the separate statements, we cannot find, under the second prong, that any expectation he had was reasonable.

Once a cooperation plea agreement is negotiated, a defendant's cooperation thereafter is not solicitation, discussion or negotiation of a plea, but rather, compliance. Contrastingly, the earlier proffer to the Commonwealth by his then counsel of evidence concerning the purchase of the Browning Hi–Power pistol by Wellnitz was made with a view to precipitating, discussing, and negotiating a plea, and thus falls squarely within the protective realm of KRE 410 as a statement made in the course of plea discussions; yet, those made in compliance with a negotiated plea—such as his two post—plea statements made in the case at hand-do not. Thus, we find no error and the statements were admissible.

*b. The Application of Roberts and Due Process*

██ Apparently anticipating our decision on this issue, Meece asserts that any application of KRE 410 to the facts at

hand which produces a different result than that desired by him under *Roberts* violates the due process and ex post facto prohibitions set forth by the United States Supreme Court in *Bouie v. City of Columbia*, 378 U.S. 347, 353–54, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964) (the Due Process Clause bars a state from achieving an ex post facto result by judicial construction), and *Carmell v. Texas*, 529 U.S. 513, 514, 120 S.Ct. 1620, 146 L.Ed.2d 577 (2000) (retrospective altering of an evidentiary principle violated the ex post facto clause). However, given the facts and circumstances presented, our holding on this issue today was neither unforeseeable, nor is it a curtailment of the evidentiary rights granted under KRE 410.

Having been based upon the two-part test adopted from *Robertson*, *Roberts* clearly envisioned KRE 410's outer limits to be the negotiation of the plea. *Roberts*, 896 S.W.2d at 6 ("Whether the accused exhibited an actual subjective expectation to negotiate a plea at the time of the discussion.").

Moreover, *Kreps v. Commonwealth*, 286 S.W.3d 213, 219 (Ky.2009), is consistent with this limitation. ("The more difficult question is whether Kreps made his statement in the course of a plea discussion."). In *Roberts*, the defendant accepted the open oral plea offer *by making* the statement. *Id.* In *Kreps*, as in *Roberts*, the defendant accepted the oral plea offer by making the confession. *Id.* at 220. ("Based on 'the totality of the objective circumstances,' it was reasonable for Kreps to expect that he was participating in a plea negotiation and that he *would be charged* with [lesser] felonies that would run concurrently *if he confessed.*") (emphasis added).

In this instance, the cooperation plea agreement was fully *negotiated and signed* before the statements, thus, the statements were given in compliance with it rather than in acceptance of it. *See United States v. Newbert*, 504 F.3d 180, 185 (1st Cir.2007) ("Basic contract principles apply to the construction of plea agreements."). "Excluding testimony made after and pursuant to the agreement would not serve the purpose of encouraging compromise." *Davis*, 617 F.2d at 685.

Thus, our decision today is a predictable application of KRE 410, given that the plea agreement had been negotiated and executed prior to the statements given in compliance therewith. Thus, "[t]he conclusion is inescapable that [Meece's] convictions [in this regard] are in keeping with the principles of due process." *Helpenstine v. Commonwealth*, 566 S.W.2d 415, 417 (Ky. 1978).

### c. The Statements were Voluntary

■ Meece also argues that the statements should have been suppressed as they were involuntarily induced by promises of leniency in the plea agreement, including, as he asserts, the promise that he would have an extended visit with his children. As support, he cites his conflict with prior counsel (alleging a lack of preparation in certain regards) and the trial court's comments made to him during the formal tender of his guilty plea that he had to confess or he would be facing the death penalty. He also asserts that his response to the *Miranda* warnings in his December 15, 2004 statement that "[y]eah, I understand those rights and this conversation is having to be made as a part of an outstanding plea agreement," demonstrates his waiver was involuntary.

■ In *Bailey v. Commonwealth*, we recognized that the Due Process Clause requires confessions be made voluntarily in order to be admissible, noting that " '[if the defendant's] will has been overborne and his capacity for self-determination critically impaired, the use of [the] confes-

sion offends due process.' " 194 S.W.3d 296 (Ky.2006) (brackets in original) (*quoting Schneckloth v. Bustamonte,* 412 U.S. 218, 225–26, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). The standard for assessing the voluntariness of a confession is the totality of the circumstances in which the confession was given. *Mills v. Commonwealth,* 996 S.W.2d 473, 481 (Ky.1999). Similarly, the United States Supreme Court has indicated that the "ultimate test" of voluntariness is whether the "confession [was] the product of an essentially free and unconstrained choice by its maker." *Schneckloth,* 412 U.S. at 225, 93 S.Ct. 2041.

■■■■ In determining whether a confession is the result of coercion, "one must look at the totality of the circumstances to assess whether police obtained evidence by overbearing the defendant's will through making credible threats." *Henson v. Commonwealth,* 20 S.W.3d 466, 469 (Ky. 1999). In making this determination, the court should consider three factors: "1) whether the police activity was 'objectively coercive;' 2) whether the coercion overbore the will of the defendant; and 3) whether the defendant showed that the coercive police activity was the 'crucial motivating factor' behind the defendant's confession." *Id.* (*quoting Morgan v. Commonwealth,* 809 S.W.2d 704, 707 (Ky.1991)).

■■■■ First, under circumstances such as this, a coercive or improper governmental activity " 'is a necessary predicate to the finding that a confession is not voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly,* 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); *See also Machibroda v. United States,* 368 U.S. 487, 82 S.Ct. 510, 7 L.Ed.2d 473 (1962). In this respect, "[i]t would be anomalous ... to hold that the state's actions [in offering the sought-after plea agreement] were 'improper' when they are" expressly contemplated by a rule

such as our KRE 410. *Wright v. State,* 307 Md. 552, 515 A.2d 1157, 1174 (1986), *abrogated on other grounds by Price v. State,* 405 Md. 10, 949 A.2d 619 (2008).

■■■ Although relevant, a defendant's concerns about the criminal defense services of his counsel do not reach the level of governmental activity necessary to a finding that a confession was not voluntary. Moreover, Meece was not told by the trial judge "he had to confess or he would be facing the death penalty"; he was told that consistent with the plea agreement, he had to testify truthfully or he would violate the agreement and he would be facing trial again.

As to any coercive aspect of the alleged promise of the Commonwealth to see that Meece got an extended visit with his children, Meece conceded in his December 15, 2004 statement that the Commonwealth's Attorney would only encourage Meece's attorney to set up the visit and would not do anything to hinder it. He further acknowledged that the Commonwealth's Attorney had fulfilled his part. We also note the court's finding, supported by substantial evidence, that Meece's visitation with his children was *not* a part of the plea agreement—it was never mentioned in the plea agreement, nor mentioned in the lengthy statement that Meece gave after the execution of the plea agreement on November 15, 2004. It was something Meece hoped to get, but that depended upon his ex-wife, Regina Meade, not the Commonwealth.

Even so, Meece testified he never intended to honor the plea agreement—it was just a tool to get a new trial with new counsel. We also note that each of the statements was given in the presence of his attorney and only after he had been given, acknowledged, and waived his *Miranda* rights. "There is [simply] no evidence in this record that [Meece's] will was

undermined or overcome." *Roberts,* 896 S.W.2d at 6. Thus, we find no error here.

### d. The References to a Plea in Meece's Two Statements were Harmless

■ In his motion to suppress the statements of November 15 and December 15, 2004, Meece also asked that any evidence of his actual "guilty plea" be suppressed. The court thereafter denied the motion to suppress the statements, but *did not* address the issue as to the formal guilty plea rendered by Meece in open court. In fact, no evidence of his formal "guilty plea" was introduced,[10] but two references to "a plea"—one by Meece and one by Commonwealth's Attorney Brian Wright—did occur in the taped statements. Meece, however, sought no rulings on this issue before the tapes were played, made no requests for redaction of these two inappropriate references, and did not object during the trial to the references to "a plea," transcripts of which had been provided to Meece and counsel and were provided to the jury for their use during the playing of the videotaped statements.

The Commonwealth counters that evidence of Meece's formal "guilty plea" was not introduced at trial, only his statements of November 15 and December 15, 2004. Moreover, they argue that at no point during either of these statements does any party expressly indicate that Meece has or will plead guilty to the crimes charged *in this case.* They assert that the two references to "a plea" are so vague as to be meaningless to a lay person. They also argue that Meece's failure to object to these two references was trial strategy

because he intended to and did attack the truthfulness of the statements at trial, attempted to explain that he lied in the statements as part of his plan to delay being tried until he could obtain more competent counsel and a new trial, and (as he said) so he could facilitate an extended visit with his children. As indicated, he testified at trial that he never intended to follow through with the plea.

In *Kercheval v. United States,* 274 U.S. 220, 47 S.Ct. 582, 71 L.Ed. 1009 (1927), the trial court allowed the defendant to withdraw his plea of guilty and proceed to trial, yet allowed the prosecution to introduce a certified copy of his former guilty plea. The United States Supreme Court reversed, noting:

> The effect of the court's order permitting the withdrawal was to adjudge that the plea of guilty be held for naught. It[s] subsequent use as evidence against petitioner was in direct conflict with that determination. When the plea was annulled it ceased to be evidence.... As a practical matter, it could not be received as evidence without putting petitioner in a dilemma utterly inconsistent with the determination of the court awarding him a trial. Its introduction may have turned the scale against him. "The withdrawal of a plea of guilty is a poor privilege, if, notwithstanding its withdrawal, it may be used in evidence under the plea of not guilty."

*Id.* at 224–225, 47 S.Ct. 582 (*quoting White v. State,* 51 Ga. 285, 289 (1874)); *See also* KRE 410(1) (prohibiting evidence of "a

---

**10.** The Commonwealth did introduce in the sentencing phase Meece's subsequent Fayette County conviction for complicity to commit murder in another instance, however, no issue is raised as to this. Only the fact that he had been convicted of a felony came in during the guilt phase.

This conviction resulted from Meece accepting a sum of money from undercover police officer Georgia Rose in Lexington, Kentucky on November 3, 2002, under a promise to kill her boyfriend in exchange for the down payment, and for an additional sum of money to be paid after the murder had been committed.

plea of guilty which was later withdrawn.").

Here, at trial, the Commonwealth presented the videotape of Meece's December 15, 2004 video statement first. This statement began as follows:

Present at this interview is William Meece, Brian Wright, the Commonwealth Attorney, Retired Det. Roy Wheat, Major Mike Sapp, myself, and Melissa Bellew, attorney for Mr. Meece. Bill again, at any time that we talk to you, you know we have to advise you of your rights again. I want you to understand that. That you have the right to remain silent. Anything you say, it can and will be used against you in a court of law. That you have the right to an attorney and have them present with you before any questioning, if you wish. And you can decide and exercise these rights and not answer any questions or make any statements, do you understand those rights?

Meece: I understand those rights. At the beginning of this conversation, this statement is being made as part of an outstanding *plea agreement*

Benningfield: Okay. Do you want to start out Brian?

Wright: Yeah, I'll start out a little bit. Mr. Meece we met sometime ago in Adair County and talked about some things. You gave a video taped statement at that time and we agreed at that time that we would come back later in all likelihood and get some more detailed information from you after we both had time to think about the conversation we had earlier. One of the main things that I wanted to cover and I'm just going to let you tell us as much about this as you can recall is what statements that Meg

made. We talked a lot about your actions, we talked a lot about the things that you recall saying and doing but I want to know more particular what Meg talked about and what she did. Specifically, beginning, I think you told us before that the initial planning of these murders began in December of 1992, and I want to know what statements that she made in regards to this planning. How this—how this planning developed and then what statements she made in regards to the actual murders themselves.

(Emphasis added). Meece then went on to describe Wellnitz's involvement in the murders, testified again about how he got in the house with the key she had given him and then went room-to-room killing the Wellnitz family.

Later, the Commonwealth played the video of Meece's November 15, 2004 statement, the pertinent parts of which were:

Benningfield: Bill [Meece], if you would just in your own words, you just tell us from the beginning, a little bit prior before this date that we discussed about and what took place.

Meece then detailed the planning and execution of the Wellnitz family murders. In this statement, he particularly described the killing of the Wellnitz family: [11]

We then drove to Columbia, the three of us, Meg [Wellnitz] drove down, Regina [Meade] drove back. Meg and Regina stayed in the car. Uh, I left the car and went down the lane. I opened the front door with the key provided by Meg. It was about four, plus or minus, 4:00 in the morning. I walked through the house to the back room where there had been a bed in the back room where Joe

11. Meece's ex-wife, Regina Meade, was never charged as a participant in the crime, as law enforcement personnel did not believe she actually participated as Meece said. She testified against Meece at trial.

and Beth had been sleeping and it had been down there Wednesday night when we came down. The bed was not there. As I backtracked through the house, I realized that there was someone in the downstairs bathroom at the end of the kitchen. That person later turned out to be Joe. He came out of the bathroom. As he came out of the bathroom, I engaged him and fired on him. He came toward me and I continued firing. He fell. I went upstairs, the end of the hall, Elizabeth was standing next to her bed. I engaged and fired on her. She fell. I came back down the hall, it took me a minute to figure how the door to Dennis's room worked, slid instead of opening forward and back, it slid left to right. I entered his room, he was sitting on his bed. I engaged him—I emptied the magazine of the weapon. He was still sitting up at the time. I dropped the magazine. I yelled for him to get on the floor. He got on the floor and I shot him in the back. I then picked up the magazine that I had dropped out of the weapon, put it in my pocket. Went through the house, made sure everyone was down. I fired no other rounds. I then went into the back bedroom and into the closet and got the fire box [safe]. Meg claimed the fire box might contain the deposit which should be about a thousand dollars.

The videotape later concluded:

Wright: I don't have anything else right now. Melissa is there anything else you want to say right now or ask right now?

Bellew: I can't think of anything right now. I'll think through it as we pause and if there's anything else

Wright: For purposes of both tapes, there is an audiotape being made and a video recording of this, this is made pursuant to your agreement to cooperate fully with us in the trial of *Commonwealth v. Margaret Ann Wellnitz*

*Appleton* and it is my understanding that if we have more questions that you will be available as part of your agreement to cooperate with us, to answer any questions we have and that may include some more questions, here in just a little while. After we take a break, *you enter your formal plea in open court* and then we come back, is that fair?

Bellew: Right. With his attorney present.

Wright: Certainly. Certainly.

Meece: That is correct. As long as my attorney is present, I am available at the discretion of the Commonwealth, with my attorney present.

(Emphasis added).

It is fair to say that when KRE 410 prohibits evidence in a criminal proceeding of "a plea of guilty which was later withdrawn," it means *any* evidence of *that* plea. It is also fair to assume, contrary to the Commonwealth's assertion, that references to a "plea" or "an outstanding plea agreement" or you will "enter your formal plea in open court and then we come back, is that fair?," within the context of the detailed statements concerning the Wellnitz family murders, could be understood by a lay juror as referring to Meece's forthcoming "guilty plea." Thus, it is violative of KRE 410(1) and its admission into evidence was error. Under these circumstances, we see no distinction between evidence that a defendant intends to plead guilty and evidence that he has already done so.

Still, given the voluminous motions filed and heard in this case and the multitude of objections made during trial, and in particular the time spent by the parties and the court dealing with the KRE 410 questions, it is difficult to understand why the simple solution of redaction was not called to the court's attention. Granted, the original motion to suppress did reference the

656

"guilty plea" in addition to requesting suppression of the statements of November 15 and December 15, 2004. However, the court in its ruling did not address this issue; quite probably, because the Commonwealth made no offer to introduce evidence of the formal plea, such as a certified copy of the "guilty plea" as dealt with in *Kercheval*, 274 U.S. at 224–225, 47 S.Ct. 582.

Yet still, at trial, it is hard to overlook two separate comments in the videotaped statements which referenced "a plea," and although the obligation to do so should fall upon all of the parties, the burden to do so lies with the defense. *Thompson v. Commonwealth*, 147 S.W.3d 22, 40 (Ky.2004) ("Even when an objection or motion has been made, the burden continues to rest with the movant to insist that the trial court render a ruling; otherwise, the objection is waived."). "It should not be permissible to frame an objection that . . . will serve to save a question on appeal [, the 'guilty plea,'] and yet conceal the real complaint [, two quick references to his 'forthcoming plea,'] from the trial court." *West v. Commonwealth*, 780 S.W.2d 600, 603 (Ky.1989) (*citing* 7 W. Bertelsman and K. Philipps, *Kentucky Practice*, Rule 46 at 154–157 (4th ed.1984)).

■ In this respect, RCr 9.22 requires a contemporaneous objection to exclude evidence, unless the court has ruled upon a fact-specific, detailed motion in limine that fairly and adequately apprised the court of the specific evidence—not just the class of evidence—to be excluded and the basis for the objection. *Lanham v. Commonwealth*, 171 S.W.3d 14 (Ky.2005), *overruling in part Tucker v. Commonwealth*, 916 S.W.2d 181, 183 (Ky.1996); *Davis v. Commonwealth*, 147 S.W.3d 709, 722–23 (Ky.2004). In this instance, although the motion, in its preamble, addressed the exclusion of both videotaped statements and the actual "guilty plea," i.e., the formal plea—the arguments and order addressed only the admissibility of the two statements. In his brief, Meece has not directed us to any part of the record where counsel made, or reiterated, or renewed, a request for ruling on these two indirect comments to "a plea." Thus, given Meece's failure to object at the time the evidence was offered, as well as his failure to request a ruling of the trial court in this regard on his motion in limine, or for that matter, to request a redaction, the error was waived.

■ Thus, we address the error under the standard set forth in *Sanders*, 801 S.W.2d at 668. "Recognizing the requirements of KRS 532.075(2), we [have] noted that such do not require 'total abandonment of the rules of preservation.'" *West*, 780 S.W.2d at 603; *See also Murray v. Carrier*, 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). And, "[i]n the absence of exceptional circumstances, a defendant is bound by the trial strategy adopted by his counsel even if made without prior consultation with the defendant. The defendant's counsel cannot deliberately forego making an objection to a curable trial defect when he is aware of the basis for an objection." *West*, 780 S.W.2d at 602.

Here, Meece, joined by counsel, specifically mentioned KRE 410's ban on evidence of a "guilty plea" in the motion to suppress. However, once the court ruled on the admissibility of the statements, they made no additional, or clarifying, requests for any ruling as to the references to "a plea" in the statements. Although that failure may be explained by the fact that the formal guilty plea was *not* introduced into evidence, it still does not explain the failure to object to the comments at issue now, when they were available to Meece and counsel at the time, via the videotape and their transcripts.

Certainly, the record does not suggest that Meece and counsel were unaware of

these statements. In fact, the comment in the December 15, 2004 statement (the first played) was *made by Meece* just as the interrogation began, an indication that the making of the statement *was very important to him at that time and in that place.* As such, it supports, or suggests, that Meece's failure to ask for the simple redaction of these statements was a tactical decision. Meece's motion to bar evidence of the "guilty plea" was of record, the Commonwealth was not planning—and did not attempt—to introduce formal evidence of the actual plea, and the trial court did not, therefore, render a ruling. Thus, we find the decision *not* to object was strategic—whatever happened later, they had an error "in their pocket."

This having been said, however, we are convinced that under the totality of the other evidence presented, i.e., Meece's statements of November 15 and December 15, 2004, Wellnitz's statements, including her videotaped statement, as well as that of his ex-wife, Regina Meade, who gave testimony that directly incriminated him in the murders (that Meece had the Wellnitzes' safe with him early that morning when he and Wellnitz returned), that Meece would have been found guilty of the capital offenses and given the death penalty even without this alleged error. Thus, any error in this instance was harmless.

### e. Purchase of the Browning Hi–Power Pistol

█ Following the murders, Meece and Wellnitz were early suspects. Moreover, evidence came to the attention of the police that Meece had a Browning Hi–Power pistol weeks before the murders. When asked of it, however, Meece explained that he had borrowed it from "a

friend of a friend" to see if he might want to buy it. He also admitted to having shot targets with the pistol near Salt Lick, Kentucky, but later decided not to buy it and returned it to the friend a week before the murders. Meece would not tell the police the alleged person's name because the friend was allegedly a felon and possession of a handgun would "have been another crime."

Kentucky State Police (KSP) ballistics experts at the time, however, had tested a Tokarev pistol and found its rifling so similar that they believed the barrel of the murder weapon had been produced on the same machine, either right after the Tokarev or in close proximity. Consequently, their initial list of potential murder weapons contained only two brands of pistols, Tokarevs and Norincos. The pistol Meece had was a Browning.

Meece's first trial began years later in November 2004. Following a week of voir dire, and due to alleged continuing problematic, conflicted relationships with counsel, Meece entered into a plea bargain with the Commonwealth in exchange for the prosecutor's recommendation of life without the possibility of parole for twenty-five years and (as alleged by Meece) the further agreement to assist in an extended visit between Meece and his young children. As noted earlier, this plea was entered and then set aside at Meece's request.

However, these plea discussions were "jumpstarted" by Meece's then counsel offering the Commonwealth previously unknown information about Wellnitz's purchase of the Browning Hi–Power pistol. This disclosure led to the plea discussions and ultimate plea bargain, which Meece testified he needed at the time.[12]

---

12. Meece also argues that such disclosure by his counsel was in violation of his attorney-client privilege. Yet, he only implies the disclosure was without his permission, he does

not directly state it. Obviously, the disclosure of client information without a client's permission violates the privilege, yet, disclosure

As a result of the divulgence of this information, Meece alleges the prosecution was able to track down the United States Bureau of Alcohol, Tobacco, and Firearms (ATF) form for the transaction[13] and the salesman who sold the gun to Wellnitz. The salesman was then able to pick Meece out of a photo line-up as having been present when Wellnitz purchased the pistol.

Prior to trial, Meece moved to suppress evidence concerning the purchase pursuant to KRE 410 as "fruit of the poisonous tree." The Commonwealth countered that its discovery was inevitable and that this Commonwealth has never imported the "fruit of the poisonous tree" doctrine into this area.[14]

Following a hearing on the issue on August 11, 2006, the trial court denied Meece's motion in limine, finding: "Wellnitz divulged the information leading to discovery regarding the purchase of the Browning Hi–Power handgun during her December 31, 2004 statement." Furthermore, the trial court indicated that:

> Additionally, the Court disagrees with Defendant's argument that if said discovery is the "fruit" of plea negotiations it is inadmissible. Although KRE 410 does limit the admissibility of a statement made in the course of formal plea proceedings, investigative work derived from the statement and producing discovery is not excluded by the rule.

Moreover, following Meece's execution of his formal plea agreement on November 15, 2004, Meece gave his first videotaped statement, wherein he was asked and answered in pertinent part, as follows:

Question: Bill, if you would just in your own words, you just tell us from the beginning, a little bit prior before this date that we discussed about what took place.

Meece: . . . . [Wellnitz] had a false I.D. We went and bought . . . a gun. [Meade] was not present when we bought the gun. [She] was aware that I was buying the gun. I used money from my tax refund that year to buy the gun. [Wellnitz] later paid me that money back—that $500—and by way of paying my bond on an unrelated charge that was later dismissed. We purchased the weapon from Sports Unlimited in Lexington, Kentucky on Boston Road. It was a Browning Hi–Power, 9mm. She used a fake I.D. to purchase the gun.

Wellnitz gave her statement on December 31, 2004. In her statement, she said that the plan to purchase the gun was suggested by Meece. At the time of the purchase, Meece was not yet twenty-one years old, and as a result, she agreed to purchase it. She went to Sports Unlimited, accompanied by Meece, where she purchased a Browning Hi–Power 9mm under

---

with permission does not. KRE 503(b). As a record has yet to be made concerning whether the communication was made with permission or was a breach of the privilege, we will not address this issue at this time. KRE 503(d)(3); RCr. 11.42(6) ("At the conclusion of the hearing or hearings, the [trial] court shall make findings determinative of the material issues of fact and enter a final order accordingly.").

13. The ATF form indicated the gun was purchased on February 8, 1993, a little over two weeks before the murders.

14. For the proposition that the rule should be imported, Meece cites to *United States v. Ankeny*, 30 M.J. 10 (C.M.A.1990) and Joseph McLaughlin, *Weinstein's Federal Evidence*, § 410.09[4] (2d ed. 2005) ("It would seem that, to enforce the policy underlying Rule 410, the better approach would be to import the fruit of the poisonous tree' doctrine into this area.").

the name of April Beagley. She noted that, while in college, the real April Beagley had provided her a copy of her birth certificate and a Social Security card. She stated that she used these documents to obtain a driver's license so that she could drink while underage. She used this license to purchase the 9mm Browning from Sports Unlimited. Wellnitz also indicated that Meece gave her the $500 which she then gave to the cashier to purchase the pistol. Thus, the record discloses two statements made by Meece and Wellnitz concerning the purchase subsequent to the disclosure of it by Meece's prior counsel. Although such a statement by Meece's counsel is protected by KRE 410, neither Meece's nor Wellnitz's subsequent statements are afforded such protection.

In its Fourth Amendment context, in order for a defendant to invoke "the fruit of the poisonous tree doctrine," a "defendant must show that: (1) he or she has standing to challenge the original violation, i.e., the tree; (2) the original police activity violated his or her rights; and (3) the evidence sought to be admitted against him or her, i.e., the fruit, was obtained as a result of the original violation." Leslie W. Abramson, 8 Kentucky Practice, *Criminal Practice and Procedure*, § 17:5 (2010–2011). If so, "[t]he exclusionary rule requires the suppression of any evidence that is either the direct or indirect result of illegal police conduct." *Id.*

"A court will, however, admit the fruit of the poisonous tree if the prosecutor establishes that: (1) the evidence was obtained from a source independent of the primary illegality; (2) the evidence inevitably would have been discovered in the course of the investigation; or (3) the connection between the challenged evidence and the illegal conduct is so attenuated that it dissipates the taint of the illegal action." *Id.*

Here, neither Meece's November 15, 2004 statement nor Wellnitz's December 31, 2004 statement is protected by KRE 410. Thus, any application of the "fruit of the poisonous tree" doctrine would be of no benefit. *See United States v. Magee,* 821 F.2d 234, 243 (5th Cir.1987) ("But, Rule 11(e)(6) and Rule 410 declare inadmissible only *statements* made during the course of plea discussions. On their face, these rules do not preclude the admission of evidence derived from such statements." *Magee* went on, however, to find, "it unnecessary, however, to decide whether the[ ] rules bar evidence derived from such statements because the district court did not err in concluding that the evidence *Magee* finds objectionable was not derived from Magee's statements.")

We also find it unnecessary in this instance to determine whether derivative evidence is barred by KRE 410, because we conclude that the evidence Meece finds objectionable was derived from his and Wellnitz's statements. Thus, we find no error. *See Winstead v. Commonwealth,* 283 S.W.3d 678 (Ky.2009).

### 2. K.D. Felice

K.D. Felice was an undercover police officer for the Kentucky State Police (KSP). In March 1994, Meece was working at TrueGreen ChemLawn when Lexington Police Detective Roy Wheat placed Felice on the job with Meece to see what statements Meece might make concerning the Wellnitz murders. Thereafter, Felice rode around with Meece for approximately three weeks while he trained her to be a salesperson. During this association, she fabricated a story about wanting to kill her abusive husband to lure Meece into talking. At the time, she was wired with a transmitter and ultimately about sixty hours of these conversations were recorded. The undercover operation ended after her rejection of Meece's sexual advances as Meece thereafter reported her to the

Lexington Police as trying to hire someone to kill her husband.

### a. Meece's Statements to Felice

Prior to trial, Meece moved to suppress evidence of his conversations with Felice on various grounds, including KRE 404, his Fifth Amendment right to remain silent, and his Sixth Amendment right to counsel. The motion to suppress was overruled and Felice testified on direct to statements that Meece made to her during the undercover investigation.[15]

Meece's statements (or conduct) introduced through Felice were:

1. *The target outside Meece's work cubicle*—Felice testified that Meece had a black and white human silhouette target hanging outside his cubicle at ChemLawn with approximately twenty-six bullet holes in an upper body spray pattern.

2. *The dry-firing of the gun at Felice*—Felice stated that, while pointing to the human silhouette target with the twenty-six bullet holes in it, Meece said to her, "By the way, what did that little trick on the wall was this" and then pulled a 9mm weapon out of his briefcase. Felice went on to testify:

 > It was a Sig Sauer 9mm, [he] pointed it at me and dry-fired twice.... He showed me the weapon and explained it ... he described the weapon. He showed me that it wouldn't shoot if he pulled the trigger without one [a bullet] ... in the chamber, so that he could dry fire it, but [there] were bullets in the chamber that he dropped [took out] and showed me how it worked.

3. *Meece's experience with lying*—Felice testified that Meece "said that he had experience lying about himself with a straight face to people. He claims to be good at it.... He said 'I can lie with a straight face and not feel bad about it at all.' He said reality was a mild inconvenience."

4. *Statements about killing Marshals*—Meece told Felice that "If someone tries to send the Marshals after him, he'd send back bodies."

5. *Statement about police hunting you down*—Meece made the comment to Felice, "If you shoot, they'll find you. It may take them thirty years, but they'll find you and you will die when they do. They'll find you; they'll hunt you down like the dog that you are. They will treat you real mean."

6. *Statement about getting rid of the evidence*—Felice testified:

 > While discussing how to get rid of a gun after a murder, he said, you don't buy it in your name [so] it can't be traced, where it can't be traced or anything. I asked, what would you do with it? He said, throw it away, leave it in a garbage can, put it in a garbage can at like an Arby's, in their dumpster and you don't have to go to the dump. Say you're shooting in the east end of Lexington, you go over Nicholasville Road and put it in a plastic bag, a white plastic bag and you put it in the dumpster. It looks like any plastic bag with the 6 zillion other plastic bags. It's viable physical evidence. Even the clothes you wear. And you don't even leave any evidence, you don't. It doesn't matter if there were no witnesses or no evidence. It doesn't matter what people think. What matters is that people can, what people can prove. I'm not a nice person. You gotta trust what I'm saying. No, I

---

**15.** The audiotape of these conversations was not played for the jury.

just don't know how, I just know how to kill people. If you train long enough and hard enough, and you do it enough, it all becomes a question of logistics.

7. *How to act after the murder*—Felice testified, "When discussing how to act after a murder, I said, "I'd look guilty." He said, 'You just act like nothing ever happened, convince yourself it was no big deal.'"

8. *The 124 grain comment*—Felice testified that Meece said, "[i]f someone's pointing a pistol at me, what is going, what's he going to do? Is he willing to hold onto it so bad he is willing to get shot? He won't after the first 124 grain hollow point hits him, the first bullet. When the first bullet hits you it will wake you up, that's a fact, this is your wake up call."

9. *Head shots*—According to Felice, Meece said, "Head shots. Take a head shot with a 9mm hollow point, she's on the ground. Not a problem. The target is not a problem with a head shot with a 9mm, someone is left dying. Good night. See you wherever you are headed. Say hi for me, I've got friends there."

10. *The smell of cordite and fresh blood*—Felice testified that Meece "talked about the smell of cordite, which is a, when you fire a weapon it's the powder. And he said the smell of cordite and fresh blood after you've shot someone, he was telling me about it, but not to worry about it because it didn't last very long. Then he went through a lesson about what cordite was, and, in an instructional way again, like he's telling somebody, I was acting like I didn't know what he was talking about."

11. *Shocked look*—Felice testified, "I asked him if he saw the bodies. He said, asked, 'Of the Wellnitz family?' I said, Whoever.' He said, 'Yeah, I've seen bodies before.' I asked, What kind of look did they have on their faces?' He paused and he said, 'Shocked mostly.'"

12. *Instructions for killing her husband*—Felice testified that Meece told her to shoot her husband twice in the body and once in the head, then watch for five minutes to see if he moved. He also told her to surprise him and instructed her to wash the cordite off of her hands and to throw everything in a dumpster halfway between Lexington and Pikeville.

#### i. *KRE 404*

KRE 404(b) reads, in pertinent part:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible:

(1) If offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident; or

(2) If so inextricably intertwined with other evidence essential to the case that separation of the two (2) could not be accomplished without serious adverse effect on the offering party.

 "We note at the outset that KRE 404(b) is not limited to other acts that are criminal or unlawful, but applies to any acts offered to prove character in order to show action in conformity therewith." *Davis v. Commonwealth*, 147 S.W.3d 709, 723 (Ky.2004) (*citing* R. Lawson, *The Kentucky Evidence Law Handbook*, § 2.25[2], at 125 (3d ed. Michie 1993)). "The word 'character,' used most narrowly and accurately, describes the personal disposition or personality of an individual." Lawson, *supra*, § 2.15[2] at 97. However, such acts must amount to

"bad acts" or "misconduct." *Kentucky Farm Bureau Mutual Insurance Company v. Rodgers,* 179 S.W.3d 815, 819 (Ky. 2005) ("The rule precludes evidence of other acts of misconduct . . . ."); *see also United States v. Rodriguez,* 831 F.2d 162, 169 (7th Cir.1987) ("Proof of an automobile accident is not proof of a prior crime or even a bad act."). And, such evidence must relate to *"other* crimes, wrongs, or acts," rather than the actual crime charged. KRE 404(b); see also R. Lawson, *The Kentucky Evidence Law Handbook,* § 2.25(2), p. 124 (4th ed. 2010) (Such questions usually arise "in criminal cases when evidence of other crimes or bad acts (other than the ones formally charged) is offered against defendants.").

Moreover, "[t]he proscription in KRE 404(b) does not apply to evidence that is probative for a purpose other than proving a person's character in order to show action in conformity therewith." *Davis,* 147 S.W.3d at 723. "KRE 404(b)(1) enumerates some of [these] 'other purposes,' including motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. [These] listed purposes are illustrative rather than exhaustive.'" *Id.* (citing Lawson, *supra,* § 2.25[2], at 151). And, even so, such evidence must also pass the test of KRE 403. Thus, we review the admissibility of evidence of "other crimes, wrongs, or acts" under the three-part test set out in *Bell v. Commonwealth,* 875 S.W.2d 882, 889–91 (Ky.1994).

Once it is determined the evidence relates to "other crimes, wrongs or acts," the first inquiry under *Bell* concerns relevance: "Is the . . . evidence relevant for some purpose other than to prove the criminal disposition of the accused?" *Id.*

"[E]vidence of criminal conduct apart from the crime charged is admissible if the evidence tends to prove a particular way of doing an act, or to prove a particular skill." *Commonwealth v. Hodge,* 380 Mass. 858, 406 N.E.2d 1015, 1019 (1980) (*citing Commonwealth v. Davis,* 376 Mass. 777, 384 N.E.2d 181 (1978)). Secondly, the probativeness of the evidence is examined: "Is evidence of the [other crime, wrong, or act] sufficiently probative of [its actual] commission by the accused to warrant its introduction into evidence?" *Bell,* 875 S.W.2d at 890. Finally, *Bell* instructs us to look at KRE 403 prejudice: "Does the potential for prejudice from the use of [this] evidence substantially outweigh its probative value?" *Id.*

The relevancy test is easily understood, while the probativeness "aspect of the *Bell* test relates to whether there is sufficient evidence that the 'other crime, wrong, or act' actually occurred." *Davis,* 147 S.W.3d at 724. And, "[a]lthough relevant and probative, the evidence can still be excluded [under the prejudice test] if its probative value is substantially outweighed by its prejudicial effect." *Id.* at 725; KRE 403.

### ii. Analysis of The Statements

#### (a.) The Target Outside Meece's Work Cubicle

At trial, Felice testified that Meece had a black and white human silhouette target hanging outside his cubicle at ChemLawn with approximately twenty-six bullet holes in an upper body spray pattern.[16] Meece objected on relevance, KRE 404(b), and lack of notice under KRE 404(c).

---

**16.** Other evidence was introduced that Meece had purchased human silhouette targets for target practice from Galls.

As to notice, the Commonwealth filed its KRE 404(b) notice on November 1, 2004. A hearing was held on the evidence on November 10, 2004, wherein the trial court found, regarding the Felice testimony, that Meece had been provided with the tape recorded conversations "quite some time ago" and "was present and a party to these conversations, hence, surprise is not applicable." Due to his subsequent withdrawal of his guilty plea, Meece was not tried until August 2006.

Under the *Bell* test, this evidence was clearly relevant to establish Meece's ability, knowledge, and competency with pistols and their shooting. The evidence having established its occurrence meets the second test of probativeness.

Here, "the Commonwealth had the right to show the defendant's particular way of firing at targets representing human beings and his skill in doing so, through the use of evidence of his public acts in the practice of a reputable occupation." *Hodge*, 406 N.E.2d at 1019. In this case, it was an "upper-body spray." "This evidence, of course, was prejudicial to [Meece], but it was not unfairly prejudicial." *United States v. Latorre*, 922 F.2d 1, 8–9 (1st Cir.1990) ("The testimony about the prior [crime], if believed, established beyond any doubt that the [defendant] had the experience, skill, knowledge and resources to plan and carry out [another similar crime].").

Many people target practice and, many of those who do, are, or become, good shots. Quite plainly, there is nothing inherently wrong, or unduly prejudicial, with respect to this evidence—even the bragging about, or holding, the pistol with which he professed to have shot the target. Thus, the probative value of this evidence, his knowledge, ability, and competency with pistols, is not substantially outweighed by any undue prejudice, and it

was therefore, admissible. There is no abuse of discretion here.

*(b.) The Dry–Firing of the Gun at Felice*

▮ In drawing attention to the pistol he shot at the target, Meece pointed it at Felice during their discussion while they were at his apartment and dry-fired it twice.

Meece argues that the act of dry-firing towards Felice during his explanation of the weapon was nothing more than propensity evidence, as was prohibited in *Arnett v. Commonwealth*, 470 S.W.2d 834, 837 (Ky.1971). We note, however, that the brandishing of the weapon in *Arnett*, "tended to show acts which constituted the commission of another offense by the accused (drawing or flourishing a deadly weapon, KRS 435.200) at a different time and place." *Id.* In this instance, the handling, dry-firing, and explanation of Meece's use of the weapon was a demonstration of his knowledge and competency. Again, we find this evidence to have met the Bell test for admissibility.

The pointing of a pistol, however, at another person, whether loaded or not, would be characterized by any reasonable person as a wrongful or bad act, and therefore carries with it some prejudice. Yet, its value, in this instance, is not substantially outweighed by any undue prejudice his conduct may have brought about, as it demonstrated Meece's knowledge and handling of the pistol he used to make the holes in the silhouette. Therefore, we find no abuse of discretion.

*(c.) Meece's Experience with Lying*

▮ Felice also testified that Meece said "that he had experience lying about himself with a straight face to people. He claims to be good at it ... he said I can lie with a straight face and not feel bad about

it at all. He said reality was a mild inconvenience."

Although a person who visits the murder victims in their home several nights *before* the murder in order to case the premises must exhibit some unusual control of his emotions and expressions, the other side of this evidence amounts to, "once a liar, always a liar." Given its introduction in the Commonwealth's case-in-chief, rather than having been explored on cross-examination of Meece with a foundation laid via KRE 613(a), it, at least, amounts to a preemptive attack on Meece's credibility prior to his testimony or the beginning of his defense. Moreover, it reflects upon a trait of character within the confines of KRE 404(b). As such, and given its tenuous connection to relevancy as surmised, we cannot help but view its probative value as minimal. Thus, we find its probative value was substantially outweighed by its danger of undue prejudice. KRE 403. Thus, the trial court abused its discretion in this instance and the admission of this comment preemptively attacking Meece's credibility was error.

 That is not to say, however, that the error was harmful under our standards. *See Winstead,* 283 S.W.3d at 688–89 (regarding evidentiary error). This testimony was elicited from Felice rather quickly and was one of several comments allegedly made to her by Meece. Moreover, Meece's own defense and his subsequent denial of the offense was constructed around his alleged ability to lie and deceive people, even his friends.

During his testimony, Meece acknowledged that he had lied a lot in his life, and that he lost count of how many times he has lied to the State Police about this case. According to Meece, his statements of November 15 and December 15, 2004 were fabrications; the timelines and detailed information disclosed therein having come from his reading of the voluminous discov-

ery. According to Meece, he wanted and entered into the original plea agreement solely to get a continuance, new counsel, and another trial. And, when asked if he was good and experienced at lying, he replied, "I'm not very good at it, but I'm experienced at it." He also acknowledged that, "at other times in my life, it [ (lying) ] has been a problem for me."

Clearly, a significant portion of his testimony concerned his ability and inclination to lie when it benefited him. According to his own defense, he had to be able to lie well, otherwise he could not have gotten the plea deal which gave him the continuance, new attorney, and new trial.

 As a general rule, the erroneous admission of evidence in violation of state law is not a federal constitutional error. And, as the Supreme Court of the United States noted in *United States v. Hasting,* 461 U.S. 499, 509, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983):

> Since *Chapman* [*v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) ], the Court has consistently made clear that it is the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless, including most constitutional violations.... The goal, as Chief Justice Traynor of the Supreme Court of California has noted, is "to conserve judicial resources by enabling appellate courts to cleanse the judicial process of prejudicial error without becoming mired in harmless error."

(Internal citations omitted); *See also* RCr 9.24. And, as we explained in *Winstead:*

> [N]on-constitutional evidentiary error may be deemed harmless ... if the reviewing court can say with fair assurance that the judgment was not substantially swayed by the error. *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). The inquiry

is not simply "whether there was enough [evidence] to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand." *Id.* at 765, 66 S.Ct. 1239.

283 S.W.3d at 688–689.

Given that Meece's defense was premised upon his videotaped statements of November 15 and December 15, 2004 having been successful lies, and considering the other evidence produced through his ex-wife and Wellnitz, this statement to Felice was indeed harmless.

### (d.) Statements About Killing Marshals If They Came After Him

█ Meece argues that this statement clearly conveys that he is a violent person who dislikes police. As such, he argues it has no relevance to the charges other than raising an impermissible inference concerning his propensity toward violence and should have therefore been excluded. We agree.

Admittedly, the general inclination here would be to characterize this statement (as to a hypothetical future event) as reflecting a propensity for violence, and therefore falling within the ambit of KRE 404(b), requiring review under the three *Bell* factors.[17] 875 S.W.2d at 889–91 (Ky.1994). Such a reference to a "propensity for violence" is a reference to "the personal disposition or personality of an individual." Lawson, *supra,* § 2.15[2], at 97.

Thus, the first inquiry we make is whether the evidence is relevant for some purpose other than to prove the criminal

disposition of the accused. We do not believe it is. Granted, the miniscule portion of the population of any civilized society that could commit such a crime as occurred here carries a propensity for violence. Yet, the existence of such a generalized propensity is not sufficient to pass our tests for the identity exception. *Clark v. Commonwealth,* 223 S.W.3d 90, 98 (Ky. 2007) (This "exception is met only if the conduct that meets the statutory elements evidences such a distinctive pattern as to rise to the level of a signature crime."). This is so, as generally such a propensity's undue prejudicial value is high enough to overwhelm the relative minimal probative value of such a generalized propensity. Thus, as here, the introduction of this statement was error.

█ An evidentiary error, however, may be deemed harmless, as we noted in *Winstead,* 283 S.W.3d at 689:

if the reviewing court can say with fair assurance that the judgment was not substantially swayed by the error. *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). The inquiry is not simply "whether there was enough [evidence] to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand." *Id.* at 765, 66 S.Ct. 1239.

Here, the jury was aware from the evidence of the numerous contacts Meece had with the investigating officers during their lengthy investigation—contacts where nothing threatening to the officers ever

---

17. For purposes of this analysis, we assume, but do not decide, that Meece's hypothetical statement about a hypothetical future event is an "act." *See United States v. Andrini,* 685 F.2d 1094, 1097 (9th Cir.1982) ("At the outset, we doubt that [the witness's] testimony

concerning the [hypothetical] 'plastic bottle' statement is evidence of an 'act' under Rule 404(b)."); *But see United States v. Carroll,* 871 F.2d 689 (7th Cir.1989); *United States v. Micke,* 859 F.2d 473 (7th Cir.1988).

occurred. Moreover, they were also aware of his propensity to recast himself as a fictional tough-guy—i.e., a Navy SEAL and a "black-ops" operative—even as a young man while in high school. These creations of his were surely not credible under the facts adduced. Moreover, Meece's confession and Wellnitz's statement to the police provided compelling evidence of Meece's capacity to commit these crimes; and, as contrasted with the erroneously admitted statement listed herein, as well as several following, leave us with no doubt that the admission of Felice's testimony in this regard did not sway the judgment in this case.

### (e.) Statement About Police Hunting You Down

 Felice also testified that "Meece made the comment, if you shoot, they'll find you. It may take them thirty years, but they'll find you and you will die when they do. They'll find you; they'll hunt you down like the dog that you are. They will treat you real mean."

Here, the gist of his statement is "you can't get away with murder." The statement was made in 1994 and Meece was not charged and arrested for the crime until almost a decade later. Essentially, however, it has very little, if any relevance and it takes a strained reading to construe it as an admission. Relevant evidence is evidence tending to make a fact or consequence more or less probable. KRE 401. In any event, it could be taken as nothing more than Meece's opinion, and its admission was error. That having been said, however, the comment is so innocuous in its wording and effect as to be harmless under our standards.

### (f.) Statement About Getting Rid of Evidence

 As to the last several comments here regarding Meece's "not being a nice person" who knows "how to kill people"

because of his training and that it "all becomes a question of logistics," we have already addressed similar matters as to the relevancy and admissibility of such evidence, and again, we find their admission to have been error for the same reasons. However, given the other evidence adduced, i.e., his admission and Wellnitz's statements, the admission of this evidence was harmless.

The comment as to how to get rid of the other evidence of a crime is consistent with his confessional statements as to what *he actually did* with the various items. It is consistent with the fact that they were *never* found. Thus, a reasonable juror could have believed that all of these statements referred to and constituted admissions of the crimes charged. As such, these statements were admissible under KRE 801A(b) and outside KRE 404, since they were neither character evidence nor evidence of an "other" crime or bad act.

Thus, as to this evidence, we find no abuse of discretion by the trial court in admitting this evidence within the context of the evidence in this case.

### (g.) How to Act After the Murder

 Here, Felice testified, "[w]hen discussing how to act after a murder, I said I'd look guilty. He said, You just act like nothing ever happened, convince yourself it was no big deal.'" This comment reflects upon his psychological ability or capacity to deal with the results. As such, it deals with his character.

Concededly, it opens a circumstantial window to his mind, but one that for reasons we already mentioned was only minimally relevant in defining a person who could commit such a crime as occurred. And as such, it has no relation to any of the exceptions set out in KRE 404(b). Thus, as proof of a character trait, the admission violated KRE 404. Yet, again, when weighed against the other admissible

evidence, we find it harmless under *Winstead.*

Meece's defense and admission were, like this, that he often lied to his friends and created scenarios and personalities. According to him, it was just role-playing.

### (h.) The 124 Grain Comment

■ Here, Meece argues that the evidence had no relevance to the case and was otherwise unduly prejudicial.

This argument ignores, however, the fact that the Wellnitzes were shot with 124 grain hollow point ammunition. In recognition of this tie-in to the crime, Meece also argues that the statement should have been redacted to remove the taint of the "fictitious" shoot-out. Yet, this context is important to explain Meece's choice of a "124 grain hollow point" for personal confrontations. Here, the statement is highly relevant and inextricably intertwined with the context within which it was stated. KRE 404(b)(2). Therefore, we find no abuse of discretion in the admission of this statement.

### (i.) Head Shots

■ Again, Meece argues this evidence was irrelevant, but if the "head shot" comments were marginally relevant, he asserts that the portion beginning with "Good night" should have been excluded because of its undue prejudice. We agree.

Most would concede that it takes a certain amount of depravity to commit murders such as occurred to the Wellnitz family. Thus, a certain amount of insight into the psychological ability or capability of a defendant to plan and execute, and handle the emotional and psychological ramifications of the results can be relevant. But, this is exactly what KRE 404 prohibits. It is character evidence without the exactness necessary to meet the "identity" ex-

ception of KRE 404(b). *See Clark,* 223 S.W.3d at 96. But, again, its admission was harmless given his and Wellnitz's statements as to the actual events.

### (j.) The Smell of Cordite and Fresh Blood

■ Meece argues that this evidence was not relevant and that it was unduly prejudicial. Admittedly, this evidence "was prejudicial to [Meece], but it was not unfairly prejudicial." *Latorre,* 922 F.2d at 8–9.

Here again, a reasonable juror could have believed that these statements referred to and constituted implicit admissions of the crimes charged as there was no proof that he had some other experience shooting people. And, the smell of cordite occurs even with target practice. Thus, it is not even a "bad act." Plainly, these statements were not introduced merely as evidence of another crime or an uncharged act, but as a statement from him of his own experience in these matters.[18] As such, they were clearly relevant and were not unduly prejudicial. Thus, the trial court did not abuse its discretion in allowing the introduction of these statements.

### (k.) Shocked Look

■ Meece makes the same argument with regard to this statement (that this evidence was not relevant and that it was unduly prejudicial).

When considered within the context of the other statements made and given that a reasonable juror could believe that by this, he was really referring to the Wellnitzes, this statement, again, is clearly relevant. Being relevant, its "probative value [was not] substantially outweighed by the danger of undue prejudice." KRE 403. Thus, we find no abuse of discretion here.

18. Again, we assume—but do not decide— that this statement is an act. *See* KRE 404(b).

*(l.) Instructions for Killing
Her Husband*

Meece argues this entire sequence is extremely prejudicial "because of the way it reflects on Meece's character. Only someone with a propensity for violence would plan someone's murder in such detail. But it has no relevance to the charged crimes." We disagree.

In fact, in his videotaped statements, Meece explained that he threw everything from the Wellnitz murders in a dumpster. Moreover, according to his statements, he surprised the Wellnitz family in the early morning hours. These statements are relevant to the question of Meece's ability and skill to plan and execute the Wellnitz murders. They do not deal with character and are consistent in large part with what occurred. Thus, a reasonable juror could have believed these statements reflected on the Wellnitz murders, and thus, they constituted admissions relative to the crimes. We find no abuse of discretion.

*b. Felice's Inquiries of Meece Did Not
Violate His Rights to Counsel or
to Remain Silent*

Meece also asserts that Officer Felice's surreptitious questioning of him violated his Fifth and Sixth Amendment rights to remain silent and to counsel under the United States Constitution, as well as under Sections Eleven and Fourteen of the Kentucky Constitution. Following an evidentiary hearing on October 8, 2004, the trial court disagreed, denying his motion to suppress Felice's testimony on these grounds.

In 1993, Meece agreed to submit to a polygraph examination at the Lexington Police Department. During the pre-interview work-up with the polygraph examin-er, Detective Dell Jones of the Lexington Police Department, Meece became angry and terminated the examination when the questions veered to the Wellnitz murders.[19]

Thereafter, according to Meece, the examiner purposely delayed unhooking him and continued to try to convince him to continue the exam for ten minutes, that is, until Meece threatened to rip the polygraph leads off. In addition, as he exited the examination room, he was met by police officers in the hallway and—as the officers tried to continue interrogating him—he told them that he had nothing else to say to them without the presence of a lawyer.

KSP Trooper Jeff Hancock testified at the hearing that Meece never indicated any desire for an attorney. Instead, Meece demanded that the officers call ahead or otherwise give him notice before they came back around or he (Meece) would consider their contact an act of hostility. Likewise, KSP Detective Roy Wheat testified that as he met Meece in the hallway after the termination of the polygraph examination, Meece indicated he did not want to talk to the police unless they called ahead and that anything less would be viewed as an act of hostility. According to Detective Wheat, Meece never indicated any desire to contact an attorney or to have an attorney present at any future meetings. Thereafter, the trial court made a finding that "[b]ased upon the testimony the court hereby finds that [Meece] did not invoke his Sixth Amendment right to counsel or his Fifth Amendment right to remain silent. Therefore, the subsequent questioning by Officer Felice will not be suppressed."

"When reviewing [a] trial court's findings of fact after a suppression hear-

---

19. Meece asserts he had agreed with Detective Wheat to polygraph questions concerning the Browning Hi–Power pistol and nothing else.

ing, the [findings] shall be conclusive if 'supported by substantial evidence.' " *Peyton v. Commonwealth,* 253 S.W.3d 504, 514 (Ky.2008). Meece contends, however, that the findings of the trial court were "conclusions," rather than "findings." Given the context of the trial court's statement immediately following the recitation of the conflicting evidence, we disagree.

▮ The court found that Meece *did not* assert his right to remain silent, nor invoke his right to counsel. "If the individual indicates in any matter, at any time prior to or during questioning, that he wishes to remain silent, interrogation must cease." *Michigan v. Mosley,* 423 U.S. 96, 99, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). Yet, even when one does so, the assertion or invocation must be unequivocal. *Davis v. United States,* 512 U.S. 452, 460–61, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994); *See also Berghuis v. Thompkins,* —— U.S. ——, 130 S.Ct. 2250, 2260, 176 L.Ed.2d 1098 (2010) ("There is good reason to require an accused who wants to invoke his or her right to remain silent to do so unambiguously."); *Ragland v. Commonwealth,* 191 S.W.3d 569, 586–87 (Ky.2006).

▮ However, there is "no ritualistic formula or talismanic phrase [that] is essential in order to invoke the privilege against self-incrimination." *Emspak v. United States,* 349 U.S. 190, 194, 75 S.Ct. 687, 99 L.Ed. 997 (1955); *See also Thompkins,* 130 S.Ct. at 2260 ("Thompkins did

not say that he wanted to remain silent or that he did not want to talk with the police. Had he made either of these simple, unambiguous statements, he would have invoked his 'right to cut off questioning.' ") (*quoting Mosley,* 423 U.S. at 103, 96 S.Ct. 321).

In this instance, Meece was given *Miranda* warnings during the polygraph examination, and, prior to and after, terminating the polygraph, signed a waiver of his *Miranda* rights. He then left the station and now asserts he invoked his right to remain silent and his right to counsel and that this invocation barred any further questioning of him by Felice.

"*Miranda,* itself, was concerned only with custodial interrogation, which means questioning initiated by law enforcement officers after a person has been taken into custody." *Soto,* 139 S.W.3d at 845. "While a defendant is free 'to terminate the questioning ... [, to] control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation,' [*Mosley,* 423 U.S. at 103–04, 96 S.Ct. 321], there must be an indication that the defendant has invoked the right to remain silent." *Bradley v. Meachum,* 918 F.2d 338, 342–43 (2d Cir.1990). And, clearly, *Miranda* cannot be read "to create a per se proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent." *Mosley,* 423 U.S. at 102–03, 96 S.Ct. 321.[20]

**20.** As the United States Supreme Court noted in *Mosley*:

It is instructive to note that the vast majority of federal and state courts presented with the issue have concluded that the *Miranda* opinion does not create a per se proscription of any further interrogation once the person being questioned has indicated a desire to remain silent. *See Hill v. Whealon,* 490 F.2d 629, 630, 635 (C.A.6 1974); *United States v. Collins,* 462 F.2d 792, 802 (C.A.2 1972) (en banc); *Jennings v. United*

*States,* 391 F.2d 512, 515–516 (C.A.5 1968); *United States v. Choice,* 392 F.Supp. 460, 466–467 (E.D.Pa.1975); *McIntyre v. New York,* 329 F.Supp. 9, 13–14 (E.D.N.Y.1971); *People v. Naranjo,* 181 Colo. 273, 277–278, 509 P.2d 1235, 1237 (1973); *People v. Pittman,* 55 Ill.2d 39, 54–56, 302 N.E.2d 7, 16–17 (1973); *State v. McClelland,* 164 N.W.2d 189, 192–196 (Iowa 1969); *State v. Law,* 214 Kan. 643, 647–649, 522 P.2d 320, 324–325 (1974); *Conway v. State,* 7 Md.App. 400, 405–411, 256 A.2d 178, 181–184 (1969); *State v. O'Neill,* 299 Minn. 60, 70–

"In [*Mosley*], the United States Supreme Court held that the police may question a suspect, who had previously invoked his right to remain silent, provided the police 'scrupulously honor' the suspect's right to cut off questioning." *Mills v. Commonwealth*, 996 S.W.2d 473, 482 (Ky.1999). The Court in *Mosley* set forth the particular circumstances present in that case which led the Court to conclude that the police had "scrupulously honored" Mosley's right to cut off the questioning. *Mosley*, 423 U.S. at 104, 96 S.Ct. 321. The Court in *Mosley*, however, "did not state that these factors were exclusive or exhaustive. Nor did it elevate any single factor above the others. Thus, we approach the *Mosley* analysis on a case-by-case basis." *Mills*, 996 S.W.2d at 483. "[T]he right to cut off questioning centers on [a] defendant's ability to 'control the time at which questioning occurs, the subjects discussed, and the duration of the questioning.'" *Id.* (*quoting Mosley*, 423 U.S. at 103–04, 96 S.Ct. 321).

Moreover, in *Maryland v. Shatzer*, —— U.S. ——, 130 S.Ct. 1213, 1222, 175 L.Ed.2d 1045 (2010), the United States Supreme Court determined that "[t]he only logical endpoint of [an] *Edwards* [*v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)] disability [i.e., a bar to further questions due to a request for counsel,] is termination of *Miranda* custody and any of its lingering effects. Without that limitation—and barring some purely arbitrary time-limit—every *Edwards* prohibition of custodial interroga-

tion of a particular suspect would be eternal." The Court then noted:

> We think it appropriate to specify a period of time to avoid the consequence that continuation of the *Edwards* presumption "will not reach the correct result most of the time." It seems to us that period is 14 days. That provides plenty of time for the suspect to get reacclimated to his normal life, to consult with friends and counsel, and to shake off any residual coercive effects of his prior custody.

*Id.* at 1223 (internal citations omitted).

Here, at some time after the *Miranda* warnings were given, and the waivers signed, Meece terminated the polygraph examination, got up, and left the premises, essentially telling the police officers that he was through talking and that if they wanted to talk to him again, they better call and check with him. Given the previous *Miranda* warnings, we view this as an invocation of his right to remain silent. *See Thompkins*, 130 S.Ct. at 2260. However, consistent with the trial court's findings, we find no invocation of his right to counsel. And, review of the evidence also indicates Meece's "right to cut off questioning" was fully respected, as the questioning ceased and he left the station.

▮ Yet, there is absolutely no support in the record for any compulsion behind any of the statements Meece made to Felice. At no time was he in custody; neither was he under any compulsion sufficient to overcome his free will. As a co-worker

71, 216 N.W.2d 822, 829 (1974); *State v. Godfrey*, 182 Neb. 451, 454–457, 155 N.W.2d 438, 440–442 (1968); *People v. Gary*, 31 N.Y.2d 68, 69–70, 334 N.Y.S.2d 883, 884–885, 286 N.E.2d 263, 264 (1972); *State v. Bishop*, 272 N.C. 283, 296–297, 158 S.E.2d 511, 520 (1968); *Commonwealth v. Grandison*, 449 Pa. 231, 233–234, 296 A.2d 730, 731 (1972); *State v. Robinson*, 87 S.D. 375, 378, 209 N.W.2d 374, 375–377 (1973);

*Hill v. State*, 429 S.W.2d 481, 486–487 (Tex. Cr.App.1968); *State v. Estrada*, 63 Wis.2d 476, 486–488, 217 N.W.2d 359, 365–366 (1974). *See also People v. Fioritto*, 68 Cal.2d 714, 717–720, 68 Cal.Rptr. 817, 818–820, 441 P.2d 625, 626–628 (1968) (permitting the suspect but not the police to initiate further questioning).
*Mosley*, 423 U.S. at 121, n. 9, 96 S.Ct. 321.

(trainee), Felice asked questions and Meece answered. And "[t]he mere fact that an investigation has focused on a suspect does not trigger the need for *Miranda* warnings in noncustodial settings...." *Minnesota v. Murphy*, 465 U.S. 420, 431, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984). "It was [a] coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited." *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977).

Here, the aborted polygraph interrogation of Meece occurred in late 1993. Officer Felice did not begin her association with him until March 1994. During the association there was no objective evidence of any compulsion, nor had Meece been charged at the time. Thus, we find no violation of Meece's Fifth and Sixth Amendment rights to remain silent or to counsel.

### c. Meece's Demand to Play the Complete "Felice Tapes"

■ On June 28, 2006, Meece filed a pro se motion in limine seeking to prevent the Commonwealth from introducing "pieces and parts" of his taped statements to Officer Felice without playing all of the taped statements between himself and Felice. The complete tapes cover conversations between Meece and Felice during their association for a period of three weeks and last approximately sixty hours. On August 2, 2006, the trial court entered a written order passing consideration of Meece's motion "until such time as the statements are offered for introduction." At trial, however, the Commonwealth examined Felice about the statements, but never offered to play any of the taped statements. She was then cross-examined by the defense.

Citing to KRE 106, Meece argues that the prosecutor's questioning of Felice "fell far short of a complete picture of the circumstances of the interrogation" and, in the context of his statements, Meece argues his inability to play the lengthy tapes was error.

KRE 106 provides, "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part ... which ought in fairness to be considered contemporaneously with it." In this respect, we have said:

> [A] party purporting to invoke KRE 106 for the admission of otherwise inadmissible hearsay statements may only do so to the extent that an opposing party's introduction of an incomplete out-of-court statement would render the statement misleading or alter its perceived meaning. "The issue is whether 'the meaning of the included portion is altered by the excluded portion.'" *Young* [*v. Commonwealth*], 50 S.W.3d [148,] 169 [ (2001) ] (*quoting Commonwealth v. Collins*, 933 S.W.2d 811, 814 (Ky.1996)).

*Schrimsher v. Commonwealth*, 190 S.W.3d 318, 331 (Ky.2006).

"Contrary to Appellant's position, KRE 106 does not 'open the door' for introduction of the entire statement or make other portions thereof admissible for [just] any reason once an opposing party has introduced a portion of it." *Id.* Meece does not advise us as to how any statement quoted or paraphrased by Felice was somehow taken out of context or otherwise plucked from the recorded statements so as to mislead the jury as to its meaning. Thus, we find no error.

### 3. Wellnitz's Statement

■ On October 18, 2004, Meece filed a motion in limine to prohibit the introduction of statements made by Wellnitz solely on the grounds that she was a co-defendant and would be tried separately, and,

thus, would not be available as a witness at his trial. *See Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). However, Wellnitz did testify at Meece's trial, having previously pled guilty and having given a videotaped statement implicating herself and Meece in the murders. Having taken the stand and testified, Meece's motions per *Crawford* were moot.

During her testimony, however, Wellnitz essentially denied any knowledge of, or any participation in, the murders. According to her testimony at trial, there was no plan to kill her family. She and Meece were studying, feeding her cats, and getting coffee and gas in Lexington during the time of the murders. When questioned about the prior statements she made during her hour and a half long video statement of December 31, 2004 (which she had reviewed), Wellnitz admitted to having made some of the statements inquired of, denied some, and did not remember the others—asserting she was high on Seroquel at the time and had said what she had to say to get the plea bargain she wanted. Like Meece, according to Wellnitz, her story was concocted accurately from all the discovery materials she had read.

Following her cross-examination during the Commonwealth's case-in-chief,[21] the Commonwealth indicated at a bench conference that it intended to play her videotaped statement as a prior inconsistent statement under KRE 613 and 801(a)(1), as well as, to rebut her testimony that she

was "high" during the statement. Counsel for Meece objected, but noted for the benefit of the court that it was the same objection as raised previously and that the court had already ruled on it, to which the court responded, essentially, "[o]kay, then, it's in the record."[22] Nevertheless, no further objection was made and the court allowed the playing of Wellnitz's video statement. No requests were made that the statement be redacted.

When the tape was thereafter tendered for playing, the Commonwealth also tendered a·transcript of the statement prepared by the Commonwealth. Meece's counsel objected on grounds that the audio portion of the videotape was clearly understandable, and thus, a transcript was unnecessary. The Commonwealth responded that the tape was, indeed, difficult to follow at times, and, thus, a transcript was appropriate. Both counsel agreed that the transcript was accurate.[23] The court then overruled Meece's counsel's objection to the transcript, allowing the jury to use the transcript during the playing of the videotape, but directed that the transcript not be given to the jury as an exhibit.[24]

A "trial judge has considerable discretion in determining whether testimony is 'inconsistent' with prior statements; inconsistency is not limited to diametrically opposed answers but may be found in evasive answers, inability to recall, silence, or changes of position." *United States v. Dennis,* 625 F.2d 782, 795 (8th Cir.1980) (*citing United States v. Rogers,* 549 F.2d

21. She was later recalled as a witness for Meece in his defense.

22. Neither party has pointed out, however, where this prior ruling appears in the record.

23. A copy of the tape and transcript had been provided to Meece.

24. Meece also asserts that where a transcript of a videotape is prepared, KRE 613—dealing

with the foundation required for the introduction of an inconsistent statement—requires that a copy of the transcript of the particular statement at issue be shown to the witness at the initial time of questioning. We disagree, as a transcript prepared by one party is only a secondary recreation of the statement—not the original.

490, 495–96 (8th Cir.1976)); *See also United States v. Hadley,* 431 F.3d 484, 512 (6th Cir.2006) ("[L]imited and vague recall of events, equivocation, and claims of memory loss satisfy the requirement . . . that a prior statement be 'inconsistent with the declarant's testimony.' ").

In *Porter v. Commonwealth,* this Court dealt with "three separate and conflicting [taped] statements [of a co-defendant witness], all of which were heard by the jury." 892 S.W.2d 594, 595 (Ky.1995). The separate, but first conflicting taped statement was made at the co-defendant's arrest, another during his guilty plea in open court, and the last when he testified against another co-defendant at the co-defendant's trial. In summarizing the conflict between the statements, the Court noted:

> In his statement to the police [the co-defendant] said that he alone had committed the crimes against the victim, Sanders. Later, in the same line of questioning, [the co-defendant] recanted and implicated the appellant as the main instigator of the crimes. In [the co-defendant's] second statement, made during his formal guilty plea proceedings, he again attempted to take sole responsibility for the crimes, but ultimately his final version was that both he and the appellant had perpetrated the crimes against Sanders. [The co-defendant's] third and final statement was at appellant's trial. On direct examination, [the co-defendant] testified that it was he alone who had burglarized, robbed and murdered Sanders. This was not recanted.

*Id.*

Noting that the appellant in *Porter* argued that the co-defendant "did not deny making the earlier statement and acknowledged the truth of and the reasoning behind his having made his first statement to the police," we relied upon an earlier holding, noting that "[i]n *Commonwealth v.*

*Jackson,* Ky., 281 S.W.2d 891, 896 (1955), the Court held that the required inconsistency exists when 'the proffered statement and the witness' testimony lead to inconsistent conclusions,' " and affirmed the admission of the statements as inconsistent. *Porter,* 892 S.W.2d at 596.

Meece cites to *Bratcher v. Commonwealth* for a different result, arguing that in *Bratcher,* we upheld the exclusion of a prior taped statement on grounds that the witness' "statements were not prior *inconsistent* statements as contemplated by KRE 613 because he had already admitted that he lied at the prior suppression hearing." 151 S.W.3d 332, 342 (Ky.2004). We also noted that "[p]laying the videotape would have had no impeachment value and would simply have been cumulative." *Id.*

In his argument, however, Meece ignores the fact that our standard of review in such matters is one of abuse of discretion. In *Bratcher,* the appellant's claim was "that introduction of the tape would have enabled the jury to compare [the witness'] demeanor during the suppression hearing where he gave testimony under oath that he later admitted was a lie, with his demeanor during his testimony [to the contrary] at trial." *Id.* Thus, in addressing the matter, we noted "[s]o long as a reasonably complete picture of the witness' veracity, bias and motivation is developed, the judge enjoys power and discretion to set appropriate boundaries." *Id.* Therefore, in *Bratcher,* we held that, "[t]he trial court did not abuse its discretion in refusing to admit the videotape." *Id.*

Here, however, although Wellnitz did admit to having made several of the statements, she gave inconsistent statements or equivocated on other statements, asserting that she had been "high" at the time. As to the facts she did admit, she asserted that she had purposefully lied in order to get the plea bargain (LWOP–25) and told

the officers only what they wanted to hear. Thus, here, like *Porter*, the required inconsistency exists because Wellnitz's taped statement and her trial testimony lead to totally inconsistent conclusions and it was, thus, within the discretion of the trial court, in this instance, to admit her prior statement in full.

 Having affirmed the trial court's admission of the taped statement for the aforementioned reasons, we must also note that Meece made no request that any portion of the prior tape be redacted. Thus, two comments by Wellnitz in the taped statements that: (1) Meece was a hit man; and (2) that Wellnitz believed that Meece had a homosexual affair with Randy Appleton—she later married Appleton—got into the evidence.[25]

However, reviewing the evidence as a whole, we are convinced that these two statements were harmless, as Wellnitz also testified that she had an affair with Meece, who was married, and that this was why her mother disapproved of her relationship with him. Moreover, as to the "hit man" comment, the jury was aware of statements he had made to Felice, and there were other comments from various witnesses (including his ex-wife, Meade) of his bragging of being a Navy SEAL and having been involved in "black ops."

### 4. Regina Meade's Testimony

#### a. Marital Privilege

Regina Meade was married to Meece from August 1991 through November 2000. Meece alleges that several statements she made during his trial were in violation of KRE 504(b).

KRE 504(b) establishes a marital communications privilege, to wit: "An individual has a privilege to refuse to testify and to prevent another from testifying to any confidential communication made by the individual to his or her spouse during their marriage.... A communication is confidential if it is made privately by an individual to his or her spouse and is not intended for disclosure to any other person." In this respect, we have noted that "[t]he term 'confidential' did not include communications made within the hearing of another person, in the presence of another person, or which could have been observed by another person." *Slaven v. Commonwealth*, 962 S.W.2d 845, 851–52 (Ky.1997) (internal citations omitted).

#### i. Going to Get Coffee

Meade testified that in the early-morning hours before the Wellnitz family was killed, Meece came upstairs to her bedroom around 1:30 or 2:00 a.m. to tell her he and Wellnitz were leaving to get coffee. Although this statement was mentioned obliquely in Meece's memorandum accompanying his motion to exclude the testimony of Regina Meade pursuant to the "marital privilege," the memorandum did not argue for its exclusion, and therefore, the court, in its order regarding the marital privilege, did not address this statement. Nor did Meece make an objection to this testimony at trial. Even so, Wellnitz testified that she and Meece went out to get coffee and gas that morning.[26]

---

**25.** Meece also objects to lack of "reasonable notice" of these two items of testimony as per KRE 404(c), yet ignores the fact that the videotape's introduction was necessitated by Wellnitz's inconsistent testimony at trial. Nor was such an objection made to the trial court. Moreover, the defense had been provided with the complete tape and had moved for its suppression under *Crawford*, 541 U.S. 36, 124 S.Ct. 1354. We find no error.

**26.** Her testimony was: "[n]o, I was, I was told at one point by someone else that I was their alibi because I said that [they] were at home and gone to get coffee. Which is true, that's what my understanding was, was that they were gone to get coffee."

For reasons that this evidence was consistent with that of Wellnitz's testimony as to the time they stopped to get coffee and gas, and therefore was consistent with Meece's defense (that he was with Wellnitz during the early hours of the day of the murder), the failure to object was obviously trial strategy, and for that reason, we will not address this alleged error any further. *Sanders*, 801 S.W.2d at 668.

### ii. Not to Talk to the Police or Let Them in Their House

■ It is undisputed that this conversation between Meece and Meade took place a couple of weeks after the murders and no one else was present. Moreover, the court ruled that this statement was barred by the marital privilege. KRE 504. Again, however, no objection, or request for admonition, was made to, or regarding, this statement when it came in inadvertently during trial.

This disclosure resulted when Meade was asked, "[d]id you tell them everything that you knew?," to which she replied, "[e]verything that I could." She was then asked by the Commonwealth, "[w]hat did you mean by that?," to which she replied haltingly, "[e]verything that I could remember—um, um [she paused]—and I was told by my ex-husband I was not allowed to talk to the state police or police in general. They were not allowed in my house." [27]

■ Given the context of the question, although broad, it does not appear that the question was intentionally framed to elicit this response. Nevertheless, the evidence was heard by the jury without any objec-tion or request for admonition by the defense. "A jury is presumed to follow an admonition to disregard evidence and [an] admonition thus cures any error." *Johnson v. Commonwealth*, 105 S.W.3d 430, 441 (Ky.2003).

There being no obvious connection to strategy under *Sanders*, however, we must consider "whether the . . . error was prejudicial. . . ." 801 S.W.2d at 668.

The statement here reflected that Meece did not want Meade talking to the police. In one respect, it is consistent with Meece's testimony that his life had been ruined solely by his association with Wellnitz and that during and after his association with her, he had been continuously harassed by the police. This sentiment was also—according to Meece and Wellnitz—the cornerstone of a letter Meece wrote to Wellnitz asking for money since his bare association with her had ruined his life. In another respect, it could also reflect a guilty state of mind. However, given the other evidence introduced—even from Meade and Wellnitz—we are convinced that this statement was harmless under our standards.

### iii. Plausible Deniability

■ Meade also testified that Meece discussed "plausible deniability"—"knowledge without knowledge"—with her. He explained he was not telling her stuff so that if she was arrested, she could claim "plausible deniability" and that she did not know anything. Meece asserts this is error, albeit unpreserved. Having reviewed the testimony, however, we find no error,

---

27. On June 11, 2003, Meade gave Detective Benningfield some handwritten notes, in which this comment appeared: "Bill told me that if the police come to our house, they are not allowed into the house. When asked by Detective Wheat why they weren't allowed in the house, I told him that Bill specifically said that they could not come in." From the context of this comment, it is not known if this statement was actually made to Detective Wheat when he came to the house wanting to enter, or whether it was made to Detective Wheat during a later interview.

as Meade testified that this statement was made "after the murders, and, I believe, after the divorce." Thus, no privilege attached.

### iv. Statements in the Wellnitz Home After the Murders

■ Meade also testified that when she and Meece went with Wellnitz to the Wellnitzes' home a week after the murders to help pack stuff, Meece made statements to her about the murders.[28] This testimony was addressed by Meece's motion in limine which was denied by the trial court after a hearing on the evidence, wherein the trial court concluded:

> [T]he Court hereby finds that [these] statements . . . fail as confidential communications because [Meece] did not have a "positive expectation of confidentiality." *Slaven v. Commonwealth*, 962 S.W.2d 845 [ (Ky.1997) ]. Furthermore, the Court finds that [Wellnitz] was present and within hearing range at the time this set of said statements was made.

Although Meade did not testify as to the specific statements that were made to her by Meece, i.e., the positioning of the bodies, she did acknowledge that Meece made statements to her about the murders. During this testimony, she could not remember if Wellnitz was there or not. No objection was made to the statement.

At the earlier evidentiary hearing on the question, Meade testified that Meece pointed out where "Joe's body" was. She also testified that when the statement was made, Wellnitz was in the adjacent kitchen, which was joined to the room in which the statements were made by an open, arched doorway. Here, the trial court heard the evidence, was aware of the size of the home, the proximity of the rooms to one another, and where the parties were at the time. We find these factual findings supported by substantial evidence. That

being so, we find no abuse of discretion, or error, in the admission of this statement, as there could be no expectation of privacy with Wellnitz in the adjacent, open room next to them.

### v. Other Comments

Meade also testified that Meece claimed to be an ex-Navy SEAL when he met her at the age of sixteen, and told her that he knew where to hit someone with a bullet to put them down—that a hit to the head would kill a person instantly. Again, no motions were made to prohibit this specific testimony, nor was an objection made at trial following the statement. Moreover, the context within which the answer was given, indicates that the statement was made before the parties' marriage, when they had just begun dating. Therefore, we find no violation of KRE 504.

### b. Prosecutor's Alleged Failure to Correct Meade's Testimony

Meece argues that his Due Process rights were violated by the prosecution's failure to correct Meade's testimony in regard to any agreements she had with the Commonwealth concerning her testimony. Meece further argues that her testimony was perjurous and this was known to the Commonwealth, citing *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) ("[I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment. . . . The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.").

"A person is guilty of perjury in the first degree when he makes a material false statement, which he does not believe, in

**28.** Meece did not object to this statement at trial.

any official proceeding under an oath required or authorized by law." KRS 523.020(1). Thus, for Meade to have committed perjury, she would have had to believe that she was giving false information.[29]

The Commonwealth asserts, among other arguments, that since the Commonwealth's agreements with Meade were disclosed to the defense in writing three years prior to the trial and again to Meece and counsel at a subsequent hearing two years before the trial, it was the defense's obligation to clear up any confusion while the witness was on the stand at the time. In this regard, Meece offers no explanation as to why no further attempt was made to impeach Meade's testimony to the extent it was anything other than a misunderstanding or innocent oversight.

29. Although one might expect Meade to know whether she had a deal with the Commonwealth, it is quite possible that she did not understand or recall what transpired during her October 24, 2002 conversation with Commonwealth's Attorney, Brian Wright.

30. As grounds for his alleged need to proceed pro se (outside the presence of the jury), Meece often noted:

Comes now the defendant, William Harry Meece, pro se, and without the benefit of learned legal counsel due the Court's appointed attorneys ongoing failure, unwillingness, inability, and refusal to communicate, cooperate, assist, or counsel the defendant, Moves this court In Limine, to preserve the record, to prohibit the Commonwealth from reintroducing any testimony that is knowingly false and material at trial.

He then goes on to brief the law on this issue, as follows (all punctuation and citations as in original):

3) "The use of incorrect, or false, testimony by the prosecution is a violation [o]f due process when the testimony is material. *Napue v. Illinois,* 360 U.S. 264, 269, 272, 79 S.Ct. 1173, 3 L.Ed.2d 1297 [1217] (1959). This is true irrespective of the good faith or bad faith of the prosecutor. *Brady v. Mary-*

Meece was extensively involved in the oversight and preparation of his defense and filed numerous pro se motions, one of which was an apparently prophetic pro se motion to bar the prosecutor from introducing false evidence.[30] This motion was filed March 17, 2006. The trial started in mid-August. On October 19, 2006, following trial, but before sentencing, Meece filed a motion for a new trial, alleging among others, that:

It was error, abuse of discretion, or misconduct to allow Regina Meade to commit perjury, where she claimed she had "no deal" for her testimony, contrary to written pleadings of the Commonwealth and oral statements by the Commonwealth on the record referring to those statements. Either the Commonwealth or the witness lied, both false and material and therefore perjury, and

*land,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–1197, 10 L.Ed.2d 215 (1963). When the prosecution knows or should have known that the testimony is false, the test of materiality is whether "there is any reasonable likelihood that the false testimony could have affected the judgement [sic] of the jury" *United States v. Agurs,* 247 [427] U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)"

4) The United States Supreme Court also says in *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 766 [31 L.Ed.2d 104] (1972), as cited by the Kentucky Supreme Court in *Commonwealth v. Spaulding,* Ky., 991 S.W.2d 651, 655:

As long ago as *Mooney v. Holohan,* 294 U.S. 103, 112, 55 S.Ct. 340, 342, 79 L.Ed. 791 (1935), this Court made clear that deliberate deception of a court and jurors by the presentation of know [sic] false evidence is incompatible with "rudimentary demands of justice." This was reaffirmed in *Pyle v. Kansas,* 3137 [317] U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214 (1942). In *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), we said "[t]he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears" *Id.,* at 269, 79 S.Ct. at 1177 . . .

it was error, abuse of discretion or misconduct to allow it to go uncorrected. Further uncorrected perjury includes additions and subtractions to her previous sworn testimony from 20 April 2004.[31]

However, in its earlier written discovery response of June 30, 2003, the Commonwealth had disclosed:

> On October 24, 2002, the Commonwealth's Attorney for the 29th Judicial Circuit, along with Capt. Jeff Hancock, KSP; Sgt. Dennis Benningfield, KSP; and Det. Ricky Underwood, KSP, met with Regina Meece (a/k/a Regina Meade), to discuss her possible knowledge of the facts of this case. Also present during this meeting was Hon. David Kaplan and Hon. John Larson, attorneys for [Meade]. [Meade] agreed to provide truthful information regarding this case in exchange for an agreement that the Commonwealth would not pursue prosecution of [Meade] for providing incorrect and/or incomplete information regarding this case in the past and that the Commonwealth would not pursue prosecution of [Meade] for possessing physical evidence related to this case. Consequently, the Commonwealth did enter into such an agreement with [Meade] and [Meade] did provide the Commonwealth with certain information related to this case. The statements made by [Meade] are contained on the cassette tape identified in the Commonwealth's response (A)(88) in paragraph eight above. Additionally, a summary of the statements made by [Meade] can be found in KSP Case Report No. 15–93–0292–Vol. II, at pages 160–163. *No agreement* was made on behalf of the Commonwealth to refrain from seeking prosecution of [Meade] for any other

involvement either direct or indirect, that she may have had in the commission of the crimes which were the basis for this case. Additionally, the agreements with [Meade] were conditioned on [Meade] cooperating completely and truthfully with the Commonwealth in the investigation and prosecution of this case.

(Emphasis added). And, at a later hearing in 2004 in the presence of the trial judge, Meece, and his counsel, Commonwealth's Attorney Brian Wright, again summarized the above-referenced agreement, stating:

> The details of any agreement between the Commonwealth, at least my office, and I would represent the Commonwealth in this action, and Regina Meade are that, in exchange for the statement that she provided the State Police and myself in October of 2002, I agreed that I would not pursue criminal charges based on any criminal conduct that she talked about at that time, provided that everything she told us was the truth. I did not mean to—to—and I guess perhaps I mis-phrased that or misspoke, mis-phrased it when I called it immunity. But, I simply meant to convey that we had told her we would not be presenting, would not be actively prosecuting any case on her for, *for instance, tampering with physical evidence or maintaining an item of evidence in Lexington—in Fayette County, I wouldn't actively do that and I would ask the prosecutor up there not to—*or for anything else she might have told us. Now, that agreement was conditioned entirely upon her telling us, truthfully and completely, what she knew about that and, based on what she told us, there was little if any criminal involve-

---

**31.** This motion was overruled orally by the Court prior to sentencing. However, no written order was ever entered.

ment on her part. I'm—I'm fairly certain I have spelled that out—I'm, I've got it now on the record, and—if this court would require anything else, I'll do whatever the court directs.

(Emphasis added).

Following her direct testimony for the Commonwealth, Meade was questioned on cross-examination. Close to the end of her cross-examination, she was asked by the defense, and answered:

Question: Do you have any agreements with the Commonwealth regarding your testimony here today?

Answer: No.

Question: There was never any agreement between you and the Commonwealth that you would not be charged with any crime?

Answer: Not to my knowledge.

Question: Not to your knowledge?

Answer: Not that I remember

Question: I take it you've never been charged with any crimes then?

Answer: Nope.

Following this colloquy, defense counsel moved on to other areas of inquiry, and after a while, closed the cross-examination. At no time during cross-examination was Meade ever really pressed by the defense on her answers, and neither she, the judge, nor the jury, were provided with a copy of the Commonwealth's written discovery response, nor was the court asked to take judicial notice of the matter. On re-direct, the Commonwealth did not address the matter.

■■■■■ "In order to establish prosecutorial misconduct ..., the defendant must show (1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false.' " *Commonwealth v. Spaulding*, 991 S.W.2d 651, 654 (Ky.1999) (*quoting United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir.1989)). "When [such] perjured testimony could 'in

any reasonable likelihood have affected the judgment of the jury,' the knowing use by the prosecutor of perjured testimony results in a denial of due process under the Fourteenth Amendment and a new trial is required." *Commonwealth v. Spaulding*, 991 S.W.2d 651, 655–56 (Ky.1999) (*quoting Giglio v. United States*, 405 U.S. 150, 153, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972)).

■■■ This rule, however, does not apply if the defendant's failure to impeach the witness's allegedly false testimony is strategic or tactical. *Jenkins v. Artuz*, 294 F.3d 284, 295 (2d Cir.2002). As was noted in *Jenkins:*

In *United States v. Helmsley*, ... we concluded that the defendant was "not only ... unable to establish a justifiable excuse for her failure to challenge ... [the] testimony at trial, but it appear[ed] that her choice not to do so may have been deliberate." 985 F.2d 1202, 1209 (2d Cir.1993).

*Jenkins*, 294 F.3d at 295. Thus,

"[T]here is no violation of due process resulting from prosecutorial non-disclosure of false testimony if defense counsel is aware of it and fails to object." *DeMarco v. United States*, 928 F.2d 1074, 1076 (11th Cir.1991). "In [*United States v.*] *Decker*, [543 F.2d 1102, 1105 (5th Cir.1976) ] we held that the Government can discharge its responsibility under *Napue* and *Giglio* to correct false evidence by providing defense counsel with the correct information at a time when recall of the prevaricating witnesses and further exploration of their testimony is still possible." *United States v. Barham*, 595 F.2d 231, 243 n. 17 (5th Cir.1979).

*Beltran v. Cockrell*, 294 F.3d 730, 736 (5th Cir.2002). Therefore,

[T]he fact that the alleged statement was known to petitioner and his counsel during the trial compelled petitioner to

raise this issue then or not at all. When a criminal defendant, during his trial, has reason to believe that perjured testimony was employed by the prosecution, he must impeach the testimony at the trial, and "cannot have it both ways. He cannot withhold the evidence, gambling on an acquittal without it, and then later, after the gamble fails, present such withheld evidence in a subsequent proceeding."

*Evans v. United States*, 408 F.2d 369, 370 (7th Cir.1969) (*quoting Green v. United States*, 256 F.2d 483, 484 (1st Cir.1958)); *See also Decker v. United States*, 378 F.2d 245, 251 (6th Cir.1967).

■ In this case, the discovery was substantial—so much so that Meece, and Wellnitz, testified that they "accurately" constructed their allegedly false confessions from it. Moreover, Meece was strongly involved in the discovery process through directions and complaints to counsel, complaints to the court about counsel not having followed or complied with his demands and requests, and numerous pro se motions for discovery and exclusion, as well as having been present at the discovery hearings. In fact, he was present at the discovery hearing when the Commonwealth's Attorney, Brian Wright, again summarized the testimony Meece alleges was false.

Meece complained of this "falsified testimony" in his pro se motion for a new trial filed prior to his sentencing. And, as demonstrated by his pre-trial motion to exclude "false testimony," he knew the law on this subject as well as anyone in the courtroom. Thus, whether the misstatement by Meade was intentional or innocent under the circumstances, given that no explanation for his failure to impeach Meade is given or apparent from the context of the alleged occurrence, one may only conclude that the failure to impeach Meade upon this allegedly false statement was strategic and tactical.

The agreement that the Commonwealth offered to Meade during her first statement of 2002 was disclosed in the 2003 discovery response and could have been used to refresh her memory, or with the court's permission, as an exhibit in order to impeach her after which she could have explained her answer. Moreover, the court was present during Brian Wright's summary of the agreement during the hearing, and, if asked at trial, could have intervened to see that the jury was fully apprised of the circumstances. *See* KRE 201.

None of this occurred, as it was not requested, which leads to the conclusion that the failure to pursue this matter at a time when it could have been clarified was a strategic or tactical decision. *See Sanders*, 801 S.W.2d at 668; *See also Barham*, 595 F.2d at 243, n. 7.

### 5. Alleged Hearsay Testimony

Meece also complains of four hearsay comments made during the testimony of Justin Manley and Meade, none of which were preserved.

#### a. Manley

■ During Manley's testimony, he testified that Wellnitz said of Meece: "He's crazy. He says he was, you know, he's killed people, and he's, and he's been in the CIA and stuff like that." This statement occurred when Manley was speaking with Wellnitz (then his wife) regarding a letter he had just read from Meece to her requesting money.

■ This statement was similar to statements Meece had been making since high school, when he first met Meade, telling her that he was a Navy SEAL. As Randy Appleton—another close friend at

the time—testified, he had heard Meece say that he was an assassin, but did not believe it and gave it no credence. Here, in the context offered, however, this statement is obviously hearsay, and, thus, error. Yet, within the context of the testimony of other witnesses, who testified to similar statements, including Meade, Wellnitz, and Randy Appleton, it was harmless.

■ As indicated, Manley also testified as to having read a letter from Meece to Wellnitz. In his recollection, the letter demanded money from Wellnitz "for services [Meece had] rendered so long ago." According to Manley, Wellnitz took the letter, shredded it, and threw it in the trash. Wellnitz admitted she tore it up and threw it away. And, according to Manley, when Wellnitz was asked why she shredded the letter, she stated the letter could be used as evidence against her.[32]

Although at trial, both Wellnitz and Meece attempted to downplay the significance of the letter, both, in their separate taped statements (Wellnitz's of December 31, 2004 and Meece's of November 15, 2004), acknowledged its tenor. In Meece's statement, he said "I sent her a letter in 2000, probably in August, through her grandmother, again hinting at the same thing, I was contemplating coming to the police if she didn't pay me." In her statement, Wellnitz said: "He sent me a letter saying that his life had been ruined and that he had read some book about the witness protection program . . . and that if I didn't give him enough money to start a lawn care service that he was going to go to the police and confess as a hit man and get put in the witness protection program to Hawaii."

During trial, Wellnitz was asked about the letter by the Commonwealth. She ad-

mitted that Meece had sent her a letter, but did not know the date, yet believed it was a couple of years before they were arrested. According to her testimony at trial, the essence of the letter was that she should give Meece some money to start a business, because his knowing her had ruined his life. On cross-examination by Meece's counsel, she again reiterated that the request was for money because his knowing her had ruined his life. However, she did not perceive the letter as blackmail and did not mention that the request was for "services rendered."

She did acknowledge that the letter was no longer in existence but asserted that Manley had lied about the content of the letter to hurt her as he had previously written her a note to the effect that he knew the letter existed and if she did not let him see their child, he would go to the State Police and ruin her life, even though he knew his version of it was not true. Thus, according to Wellnitz, Manley said "he would tell the police that Meece was wanting to get paid for something." During her testimony, however, she was not asked about her alleged statement to Manley that the letter was destroyed as it "could be used as evidence against [her], you know." This predicate was required. KRE 613.

"A statement is not excluded by the hearsay rule, even though the declarant is available as a witness, if the declarant testifies at the trial or hearing and is examined concerning the statement, with a foundation laid as required by KRE 613, and the statement is: (1) Inconsistent with the declarant's testimony. . . ." KRE 801A(a). KRE 613(a) provides:

> Before other evidence can be offered of the witness having made at another time a different statement, he must be in-

---

32. The context was that early in their marriage, Wellnitz had told Manley that the po-

lice suspected her and Meece of the murders, but that they were innocent.

quired of concerning it, with the circumstances of time, place, and persons present, as correctly as the examining party can present them; and, if it be in writing, it must be shown to the witness, with opportunity to explain it.

Our precedent has "consistently required strict compliance with the foundation requirements of ... KRE 613(a)." *Noel v. Commonwealth*, 76 S.W.3d 923, 930 (Ky. 2002). The intent of the rule is to first give the witness an opportunity to admit and explain the statement, but if the witness denies it, he may then be impeached by it under KRE 801A(a)(*l*).

■ As Wellnitz was not asked about the statement, its elicitation from Manley was error. Yet, given the context—that she had told Manley years before, when they first met, that she was under suspicion, and "that she was innocent, but people in, back in Columbia, Kentucky thought that she was responsible for her family's death"—the impact of the statement, however, was, at best, minimal. Moreover, she admitted in her testimony that the letter no longer existed, denied that it ever said what Manley said it did, and in her statement of December 31, 2004, admitted to tearing it up and throwing it away. In this context, given the other valid evidence introduced, this error was harmless.

### b. Meade's Testimony of Wellnitz's Statements

#### i. The "Excited Utterances"

■ Meece also alleges that Wellnitz's statement (as related by Meade) that "Dennis was not supposed to be there!" was hearsay and, thus, error, for reasons that the statements were made by Wellnitz some two hours after the killings and Wellnitz had certainly had time to distance herself from the killings.

■ Granted, an excited utterance is one made "so near in point of time as to exclude the presumption that it was the result of premeditation or design." *Consolidated Coach Corp. v. Earls' Adm'r*, 263 Ky. 814, 94 S.W.2d 6, 8 (1936). However, we have never restricted this rule to statements made only during the event perceived. Quite to the contrary, an excited utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." KRE 803(2). For an out-of-court statement to qualify for admission under KRE 803(2), " 'it must appear that the declarant's condition at the time was such that the statement was spontaneous, excited, or impulsive rather than the product of reflection and deliberation.' " *Noel*, 76 S.W.3d at 926 (*quoting United States v. Iron Shell*, 633 F.2d 77, 86 (8th Cir.1980)). Factors relevant to a determination of whether an out-of-court statement is admissible under KRE 803(2) are:

"(i) lapse of time between the main act and the declaration, (ii) the opportunity or likelihood of fabrication, (iii) the inducement to fabrication, (iv) the actual excitement of the declarant, (v) the place of the declaration, (vi) the presence there of visible results of the act or occurrence to which the utterance relates, (vii) whether the utterance was made in response to a question, and (viii) whether the declaration was against interest or self-serving."

*Noel*, 76 S.W.3d at 926 (*quoting Jarvis v. Commonwealth*, 960 S.W.2d 466, 470 (1998)).

These factors are not to be used as a "true-false test for admissibility but, rather, [as] guidelines to be considered in determining admissibility." *Id.* In *Noel*, we held the statement at issue inadmissible, as it was made "more than twenty-four hours after the first opportunity to report." *Noel*, 76 S.W.3d at 927. However,

we noted in *Noel* many cases with time lapses greater than the two hour interval here. *Id.* at 927; *see also United States v. Nick,* 604 F.2d 1199, 1202 (9th Cir.1979) (the same day); *People v. Sandoval,* 709 P.2d 90 (Colo.Ct.App.1985) (fourteen hours); *Brantley v. State,* 177 Ga.App. 13, 338 S.E.2d 694 (1985) (several hours); *People v. Nevitt,* 135 Ill.2d 423, 142 Ill.Dec. 854, 553 N.E.2d 368 (1990) (five hours); *State v. Rodriquez,* 8 Kan.App.2d 353, 657 P.2d 79 (1983) (four hours); *People v. Pottruff,* 116 Mich.App. 367, 323 N.W.2d 402 (1982) (less than twenty-four hours); *Love v. State,* 64 Wis.2d 432, 219 N.W.2d 294 (1974) (the following day).

Here, given the relatively short time lapse between the murders and Meece and Wellnitz's arrival at Meade's Lexington home, the fact that she was "freaking out," saying "she couldn't believe it happened— Dennis wasn't supposed to be there!" and Meece's attempts to calm her down with statements that "everything will be okay— you need to get home before the police find out and call," we are convinced that Wellnitz's statements were "excited utterances." KRE 803(2). Thus, we find no error.

### ii. The Safe Came from the House

 Meade also testified that Wellnitz and Meece returned to her apartment that morning and that Meece was carrying a safe. Meade was then asked by the Commonwealth, "did [Meece] tell you where the safe had come from?" Meade responded that Wellnitz said the safe "came from the house." No objection was made to this non-responsive answer.

Meade later testified that she believed the safe had been opened before it was brought into the house and that she and Meece later had a key made for the safe and she started using it for herself. She turned it over to the Kentucky State Police

in 2002. She and Meece later bought another smaller safe.

Wellnitz's statement was allegedly made at the time of their entry into Meade's house around 6:30 or 7:00 a.m. According to Meade, Wellnitz was "freaking out" and saying things like: "I can't believe that it happened. Dennis wasn't supposed to be there!" According to Meade, Wellnitz said if she thought about what happened, that she would lose it. Meanwhile, Meece was trying to calm her down and telling her everything would be okay. He told her she needed to get home before the police found out and called. This entry into the house and the referenced conversation occurred within several hours of the murder of the Wellnitz family.

Given the fact that the statement was made upon Meece and Wellnitz's reentry into Meade's home in the early-morning hours, several hours away from the site of the murders, in Columbia, Kentucky and that they came in carrying a safe, with Meece wearing different clothes than he had left in, and with Wellnitz "freaking out" and making statements that "Dennis shouldn't have been there," the fact that Meade said that Wellnitz said the safe had come from the house added very little to the picture painted by this evidence and could have had absolutely no impact, or sway, on the jury's verdict given this and other evidence. *Kotteakos,* 328 U.S. at 765, 66 S.Ct. 1239. Meece, himself, acknowledged in his November 15, 2004 videotaped statement that he took the safe. Thus, it was harmless.

### c. Torston Rhodes

Meece also complains of the testimony by Torston Rhodes, Director of Engineering for the Sentry Safe Company, the company that made the safe allegedly taken from the Wellnitz home. According to Rhodes, Sentry Safe quit making this safe

after July 1993. The murders occurred on February 26, 1993. This testimony contradicted a letter provided to the prosecution from another engineer at Sentry Safe that said, based upon the serial number of the safe, it had been manufactured in October 1993, *after* the Wellnitz murders.

Although Meece's original objection to Rhodes' testimony was that it was speculative, once Rhodes was excused from the witness stand following cross-examination, Meece objected on the grounds of hearsay, in that his testimony was based upon a review of company records and information received from other employees of Sentry Safe.

■ However, the trial court properly exercised its discretion in finding that the witness, as Director of Engineering for Sentry Safe Company, was qualified to express an opinion about his company's past practices. As we have noted, "there is absolutely nothing improper about basing an expert opinion on Tacts and data ... made known to the expert at or before the hearing.' " *Baraka v. Commonwealth,* 194 S.W.3d 313, 314–15 (Ky.2006) (*quoting* KRE 703(a)).

*Robinson v. Commonwealth,* 926 S.W.2d 853, 854 (Ky.1996), is simply not applicable. That case dealt only with the erroneous admission of a facsimile copy of a computer printout of the defendant's prior convictions and charges. *Id.* Nor is *Ful-*

*cher v. Motley,* 444 F.3d 791 (6th Cir.2006), applicable. That case involved the admission of an unavailable accomplice's out-of-court statement implicating the defendant in the crime. *Id.* at 798. As we noted in *Baraka,* "[i]t has been long held that such underlying factual assumptions are properly left for scrutiny during cross-examination." 194 S.W.3d at 315. This is "the primary means by which trial counsel can attempt to persuade jurors of the weight or significance to be attached to the testimony of the witnesses." *Brown v. Commonwealth,* 934 S.W.2d 242, 247 (Ky.1996). Thus, we find no error.

### 6. Evidence of Wicca Worship and the Occult

■ Meece also complains of the introduction of evidence attempting to connect him and Wellnitz with Wicca worship and the occult, although no objections were made to the introduction of the evidence at trial.[33],[34]

Although this issue cropped up early in the investigation—there was a book of the occult on Beth Wellnitz's nightstand and Wellnitz had a black candle in her bedroom along with a freshman term paper on human sacrifice among the ancient Incan Indians—the prosecutor introduced the jury to this possible occult component in his opening statement. During this state-

---

**33.** Meece argues that the issue was "arguably preserved" by his motion for a new trial, however, "[t]he raising of [an] issue for the first time in a motion for ... new trial does not preserve it for appellate review. RCr 9.22." *Byrd v. Commonwealth,* 825 S.W.2d 272, 274 (Ky.1992) *overruled on other grounds* by *Shadowen v. Commonwealth,* 82 S.W.3d 896 (Ky.2002). We will, however, consider the issue under the standards of *Sanders v. Commonwealth,* 801 S.W.2d at 668.

**34.** Meece also asserts that no notice of this evidence was given as required by KRE 404(c). However, the record reflects that

Meece had been given copies of both his taped statements as well as Wellnitz's. Meece did move to exclude the complete videotaped statements on various grounds, yet once motions were overruled, he never made any request that the "complained of" material be redacted from any of the statements prior to their playing. Had this occurred only once, possibly one could argue that the strategy standard applicable under *Sanders* is inappropriate. But, given there was never a request at trial that any of the three statements be redacted, one could surmise, at this time, only one purpose: strategy.

ment, the jury was advised that Meece and Wellnitz were sexually involved and were both into Wicca, a religious belief that included magic. The prosecutor also told the jury that Meece and Wellnitz's common belief in Wicca was part of what attracted them to one another. And, during the trial, Meece, Wellnitz, and Meade were questioned concerning Wicca and their respective beliefs. This questioning stemmed in part from statements Meece and Wellnitz had made in their videotaped statements, all of which were played to the jury.

In her statement of December 31, 2004, Wellnitz indicated that they and several of their friends had talked about setting up a commune. According to her, Meece even had a business plan for a commune entitled "Blackwatch Enterprises." It was to be a "David Koresh" kind of colony. In fact, as part of the inducement for the murders, Meece "was promised to get to have his little dream commune" at the Wellnitz farm. Nevertheless, Wellnitz testified that the murders had nothing to do with "Wiccan anything," and that she had only been to "one Wiccan [inaudible] once at Transylvania University and one informational meeting." When asked in her taped statement, however what she would personally gain from the murder of her family and why she went along with it so easily, Wellnitz replied "the commune." When asked why there was never a commune thereafter, she indicated that when her family died the farm was pretty well bankrupt and had to be sold.

In his November 15, 2004 statement, Meece admitted there was "some discussion about whether or not [Meade] and I and my daughter could move onto the farm, I guess there's a cabin on the back of the farm." Moreover, he stated that he was "somewhat involved in some very heavy spiritual issues and that could be called occult, including vampirism and

some other things and some magic. As is always said, magic attracts magic, which is personally what attracted me to [Wellnitz] to begin with, and that was a mutual attraction." He explained that "Wicca is an earth-based religion that is encompassing of a long list of beliefs, mostly in elemental—elemental-spiritual powers, that is—witches, warlocks, earth, wind, fire, water, uh, spirits, ghosts, demons, encompasses all of that—good, evil, in an elemental sort of sense." When asked in his first taped statement whether anything of that nature was ever part of what happened, he responded:

Uh, not to the best of my knowledge. I know that there has been some rumors to that effect. Uh, maybe [Wellnitz] had that in her mind, maybe she talked to [Meade] about that. [Meade] had been involved in witchcraft, which is part of what attracted [Meade] and I together is that we had been involved in some occult, in witchcraft, and some spiritualism and we had actually—had moved beyond that and had been moving into reformed Judaism. That was something that was—[Meade] was very comfortable with. I attended occasionally. It was something that I'd always been comfortable with for as long as I'd known, which was probably since about seven years old, because it's an elemental type of religion. It is not the cult of personality of Jesus Christ. And I—I'm not even going to apologize if that offends anyone. *And any occult involvement in these murders was entirely secondary to a financial gain motive.* The financial gain motive was for [Wellnitz] for the estate and secondary for me and for what [Wellnitz] was supposed to pay me.

(Emphasis added). In his second statement, Meece acknowledged that Wellnitz had told him something to the effect that her mother, Beth Wellnitz, "thought we were a cult ... cultists because my ex-wife

[Meade] and I both were, had been, involved in Wicca and witchcraft of some sort. . . ."

In this regard, in the guilt phase closing argument, the prosecutor stated:

The discussions about the occult and Wicca. I don't believe the evidence supports an inference that this was a ritualistic sacrifice. I believe that that certainly demonstrates, along with a lot of other things, demonstrates the character of Bill Meece. I think it shows you that he is willing to lie. He told you in his statement that he was into reformed Judaism. Talked about the cult of personality of Jesus Christ. And said on his statement, "I'm not even going to apologize if that offends anybody." That wasn't from the discovery, that was him talking, telling the truth. Certainly Wicca was something that Beth Wellnitz questioned. She was concerned about her daughter's involvement with those people. [Wellnitz] told you in her statement that part of her reasoning for wanting to take Bill and Regina down was to show her mother that they weren't such evil monsters. You know, from a very early age, one of the biggest fears that anyone has, almost two years old, one of the biggest fears anybody has is, is a monster going to get us during the night? She took them down there to show them, to show her parents that they weren't evil monsters. Forty-eight hours later what did they do? What did he do? But do I think that the occult involvement was the primary reason for this? No. Was it a factor? Certainly. Was it a factor in who the suspects were? Absolutely. But Bill Meece in his statement told you about the occult involvement versus what his motive was. This is his discussion, not from the discovery, but his discussion of what his motive was. "The occult involvement in these murders was entirely secondary to a finan-

cial gain motive. The financial gain motive was for [Wellnitz] for the estate, and secondary for me was what [Wellnitz] was supposed to pay me." Secondary for what Meg was supposed to pay me. That's what he wanted.

Citing to *Dyer v. Commonwealth*, 816 S.W.2d 647 (Ky.1991), Meece contends such evidence was nothing more than propensity (character) evidence and was, thus, inadmissible under KRE 404(a). *See also State v. Theer*, 181 N.C.App. 349, 639 S.E.2d 655, 664 (2007); *Mitchell v. State*, 298 S.C. 186, 379 S.E.2d 123 (1989); *Flanagan v. State*, 109 Nev. 50, 846 P.2d 1053, 1056 (1993). *Theer*, however, addressed conduct which occurred after the murder yet, nevertheless, held it to be harmless under the evidence introduced. 639 S.E.2d 655. *Mitchell* "dealt with impermissible character evidence supplied in a case where the prosecution had no direct evidence to link the defendant to the crime." *Walls v. South Carolina Dept. of Corrections at Perry Correctional Inst.*, 2009 WL 2423750, p. 5 (D.S.C. Aug. 5, 2009). And, in *Flanagan*, the evidence of the occult and membership in a "coven" also had no connection or relevance to the crime. As such, the court stated "[t]he prosecution may not raise the issue of appellants' religious beliefs for the bare purpose of demonstrating appellants' bad character. By violating this prohibition, the prosecution invited the jury to try appellants for heresy." 846 P.2d at 1058–59. *Flanagan*, however, acknowledges that "constitutionally protected activity is admissible . . . if it is used for something more than general character evidence." *Id.*, at 1056.

In *English*, 993 S.W.2d at 943, we noted with regard to KRE 404(b) that:

This Rule is virtually identical to Rule 404(b) of the Federal Rules of Evidence. Even prior to the adoption of the Ken-

tucky Rules of Evidence, effective July 1, 1992, our courts had always recognized the general prohibition against proving character or criminal predisposition by evidence of prior wrongful acts. See, e.g., *Jones v. Commonwealth,* 303 Ky. 666, 198 S.W.2d 969 (1947). However, we also recognized that evidence of prior conduct is admissible, if it is "probative of an element of the crime charged ... even though it may tend to prove the commission of other crimes." *Sanders v. Commonwealth,* Ky., 801 S.W.2d 665, 674 (1990), *cert. denied,* 502 U.S. 831, 112 S.Ct. 107, 116 L.Ed.2d 76 (1991). Specifically, we held that evidence of other crimes, wrongs or acts was admissible if it tended to show "motive, identity, absence of mistake or accident, intent, or knowledge, or common scheme or plan." *Pendleton v. Commonwealth,* Ky., 685 S.W.2d 549, 552 (1985) (emphasis added). "Common scheme" is not included in the "other purpose" exceptions listed in KRE 404(b)(1), though "plan" is specifically included. We do not interpret this omission or variance in terminology as intending an alteration of this long-standing legal concept, for "the specifically listed purposes are illustrative rather than exhaustive." *Tamme v. Commonwealth,* Ky., 973 S.W.2d 13, 29 (1998), *cert. denied,* 525 U.S. 1153, 119 S.Ct. 1056, 143 L.Ed.2d 61 (1999) (*quoting* R. Lawson, The Kentucky Evidence Law Handbook, § 2.25, at 87 (3d ed. Michie 1993)).

*See also Clark v. O'Dea,* 257 F.3d 498, 502 (6th Cir.2001) ("A review of the record demonstrates that the Commonwealth presented evidence ... to substantiate its theory that Warford's death was motivated by the performance of a Satanic ritual. The fact that the Commonwealth's overall proof on this issue in retrospect was not strong does not detract from the initial admissibility of the evidence in question.").

Here, according to Meece, Wellnitz had indicated to him that her mother, Beth Wellnitz, thought they were occultists because Meece and his wife, Meade, were or had been involved in Wicca or witchcraft of some sort. And, according to Wellnitz, part of Meece's compensation for the murders was that he "was promised to get to have his little dream commune" at the Wellnitz farm. According to Wellnitz, except for the bankruptcy and sale of the property after the murders, this probably would have happened. Moreover, as Meece noted, "magic attracts magic, which is personally what attracted me to [Wellnitz] to begin with, and that was a mutual attraction." In this same regard, Meece also noted that "any occult involvement in these murders *was entirely secondary to a financial gain motive.*" (Emphasis added).

Thus, the evidence established attraction between the two key players in the murders as well as motives, all of which were appropriate under KRE 404(b).[35] In this context, the prosecutor's statements in closing constituted fair comment. Thus, we find no error.

### 7. Meece's Statement to Dell Jones

■ Dell Jones was a polygraphist with the Lexington Police Department. In 1993, he began to give Meece a polygraph. However, when the questions turned to the Wellnitz murders, rather than the purchase of the Browning Hi–Power pistol as he alleged he had agreed to, Meece demanded the polygraph cease. According to Jones, from the time of Meece's request to terminate the polygraph, and during the process of his disconnecting the leads from Meece, their conversations dealt only with

**35.** Meece raises no issues regarding balancing under KRE 403.

paperwork Meece was to sign (a second *Miranda* waiver), along with the nature of the actual questions on the test in case he wanted to come back and do it again. According to Jones, the audiotape, which had been provided to all the parties, was left on during this entire process.

Prior to trial, Meece moved pro se to suppress any statement he may have made to Jones on grounds that the waivers were ineffective and his *Miranda* rights were violated for reasons that he was deceived as to the real purpose for the questioning. According to Meece, he and Detective Wheat had agreed that he would take a polygraph in regard to the Browning Hi–Power pistol. The attempted interrogation, however, dealt with the murders. Because of this, and other alleged coercive actions, Meece contended the waiver was invalid and his *Miranda* rights were violated, compelling suppression of any statements made to Jones. Following an evidentiary hearing at which Jones testified, the trial court denied the motion, finding the statements Meece made to Jones were voluntary.

In testifying at trial about conversations during this testing,[36] Jones testified that, "at one point, [Meece said] that there had been sixteen rounds fired." According to KSP Detective Wheat, who initially investigated the murders and testified later in the trial, he had *not* released any information as to how many shots had been fired at the scene; the implication being that this was information only the killer could have known.

Meece now argues that, as the Commonwealth failed to prove that his statement to Jones regarding the number of shots fired was not proven to have occurred *prior* to the attachment of his *Miranda* rights upon his demand for termination of the test, the admission of the statement was error in

violation of *Miranda v. Arizona*, 384 U.S. 436, 473–74, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) ("Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease."). This request must be "scrupulously honored." *Mosley*, 423 U.S. at 104, 96 S.Ct. 321.

Here, Jones's testimony at the suppression hearing supports a finding that no conversations occurred between Meece and him following the termination and during his disconnection of the leads from Meece except in regard to his explanation of the final waiver Meece needed to sign and an explanation of the testing procedure and questions. Meece, during this time, was becoming agitated and threatened to pull the leads off if Jones did not take them off. Thus, there is no factual basis from which to infer that Meece's statement as to the number of rounds fired during the murder occurred *after* his demand for termination.

Meece's conduct during the trial discloses exceptional intellectual abilities and his argument that he was deceived as to the nature of the test is unavailing. He was aware of the nature of the test as the questions were asked. He further admits that he was advised by Jones that "you don't have to stay here if you don't want to .... if at any time during this test you want to be out of here, you let me know and you're out." And he did leave. Accordingly, we find no error in the trial court's admission of Jones's testimony.

### 8. Meece's 1993 Statement to KSP Detective Wheat

■ Meece gave a statement to Detective Wheat at Randy Appleton's apartment

---

**36.** The context of the polygraph test was not mentioned.

in Lexington in March of 1993. According to Meece, this statement was coerced, and, therefore, its admission at trial was error. This issue was not preserved.

In this conversation, Meece discussed with Wheat his sale of the Browning Hi–Power pistol to an "unnamed" person. And, at the time, he was not in custody. Following the conversation, Wheat and the other officers left Appleton's premises.

Plainly, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). Thus, again, we find no error as there is no evidence to indicate the conversations were anything but voluntary.

### 9. *Evidence of Wellnitz's Guilty Plea and Sentence*

 Contrary to her videotaped statement, during her examination by the Commonwealth at trial, Wellnitz attempted to testify that there was no plan to kill her family and that she and Meece were in Lexington during the time of the killings. During her examination, Wellnitz attempted on several occasions to explain her prior statements by saying that she had lied to get the plea bargain she got and that she was "high" during the statement. Thus, the Commonwealth questioned her extensively concerning prior statements she had made during her videotaped statements.

Following the Commonwealth's closing of her direct examination, the defense propounded questions designed to support her testimony, including that she did not re-

member much of her December 31, 2004, statement, the statement was concocted accurately from all the particulars available to her from discovery, as well as her access to alleged medications while in jail.

Thereafter, on redirect, the Commonwealth followed up briefly on her testimony regarding her guilty plea in an effort to impeach her testimony. This impeachment purpose is obvious from the context. Moreover, counsel for Meece made no objection to Wellnitz's mention on direct examination of having pled just to get the plea bargain, nor to the Commonwealth's redirect examination that she pled to life without parole for twenty-five years. Thus, this issue is unpreserved.[37]

As aforementioned, we review unpreserved allegations of error in death penalty cases under the standard established in *Sanders*, 801 S.W.2d at 668; *See also Soto v. Commonwealth*, 139 S.W.3d 827, 848 (Ky.2004). Here, clearly, Meece's failure to object was trial strategy, as Wellnitz's testimony regarding her statement supported Meece's testimony that his statements were also untruthful. Moreover, it was obviously beneficial to Meece for the jury to know that his alleged accomplice only got life without parole for twenty-five years, which was an option in his sentencing. Still, Meece asserts error predicated upon *Commonwealth v. Gaines*, 13 S.W.3d 923 (Ky.2000), *Parido v. Commonwealth*, 547 S.W.2d 125 (Ky.1977), and *Tipton v. Commonwealth*, 640 S.W.2d 818 (Ky.1982).

In *Parido*, we plainly stated that, as the witness' "credibility was *not* an issue, the admission of evidence concerning his guilty plea and the assessed maximum penalty of

---

**37.** We note, however, that Wellnitz's testimony in this regard was similar to Meece's (i.e., that both their earlier taped statements admitting guilt were not truthful and were made for purposes other than being guilty; in Meece's case, it was to get a continuance, new coun-

sel, new trial, and (according to him) a visit with his children, while in Wellnitz's case, it was necessary to get the plea bargain she wanted—as "she knew she would not get a fair trial.")

twenty years' imprisonment was reversible error." 547 S.W.2d at 127 (emphasis added). We noted in *Tipton*, however, that *Parido* "left open the possibility that evidence of the plea could be introduced to impeach the co-indictee." 640 S.W.2d at 820. Moreover, in *Gaines*, we affirmed the authority of the Commonwealth to cross-examine a witness concerning a guilty plea where the issue was first raised by the defense. 13 S.W.3d at 924.

In this instance, the Commonwealth did not seek to elicit information about the "guilty plea" on its direct examination. It was volunteered by Wellnitz and supportive of Meece's positions. Thus, the Commonwealth's inquiry of Wellnitz in regard to her plan and sentence was clearly for purposes of impeachment. Thus, aside from Meece's strategy, we find no error.

### 10. Crime Scene Videos and Photographs

■ In addition to diagrams of the crime scene, at trial the Commonwealth played a videotape of the scene and victims during the testimony of the coroner. Thereafter, during the testimony of a KSP detective, twelve photographs of the victims were shown to the jury. Kentucky State Medical Examiner, Barbara Weakley–Jones, also testified extensively about the wounds to each of the bodies and introduced eight enlarged wound charts, as well as nineteen autopsy photographs of the Wellnitz family. Although he failed to preserve this issue at trial, Meece now argues that, as the videotapes and photographs were unnecessary to prove any point in actual controversy, their use was error. We disagree.

■ " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." KRE 401. Moreover, photographic or video presentations are simply not excludable because they are gruesome and the crime is heinous. *Bedell v. Commonwealth*, 870 S.W.2d 779 (Ky.1993); *Epperson v. Commonwealth*, 809 S.W.2d 835 (Ky.1990); *Holland v. Commonwealth*, 703 S.W.2d 876 (Ky.1985); *Gall v. Commonwealth*, 607 S.W.2d 97 (Ky. 1980) *overruled on other grounds* by *Payne v. Commonwealth*, 623 S.W.2d 867 (Ky.1981).

Here, all of the crime scene videos and photographs were relevant to show the circumstances of the crime and the nature of the injuries inflicted by Meece. Not only did these photographs aid the medical examiner in explaining the nature and cause of the victims' injuries and their ultimate deaths, but they also helped establish that the person who inflicted the wounds intended to cause the victims' deaths, as did the crime scene diagrams and videotapes. And, unlike the photographs in *Clark v. Commonwealth*, 833 S.W.2d 793 (Ky.1991), and *Funk v. Commonwealth*, 842 S.W.2d 476 (Ky.1992), the photographs and videos in the present case did not depict mutilation, decomposition, or decay not directly related to the crime.[38]

Where depictions relate to an element of the case, a defendant may not deprive the Commonwealth of its right to prove its case by stipulating or not contesting issues to which the proof relates. There was no error here.

### B. Evidence Excluded

#### 1. Wellnitz's Hearsay Testimony

During the presentation of his defense, Meece recalled Wellnitz to the stand.

---

**38.** Meece further argues that the prosecutor's act of using the photographs in the penalty phase argument was error. It was not.

During this testimony, she was again asked to explain why she pled guilty if she was innocent. She responded that, based on her counsel's statements to her, literature he had provided to her, and her experiences up to that time in the legal process, she did not feel she could get a fair trial, and would thus get the death penalty. In addition, she testified she did not want to put her grandmother and son through the process of having to beg for her life in the penalty phase were she convicted. When she started to detail, however, what she was actually told by her counsel, the Commonwealth objected and the trial court sustained the objection, explaining that her counsel's statements to her were "all hearsay."

Meece argued, however, that it was not being offered for the truth of the matter asserted, but was non-hearsay (state of mind) evidence admissible under KRE 801(c), offered only to explain her actions. Thereafter, the trial judge reiterated that the testimony was hearsay and admonished the jury not to consider her previous statements regarding what she was told.[39] Moreover, Meece asserts that—as one of the biggest hurdles he had to overcome was convincing the jury there were legitimate reasons why he and Wellnitz would plead guilty even though they were innocent—this ruling prevented him from presenting Wellnitz's reasons for pleading guilty, and therefore, deprived him of his right to present a defense and to a fair trial under the rationale of *Crane v. Kentucky*, 476 U.S. 683, 689, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986), as well as, under the Constitutions of the United States and this Commonwealth.

■ *Crane*, however, "never questioned the power of [the] States to exclude evidence through the application of eviden-

---

39. During her avowal, Wellnitz testified, in pertinent part, that:

[Her attorney] said that Sheriff Cheatham was lying and my whole trial was going to be like that and everybody knew it. And that without a change of venue they might as well put the needle in my arm.

....

I was very distraught by the entire thing, and pretty much that's what pushed me over the edge to take a plea bargain. They'd been kind of pushing me towards trying to get a plea bargain for quite a while but that kind of did it. And, you know, at the time they were saying, "Well at least if you take this plea bargain, you know, your life won't be over. When you get out, it, it's, your first chance at parole, you won't, you won't be that old. Fifty-three's not that old.["] And it—I'd been all ready to stand firm and, you know, stand up for myself, and try to trust the judicial system, but he basically told me it was going to be a joke and I was screwed. And that, you know, the truth was irrelevant and what was relevant was what was going to happen to me and did I really think I could get a fair trial in Adair County? And, I didn't. I couldn't even go to my own high school reunion and I hadn't even been indicted yet.

....

He said that the only way I [would not] get-when we lost, the only way I wasn't going to die is if Nannie and Gabe got on the stand and cried and begged the jury for my life.

....

My grandmother's had enough, and this, this whole thing is horrible enough for her to begin with. I mean, I can't even imagine putting her in that position, I mean, that's just horrible, and he, and he would bring that up every time I saw him. Well, have you decided what you're going to do about the penalty phase? And, you know, it was really—I wasn't on my psych meds. I was already really depressed anyway. I was under tremendous amounts of strain and, you know, then he started talking about, and they might not let, then they might put it off and try Bill first and, "You could be in County Jail for another two years." And, I mean, I just pretty much gave up. And, you know, they were telling me that that was the only chance I was going to have at any sort of a life ever, was to take a plea bargain and hope for parole.

692

tiary rules that themselves serve the interests of fairness and reliability—even if the defendant would prefer to see that evidence admitted." *Crane*, 476 U.S. at 690, 106 S.Ct. 2142 (*citing Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973)). And, as was noted in *Chambers*, "[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense. [However, i]n the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." 410 U.S. at 302, 93 S.Ct. 1038 (internal citations omitted).

 "An objection on hearsay grounds will often be met with a claim that the statements in question are being offered as non-hearsay. The key to determining whether such a claim is legitimate, or merely a pretext for violating the hearsay rule, is a proper application of the relevancy requirement." Lawson, *supra*, § 8.05(3), at 558. Relevancy, in this respect, "does not turn on whether the information asserted tends to prove or disprove an issue in controversy, but on whether the action taken by the [witness] in response to the information that was furnished *is an issue in controversy.*" *Sanborn v. Commonwealth*, 754 S.W.2d 534, 541 (Ky.1988) (plurality op.) *overruled on other grounds* by *Hudson v. Commonwealth*, 202 S.W.3d 17 (Ky.2006).

 Here, Wellnitz's state of mind during her statement was an issue, as the jury was presented with her contrasting statements—those made while on trial professing her innocence versus those made in her videotaped statement. Thus, its exclusion was error.

 However, given the considerable amount of time she spent during her testimony explaining why she made her confession, notwithstanding her professed inno-

cence, the error was harmless. She was, in fact, allowed to testify that she confessed because, based upon her conversations with her attorney and the literature he gave her, and her desire not to put her grandmother and son through the process of crying and begging for her during the sentencing phase, she decided to confess to get a lighter sentence, since she believed that she would not get a fair trial and would be convicted and given the death penalty otherwise. This was repeated time after time.

Thus, the exclusion of the few particulars she may have added by her recitation of her attorney's statements to her was harmless.

*2. Judicial Notice of a Disputed Recitation of Fact in a Prior Court of Appeals' Opinion Regarding Meece's Divorce*

 Prior to trial, Meece asked the trial court to take judicial notice of a recitation of fact contained in a related Court of Appeals' opinion dealing with visitation rights in Meece and Meade's dissolution proceeding. In its recitation of facts, the Court of Appeals' opinion stated:

Meece and Meade separated in November 1999. The following month, Meade filed rape charges against Meece. While the case was pending, Meece agreed not to contest Meade's request for a domestic violence order (DVO) based on the circumstances alleged in the criminal complaint.

The grand jury refused to indict Meece, and the case was returned to the district court. *[Thereafter, t]he charges against Meece were dismissed by the district court on the motion of the County Attorney because Meade had been untruthful in her statements concerning the alleged rape.*

(Emphasis added).

The trial court heard the matter on June 1, 2006, and ruled that it would take judicial notice of the opinion to the extent that the charges levied at Meece by Meade were dismissed on motion of the Commonwealth. The court ruled, however, that it would *not* take judicial notice of the *reason* for such dismissal, as the reason for such appeared to be an opinion.

At trial, Meece established during Meade's testimony that the charges she filed against him had been dismissed. Meade denied, however, that the charges were untrue.

Under KRE 201, a court may take judicial notice, or take notice of a fact which is not subject to reasonable dispute in that it is either: "(1) generally known within in the county from which the jurors are drawn, or, in a nonjury matter, the county in which the venue of the action is fixed; or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." KRE 201(b). If so taken, "[t]he court shall instruct the jury to accept as conclusive any fact judicially noticed." KRE 201(g).

Here, we are not dealing with a question arising within the knowledge of the community of jurors, but rather, whether its accuracy is "capable of accurate and ready determination." This has been referred to as the "authoritative sources test." Lawson, *supra*, § 1.00[3][c], at 10. In this regard, Professor Lawson has noted:

> Anything which can be 'looked up' in an authoritative source is a candidate for this type of judicial notice. [If so, t]he judge should ask two questions: (1) Does the source provide the precise fact to be noticed; and (2) Is the source accurate? While the first question is answered by reading the source, the second question may require the judge to pass on the accuracy of the source as a preliminary matter under Rule 104(a).

*Id.* (*quoting* Evidence Rules Study Committee, Kentucky Rules of Evidence—Final Draft, p. 16 (Nov.1989)).

"[W]hen facts do not possess this requisite degree of certainty, the basic standards on which the system of evidence is based require formal proof within the framework of the adversarial system." *Id.* (*quoting* 1 Joseph McLaughlin, *Weinstein's Federal Evidence*, § 201.02[2] (2d ed.2003)). Of course, there is some stringency in the application of KRE 201, "because accepting disputed factual propositions about a case 'not tested in the crucible of trial is a sharp departure from standard practice.'" *United States v. Hoyts Cinemas Corp.*, 380 F.3d 558, 570 (1st Cir.2004) (*quoting Lussier v. Runyon*, 50 F.3d 1103, 1114 (1st Cir. 1995)). Moreover, some courts take the position that "were [it] permissible for a court to take judicial notice of a fact merely because it had been found to be true in some other action, the doctrine of collateral estoppel would be superfluous." *Taylor v. Charter Medical Corp.*, 162 F.3d 827, 830 (5th Cir.1998); *See also Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388–89 (2d Cir.1992); *Holloway v. A.L. Lockhart*, 813 F.2d 874, 878–79 (8th Cir.1987); *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir.1994).

Although a finding of fact may satisfy the indisputability requirement of KRE 201, the requirement has not been satisfied in this case as the proposed fact to be noticed was a county attorney's alleged reason for dismissing the charge. Thus, if true, it was his opinion only—without any support in any underlying court adjudication. Thus, we find no error.

### 3. *Meece's Letters to Wellnitz's Attorney*

During examination of Meece, his counsel sought to use copies of two letters

that Meece wrote to Wellnitz's attorney apparently informing him of his plan to give false statements in exchange for a plea bargain. The letters included Meece's prison identification number, the name of the prison in which he was then held, and his address. Prior to introducing them, Meece's counsel moved to have the letters redacted to delete this information.

Opining that Meece had opened the door to this information, the trial court deferred its ruling until after the Commonwealth's cross-examination. Meece's counsel renewed his request the next day following his closing argument. At this time, the motion to redact was overruled.

Meece now claims that it was reversible error for the trial court to deny him the requested redaction of the two letters. However, it was obvious from the evidence, including Meece's own testimony, that he was incarcerated while awaiting trial.[40] Thus, any error in this regard, if there was—given the other evidence indicating his incarceration—was utterly harmless.

### 4. Letters Between Meece and His Children

■ During the sentencing phase, Meece testified about his love for his three children and his difficulty in corresponding with them due to their mother's uncooperativeness. He also noted that he had not seen his children since the December 2004 meeting facilitated by the withdrawn plea bargain. He was, however, able to corre-

spond with them during several summers when they were at summer camp. In essence, Meece testified that he loved his children and when they could communicate with him, they assured him of their love. Meece's testimony in this regard was uncontested.

As part of this testimony, however, Meece offered copies of several letters he had written to the children while they were at summer camp and several they had written in return. All the letters were excluded on the grounds of hearsay.[41]

While we acknowledge, "[w]e think it desirable for the jury to have as much information before it as possible when it makes the sentencing decision," *Gregg v. Georgia*, 428 U.S. 153, 204, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), such evidence must still come in under our Rules of Evidence.[42] Here, the letters obviously dealt with Meece's and the children's states of mind at the time of their separate writings. And, where admissible, we have not been hesitant to allow for their evidentiary value, brief glimpses of the love a family has for one of their own. *See McQueen v. Commonwealth*, 669 S.W.2d 519 (Ky.1984); *Hilbert v. Commonwealth*, 162 S.W.3d 921, 927 (Ky.2005). In essence, such displays, if entering under the hearsay rules, would have to meet the requirements of KRE 803(3), the state of mind exception.

This exception deals with a "declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling,

---

**40.** During his testimony, Meece even discussed a motion he had filed to "get a good night's sleep" and for "clean underwear" and for him to be able to "keep underclothing." He also testified that December 2004 was the last time he had seen his children.

**41.** During the discussion, the trial court noted that Meece had ample opportunity to bring witnesses in to testify.

**42.** Meece argues otherwise, citing to *Green v. Georgia*, 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979) and *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). However, *Green* and *Chambers* deal with different hearsay restrictions then utilized in the states of Georgia and Mississippi—not the hearsay rule now at issue.

pain, and bodily health)...." KRE 803(3). "Internal states of mind (*e.g.*, intention, love, malice, knowledge, fear, etc.) are regularly pertinent to issues in litigation. They are no less difficult to prove than pain or other bodily condition, not being observable to the naked eye, and thus, have long been the subject of an important exception to the hearsay rule: 'assuming that the state of mind of a person at a particular time is relevant, . . . his declarations made at that time are admissible as proof on that issue, notwithstanding that they were not made in the presence of the adverse party.'" Lawson, *supra*, § 8.50[3], at 645 (*citing Goin v. Goin*, 313 Ky. 259, 230 S.W.2d 896, 898 (1950)).

Love, and the capacity to exhibit such, is both an emotional condition and a sensation. Thus, if otherwise relevant, the letters were admissible. And, as aforenoted, we have recognized that brief glimpses of the love a family has for one another can be relevant. Thus, we find that, for purposes of sentencing, glimpses of the bonds between family members and defendants, as well as the victims, are admissible within bounds, for whatever value a jury would give them. *See McQueen*, 669 S.W.2d 519; *Hilbert*, 162 S.W.3d 921.

■ To this extent, the court erred in excluding the letters. However, given the fact of Meece's uncontested testimony about the love between himself and his estranged children, the error is harmless.

### 5. *Meece's Explanation of His Guilty Plea*

■ David Kaplan was Meade's counsel in her divorce from Meece. Just prior to Meece's guilty plea, Kaplan faxed Brian Wright (the Commonwealth's Attorney prosecuting Meece) a letter stating that if Meece would plead guilty, his wife would agree to allow him a visit with his children so he could explain to them why he would be spending the rest of his life in prison. A copy of the letter was given by Wright to Meece's then-defense counsel. During his testimony, Meece offered a copy of the fax into evidence in support of his evidentiary position that he gave false statements and falsely pled guilty to get this visit with his children,[43] as well as to avoid going to trial with his then-defense counsel, whose ineffectiveness he alleges he feared was going to lead to the jury sentencing him to death.

When offered, the Commonwealth objected on the grounds of hearsay and the court sustained the objection. Meece now asserts that the exclusion was error for reasons the fax was admissible under KRE 801A(b)(2), (3), and (4), and, in the alternative, were it to be hearsay, its exclusion violated the holding of *Chambers*, 410 U.S. at 302, 93 S.Ct. 1038, i.e., that state hearsay rules must give way to a defendant's right to present a defense.

KRE 801A(b) provides, in essential part, that:

(b) Admissions of parties. A statement is not excluded by the hearsay rule, even though the declarant is available as a witness, if the statement is offered against a party and is:

. . . .

(2) A statement of which the party has manifested an adoption or belief in its truth;

(3) A statement by a person authorized by the party to make a statement concerning the subject;

(4) A statement by the party's agent or servant concerning a matter within the scope of the agency or employment,

---

**43.** During the July 31, 2006 evidentiary hearing, Meece expressly conceded that the Commonwealth did not negotiate visitation with his children as a part of the plea. As previously noted, the trial court also made a finding that the visitation with his children was not part of Meece's plea agreement.

made during the existence of the relationship. . . .

Under KRE 801A(b), the statement must be one "offered against a party." *Id.* Here, the fax was offered against the Commonwealth without any proof that it had "manifested an adoption or belief in its truth," KRE 801A(b)(2), other than the fact that it received and transmitted the letter from Meade's counsel; or, that the statement was made "by a person authorized by the [Commonwealth] to make a statement concerning the subject," KRE 801A(b)(3), (i.e., David Kaplan); or, that David Kaplan was the Commonwealth's agent for the purpose of facilitating the plea negotiations. Thus, we find no error.

 Even so, Meece was not prevented from testifying as to his version of the genesis for his plea agreement. He did so extensively. Thus, in no sense of the word, was Meece denied "a meaningful opportunity to present a complete defense." *Crane,* 476 U.S. at 690, 106 S.Ct. 2142. And, *Chambers,* as asserted by Meece, dealt with a significantly different hearsay exception. Thus, even were we to find error in this instance, it would be harmless.

### 6. *Exclusion of Portions of Diane Haynes' Testimony*

 During Meece's case-in-chief, he sought to introduce testimony from Diane Haynes concerning a phone conversation she overheard between Joseph Wellnitz and an unknown third party. The trial court excluded this testimony on grounds of hearsay and relevancy. On avowal, Haynes testified that in the days before their deaths, she was in the Wellnitz's family room with Mr. and Mrs. Wellnitz, when Mr. Wellnitz received a threatening phone call from someone regarding some animals. He spoke with Mrs. Wellnitz about it and Haynes felt concerned about it.

Meece now contends this exclusion impeded his constitutional right to due process to present a defense and evidence of an alternate perpetrator. *See Beaty v. Commonwealth,* 125 S.W.3d 196 (Ky.2003); *Blair v. Commonwealth,* 144 S.W.3d 801 (Ky.2004).

 Meece "is correct . . . that under both the Kentucky and the United States Constitutions, he has the right to present a complete and meaningful defense." *Brown,* 313 S.W.3d at 624–25 *(citing Beaty v. Commonwealth,* 125 S.W.3d 196 (Ky.2003)); *Holmes v. South Carolina,* 547 U.S. 319, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006). "A defendant is not at liberty, however, 'to present unsupported theories . . . and invite the jury to speculate as to some cause [for the crime] other than one supported by the evidence.'" *Brown,* 313 S.W.3d at 625 *(quoting Davenport v. Commonwealth,* 177 S.W.3d 763, 772 (Ky.2005) (internal citations and quotation marks omitted)). Thus, "[a] trial court may infringe upon this right when the defense theory is 'unsupported,' 'speculat[ive],' and 'far-fetched' and could thereby confuse or mislead the jury." *Beaty,* 125 S.W.3d at 207 (alteration in original, internal citations omitted).

In this instance, there was no evidence to support the caller having committed any crime. Thus, this evidence was "unsupported, speculat[ive], and far-fetched and could thereby confuse or mislead the jury." *Id.* (internal quotation marks omitted). There was no abuse of discretion. Thus, again we find no error.

### C. Trial and Procedural Issues

#### 1. *Procedural*

#### a. *Failure to Allow Meece to Speak with Counsel While on the Stand*

 Meece asserts that the trial court erred by preventing him from talking to

his counsel while he was on the witness stand. During Meece's testimony, the trial court ruled that the letter from David Kaplan (and Meece's visitation with his children) was hearsay. Following this ruling, Meece asked the court if he might have a moment to confer with his counsel, which the court denied, pointing out that he was on the witness stand. No recess had been called. Meece asserts this refusal was an unwarranted interference with his right to counsel, suggesting now that the request was made in his "pro se counsel" role, and pursuant to his constitutional rights "to be heard by himself and counsel" under Section 11 of the Kentucky Constitution. We find no error here.

■ Whatever role a defendant may play in a trial, when he takes the stand, he is a witness. "[W]hen a defendant becomes a witness, he has no constitutional right to consult with his lawyer while he is testifying. He has an absolute right to such consultation before he begins to testify, but neither he nor his lawyer has a right to have the testimony interrupted in order to give him the benefit of counsel's advice." *Perry v. Leeke*, 488 U.S. 272, 281, 109 S.Ct. 594, 102 L.Ed.2d 624 (1989); *See also Beckham v. Commonwealth*, 248 S.W.3d 547, 554 (Ky.2008) ("As the Court held in *Perry*, 'we do not believe the defendant has a constitutional right to discuss [his] testimony while it is in process.'").

Moreover, during the June 1, 2010 hearing, when inquired of by the court, Meece asserted that he did not wish to act as his own co-counsel. He also asserted that he did not wish to participate as counsel during trial. Here, in any event, he was the witness.

### b. The Sequestering of Meade During a Recess in Her Testimony

■ Meece also complains that the court improperly barred his counsel from interviewing Meade during an overnight recess in the course of her ongoing testimony. However, a "judge's power to control the progress and, within the limits of the adversary system, the shape of the trial includes broad power to sequester witnesses before, during, and after their testimony." *Geders v. United States*, 425 U.S. 80, 87, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976) (*citing Holder v. United States*, 150 U.S. 91, 92, 14 S.Ct. 10, 37 L.Ed. 1010 (1893)); *United States v. Robinson*, 502 F.2d 894 (7th Cir.1974); *United States v. Eastwood*, 489 F.2d 818, 821 (5th Cir.1974). Moreover:

> Wigmore notes that centuries ago, the practice of sequestration of witnesses "already had in English practice an independent and continuous existence, even in the time of those earlier modes of trial which preceded the jury and were a part of our inheritance of the common Germanic law." 6 J. Wigmore, Evidence s 1837, p. 348 (3d ed., 1940). The aim of imposing "the rule on witnesses," as the practice of sequestering witnesses is sometimes called, is twofold. It exercises a restraint on witnesses "tailoring" their testimony to that of earlier witnesses; and it aids in detecting testimony that is less than candid. *See* Wigmore, Supra, s 1838; F. Wharton, Criminal Evidence s 405 (C. Torcia ed.1972). Sequestering a witness over a recess called before testimony is completed serves a third purpose as well preventing improper attempts to influence the testimony in light of the testimony already given.

*Geders*, 425 U.S. at 87, 96 S.Ct. 1330.

In *Geders*, "[t]he trial judge ... sequestered all witnesses for both prosecution and defense and before each recess instructed the testifying witness not to discuss his testimony with anyone. Applied to non-party witnesses who were present to give evidence, the orders were [found to be] within sound judicial discretion...." *Id.* at 87–88, 96 S.Ct. 1330.

The rule as to parties, however, is somewhat different, as "[a] sequestration order affects a defendant in quite a different way from the way it affects a non-party witness who presumably has no stake in the outcome of the trial. A non-party witness ordinarily has little, other than his own testimony, to discuss with trial counsel; a defendant in a criminal case [, however,] must often consult with his attorney during the trial." *Id.* at 88, 96 S.Ct. 1330. "Moreover, 'the rule' accomplishes less when it is applied to the defendant rather than a non-party witness, because the defendant as a matter of right can be and usually is present for all testimony and has the opportunity to discuss his testimony with his attorney up to the time he takes the witness stand." *Id.* Even so, a defendant does not have "a constitutional right to discuss [his] testimony while it is in process." *Beckham*, 248 S.W.3d at 554 (*citing Perry*, 488 U.S. at 283–84, 109 S.Ct. 594).

In *Beckham*, we upheld a trial court's admonition limiting a defendant and his counsel's contact by directing the attorneys not to discuss their "clients ongoing testimony." *Beckham*, 248 S.W.3d at 553–54. Moreover, we have held that "'[t]he rule clearly does not restrict trial counsel's freedom to confer with his own witness during [a recess during the] trial.'" *Smith v. Miller*, 127 S.W.3d 644, 646 (Ky.2004) (*quoting Reams v. Stutler*, 642 S.W.2d 586, 589 · (Ky.1982) ("The admonition [disapproved of] was given when a recess was called interrupting respondent's direct examination of Dr. Lyon.")).

Here, Meade was a non-party witness and, as such, the only thing to discuss with her would relate to her testimony, whether already given or to be given the next day. Such a discussion would violate the premises for the rule of sequestration. There was no prohibition of any discussion or investigation of her prior to her testimony, or, for that matter, afterwards—only during her testimony. Thus, we find no error.

#### c. *KRE 615*

■ Meece also alleges that the trial court erred when it allowed two former lead detectives on the case, Roy Wheat and Dennis Benningfield, to sit at counsel table during the trial.[44]

A similar circumstance was addressed in *United States v. Phibbs*, 999 F.2d 1053 (6th Cir.1993), in reference to FRE 615(3), a rule identical, in pertinent part, to our KRE 615.[45] There, the court allowed a Drug Enforcement Administration (DEA) special agent, qualified as an "essential" witness who could remain in the courtroom in addition to a Federal Bureau of Investigation (FBI) special agent, qualified as a governmental representative, to assist with the drug prosecution. *Id.* at 1073. In upholding the inclusion, the *Phibbs* court held that:

> The "essential" witness exception set out in Rule 615(3) "contemplates such per-

---

**44.** There were at least five lead investigators during the thirteen years between the crime and the trial. At trial, the officer in charge was Mark Wesley. He had maintained responsibility for the case for two and one half years prior to trial. Before Wesley, there was Joe Woods, and prior to Woods, Ken Hill had been the lead investigator. Roy Wheat, however, was the original investigator until he retired in 1997. Dennis Benningfield then took over for two years after Wheat, and later returned to the case for a year, three years later. It is unclear who was in charge between Benningfield's two assignments to the case.

**45.** KRE 615 "does not authorize exclusion of ... [a] person whose presence is shown by a party to be essential to the presentation of the party's cause." KRE 615(3) Similarly, FRE 615 "does not authorize exclusion of ... a person whose presence is shown by a party to be essential to the presentation of the party's cause." FRE 615(3).

sons as an agent who handled the transaction being litigated or an expert needed to advise counsel in the management of the litigation." We are persuaded that [the DEA agent] fell within this category due to the particular circumstances of the case at bar. This was a trial that was scheduled for approximately one month, involving several defendants and a great deal of evidence, not all of which was readily accessible. After [the FBI agent] was designated the government's representative in accordance with Rule 615(2), the court determined that [the DEA agent], who was intimately familiar with portions of the evidence, was also needed to advise the government in its handling of the prosecution. As [they] were, for the most part, responsible for distinct aspects of a far-flung investigation, this was not an abuse of discretion.

*Id.*

Likewise, in this case, Wheat and Benningfield were, for the most part, the lead investigators responsible for different periods of time. Given the unique nature and complexity of the case, the vast time period of investigation, and the length and complexity of the trial, the trial court did not abuse its discretion in allowing both to remain at counsel's table to advise the prosecution in its handling of the case.[46]

### 2. Jury Selection

#### a. Voir Dire

##### i. Individual Voir Dire

■ Meece asserts here that the court erred by placing impermissible restrictions on individual voir dire, alleging that the defense was not allowed to ask jurors their feelings about the death penalty, or about what purpose they thought the death penalty served, or about the specific mitigator of mercy.[47]

During its general statement to the jury at the beginning of the panel's voir dire, the trial court explained the general trial procedure, including the initial guilt phase and the subsequent sentencing phase, along with the requirement of findings of aggravating circumstances prior to the consideration of death as a penalty. Included in this general guidance, the court also explained the interplay of mitigating circumstances, including fairness and mercy, pointing out that even if aggravating circumstances were found beyond a reasonable doubt and no mitigating circumstances were found, death was not mandated. Thereafter, the court began with individual voir dire.

■ Prior to allowing individual voir dire by counsel, the court explained the range of punishments available to the jury were they to find Meece guilty, including finding the required aggravators beyond a reasonable doubt. The court then inquired of each juror as to whether or not that juror could give serious and meaningful consideration to the entire range of punishment and then, again, made inquiries of each juror as to each of the authorized punishments: a term of years, a life sentence, LWOP–25, and death. The court then inquired as to any juror's prior knowledge concerning the case. Following the court's inquiry, further inquiry as to the juror's proper knowledge, consider-

---

46. We also note the trial court took distinct steps to ensure that each did not parrot the other's testimony by requiring that one would be excluded from the courtroom while the other testified.

47. Initially, the court did allow questions concerning the specific mitigation of mercy over the Commonwealth's objection, but after further consideration, reevaluated its position. Yet, both parties continued to discuss mercy as a potential mitigator.

ation of the penalties, aggravators, and mitigators, was left to the parties. They were not allowed, however, to attempt to commit a juror in advance to a particular theory or result. "There is no entitlement ... to a jury or to individual jurors committed at the outset to view particular mitigating factors as having a mitigating effect." *Harris,* 313 S.W.3d at 47.

▮▮▮▮▮ "[P]art of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors." *Fields v. Commonwealth,* 274 S.W.3d 375, 393 (Ky.2008) (*quoting Morgan v. Illinois,* 504 U.S. 719, 729, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992)). However, "it is within the trial court's discretion to limit the scope of voir dire." *Fields,* 274 S.W.3d at 393 (*citing Webb v. Commonwealth,* 314 S.W.2d 543, 545 (Ky.1958)). And, appellate review of such a limitation is one for an abuse of discretion. *Hayes v. Commonwealth,* 175 S.W.3d 574, 583 (Ky. 2005). In this regard, questions as to what a juror's feelings were about the death penalty or what purpose they thought the death penalty or the death penalty's deterrent effect served were properly prohibited. *Woodall v. Commonwealth,* 63 S.W.3d 104, 117 (Ky.2001); *Hodge,* 17 S.W.3d at 839.

We have said that "[t]he test for abuse of discretion in this respect is whether an anticipated response to the precluded question would afford the basis for a peremptory challenge or a challenge for cause." *Hayes,* 175 S.W.3d at 583. However, "[t]he mere fact that more detailed questioning might have somehow helped the accused in exercising peremptory challenges does not suffice to show abuse of ... discretion in conducting the examination." *Woodall,* 63 S.W.3d at 116. Here, counsel were given sufficient leeway in their questioning to develop their challenges for cause.

Meece also complains that after the first several jurors, he was not allowed to question the remaining jurors concerning the specific mitigator of mercy. However, Meece's counsel did include mercy as a mitigator in questions to other jurors.[48] "Here, '[b]oth parties were able to thoroughly voir dire the panel[,]' *Furnish [v. Commonwealth,* 95 S.W.3d 34, 44 (Ky. 2002) ], and we find no error in the trial court's rulings as to the scope of individual voir dire questioning." *St. Clair v. Commonwealth,* 140 S.W.3d 510, 534 (Ky.2004).

### ii. Jury Selection

Meece also alleges additional errors associated with jury selection. These issues were preserved.

#### (a.) Dismissals for Cause— Jurors Excused

He first argues that the court erred in excusing jurors D.S., C.W., and K.D. for cause as they did not express such views as would prevent or substantially impair the performance of their duties in determining the facts and following the court's instructions on the law.

▮▮▮▮ As this Court noted in *Brown v. Commonwealth:*

> Jury selection in criminal cases in Kentucky is governed by RCr 9.30 through RCr 9.40 and Part Two of the Administrative Procedures of the Court of Justice. Under these provisions the trial court is vested with broad discretion to oversee the entire process, from summoning the venire to choosing the petit jury which actually hears and decides the case. *Fields v. Commonwealth,* 274

---

48. Although the trial court in its introductory comments mentioned mitigators such as "fairness and mercy," mercy is not specifically mentioned as a statutory mitigating circumstance. KRS 532.025.

S.W.3d 375 (Ky.2008); *Soto v. Commonwealth,* 139 S.W.3d 827 (Ky.2004). Our review of the rulings [Meece] challenges is thus limited to determining whether the trial court abused that discretion, that is, whether the ruling can be characterized as arbitrary, unreasonable, or contrary to sound legal principles. *Commonwealth v. English,* 993 S.W.2d 941 (Ky.1999).

313 S.W.3d 577, 596 (Ky.2010).

 Further, as noted in *Brown:*

[T]he United States Supreme Court recently reviewed its precedents in this area and found them to establish at least the following four principles:

> First, a criminal defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause.... Second, the State has a strong interest in having jurors who are able to apply capital punishment within the framework state law prescribes.... Third, to balance these interests, a juror who is substantially impaired in his or her ability to impose the death penalty under the state-law framework can be excused for cause, but if the juror is not substantially impaired, removal for cause is impermissible.... Fourth, in determining whether the removal of a potential juror would vindicate the State's interest without violating the defendant's right, the trial court makes a judgment based in part on the demeanor of the juror, a judgment owed deference by reviewing courts.

*Uttecht v. Brown,* 551 U.S. 1, 9, 127 S.Ct. 2218, 167 L.Ed.2d 1014 (2007). (citations omitted). The distinction the trial court must make under these principles is not the simple one between potential jurors who oppose and those who favor capital punishment. It is the much more difficult distinction between potential jurors whose opposition to, or whose reservations about, capital punishment would "prevent or substantially impair the performance of [their] duties as ... juror[s] in accordance with [their] instructions and [their] oath." *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) (citation and internal quotation marks omitted), and potential jurors whose reservations about capital punishment are as serious, perhaps, but who are capable, nevertheless, of considering capital punishment in circumstances where the General Assembly has deemed it an appropriate potential sentence.

*Brown v. Commonwealth,* 313 S.W.3d at 598–99 (alterations in original). Thus,

> [I]t is the trial court's difficult task to distinguish between potential jurors whose [contrasting statements] reflect[ ] merely careful thinking and a strong sense of responsibility in the face of such an important decision and those jurors whose [contrasting statements] signal[ ] an impaired ability to abide by the jury instructions and to give to capital punishment the consideration Kentucky law requires. Because this distinction will often be anything but clear and will hinge to a large extent on the trial court's estimate of the potential juror's demeanor, the decision is one particularly within the trial court's discretion and is subject to reversal on appeal only for an abuse thereof. *Uttecht, supra.*

*Id.* Moreover,

> A juror is not disqualified ... merely because he or she "find[s] it difficult to conceive of minimum punishment when the facts as given suggest only the most severe punishment.... [Nor is the test] whether a juror agrees with the law when it is presented in the most extreme manner. The test is whether,

after having heard all of the evidence, the prospective juror can conform his views to the requirements of the law and render a fair and impartial verdict." *Stopher v. Commonwealth,* 57 S.W.3d 787, 797 (Ky.2001); *Walker v. Commonwealth,* 288 S.W.3d 729 (Ky.2009).

*Harris v. Commonwealth,* 313 S.W.3d 40, 47 (Ky.2010).

Having reviewed the colloquy between the court and counsel in regard to Jurors D.S., C.S., and K.D., we find no abuse of discretion by the trial court in its excusal of these jurors for cause.

▌▌▌▌ Juror D.S. was asked, and answered:

Judge: Could you have a serious, meaningful consideration—an honest consideration—in the imposition of the death penalty?

D.S.: [Long pause.] That'd be difficult for me to do.

Judge: I'm sure it would. But, even though it may be difficult, would you consider it—seriously consider it? The death penalty?

D.S.: Well, I do have a problem with that. I really do.

. . . .

Judge: Are you telling me that you could not give serious consideration, then, to the imposition of the death penalty?

D.S.: It'd be very difficult for me. Yes, sir.

Juror C.S. was asked, and answered:

Judge: Would you if you found beyond a reasonable doubt that someone committed the crime, that there was an aggravating circumstance and you believed that the evidence warranted the imposition of the element of his death—could you vote for death?

C.S.: It really would be hard for me to go with the death penalty.

Judge: I'm sorry?

C.S.: It would re—It would be really hard for me to go with the death penalty.

Judge: It would be hard for anyone to go with the death penalty, I believe. Now, I'm asking you if it was warranted by the evidence could you vote for the death penalty?

C.S.: I, I would consider it.

Judge: You would consider it. That's the only answer you can give me?

C.S.: Ye—Depending on what evidence is presented.

Judge: Well I just asked you, ma'am, if it was warranted, could you vote for the death penalty?

C.S.: I don't believe so, I can, I don't believe sir I can.

Juror K.D. was asked, and answered:

Judge: Now, I'm not asking you to make a commitment as to what you would do—I'm not asking that. You've not heard any testimony, you've not received any evidence. What I am asking is could you consider—could you consider each one of these potential penalties. Could you give a serious, meaningful, honest consideration to the entire range of punishment?

K.D.: To be honest, I, I really don't know if I could do the death penalty.

Judge: Well, we certainly want you to be honest with us, now.

K.D.: I mean, I always thought I believed in it. But, until I was actually put in this place, I'm not really sure.

. . . .

Judge: Now, are you telling me that you could not consider the death penalty.

K.D.: I—I don't know. I just kind of have a problem with it. Like I said, I always thought I believed in it, but I never was put in a position that I had

to make the decision, so, I—I just don't know.

Judge: You don't know? Let me ask you this. Prior to last Thursday when you came here to court, did you have any knowledge of this case?

K.D.: Yes, sir.

Judge: Tell us what you knew about it, please.

K.D.: Uh—I worked with the, a fellow, for the last five years that's from Columbia, Kentucky.

Judge: Yes, sir.

K.D.: And, uh, I didn't know this trial was coming about, but, uh, at that time, but, uh, he had told me, uh, why the crime was committed, how the crime was committed, and uh, some of the details about a couple of rooms that the crime was committed in.

Judge: About a couple of what, now?

K.D.: A couple of the rooms in the house that the crimes were committed in.

Judge: Yes, sir.

K.D.: And, uh, of course I don't know if what he t—told me is actually facts if that's just what he had heard from other people. But, yes, sir, I had—

Judge: Let me ask you this, sir. Based upon what he told you—what you heard about this matter. Did you form an opinion as to the guilt of innocence of the defendant, Mr. Meece?

K.D.: Well, yes, sir, at that time I kind of did. But, I don't think that I would have a problem putting that off.

Judge: You said you kind of did. What do you mean by that, if I may ask?

K.D.: Well, I kind of thought he was guilty. I mean, I did think well, yeah, this guy did it. But—

Judge: Did you—did you express that opinion?

K.D.: Well—

Judge: Did you ever tell anybody that? Your friend when you and he were talking about it?

K.D.: Yes.

Judge: You told him that?

K.D.: Yeah. Well, he told me, and I kind of agreed. But, uh, this is the first time I've ever done jury duty—this month.

Judge: I understand.

K.D.: And, while I come on this jury, I kind of look at things different now, so, uh, even though I had heard this before and had formed an opinion at that time, I think I could still look at it with an open mind, if I'm picked to do so.

Following this colloquy between the trial judge and Juror K.D., there was an objection and a bench conference between the attorneys and the court primarily regarding Juror K.D. having formed an opinion about the case, thereafter, the Commonwealth resumed its voir dire of this juror.

Commonwealth: I want to talk with you about the punishments up here on the board. You indicate that you had always believed in the death penalty. Uh, when the court asked you if you felt like you could, uh, seriously consider [inaudible]. Let me, refresh for me what your response was to that.

K.D.: Well, I think I could consider it, but, I don't know if I could go through with it. I've always believed in it, uh, when I leave here, if it were my family, I would probably believe in it. Ill probably believe in it tomorrow. But, can I be the one to actually say who lives and who dies—I can't do that.

Commonwealth: And, and, so from that, I take it that, that, in a, in a murder case you don't feel like you, as a juror, could seriously consider the imposition of the death penalty?

K.D.: That's correct. I would consider it, but I just don't think I can do it.

Commonwealth: Would that be true in all cases?

K.D.: The other charges—or another—

Commonwealth: No, no. With regard to the death penalty. If you don't feel you could do it. Is that—that wouldn't just be in this case, but that would be true in any case.

K.D.: That would be—yes, sir, that would be true in any case.

From the total context of their answers, we cannot say that the trial court abused its discretion in excusing them under these circumstances. Moreover, as the trial court recognized in its rulings, K.D. acknowledged that he had previously formed an opinion of Meece's guilt. *See Montgomery v. Commonwealth*, 819 S.W.2d 713, 716 (Ky.1991). Thus, we find no error in the trial court's excusal of these jurors for cause.

### (b.) Meece's Challenges for Cause— Jurors Not Excused

During voir dire, Meece challenged Jurors L.W., D.M., S.P., and C.H. for cause. Each challenge was overruled, and subsequently, each of the jurors was removed by a peremptory strike. Meece now alleges error in the failure to remove these juror for cause.

When questioned initially by the court during individual voir dire, L.W. stated that he would give serious and meaningful consideration to all the possible sentences from a term of years up through the death penalty. Thereafter, he was questioned by Meece's counsel, Mr. Eustis, wherein he was asked, and answered:

Eustis: [W]e're talking about aggravators—multiple murders. In a situation like that, do you—do you think that anyone who killed somebody should automatically be executed themselves?

L.W.: It's according—what happened and what caused and everything. You've gotta hear the sides of it to see which—what you—I understand that.

Eustis: Well, let's say you've got the aggravators of a multiple murder, willful, planned, robbery. Do we start out by now saying that man should die unless they can convince me otherwise?

L.W.: No, I think [he] should get fair trial and get a—get to hear his case and then decide after I get done.

Eustis: No, he's already been found guilty.

L.W.: Oh, he's done been found guilty.

Eustis: He's already found guilty, already decided it's been multiple murders, and willful, and a robbery.

L.W.: I—I think he should get the punishment he's supposed to get.

Eustis: Which is?

L.W.: If it's multiple murders—then death

Eustis: Death. That's where we start?

L.W.: Yeah.

Eustis: And then the defense has to try to convince you otherwise?

L.W.: That's right.

Eustis: Okay. Thank you, sir.

Thereafter, he was examined by the Commonwealth, and was asked and answered as follows:

Commonwealth: What Mr. Eustis was talking to you about, what the law allows of the indictment in this case.

L.W.: Yeah.

Commonwealth: There—there are multiple counts of murder, [inaudible] and we're thinking ahead to the penalty phase. But, now, we're not talking about this case, because in this case, Mr. Meece is presumed innocent.

L.W.: I would agree with that.

Commonwealth: Let's just talk about a murder case, far removed from this one. And, in Kentucky there are what's called aggravating circumstances that make a case eligible for the death penalty. It could be that there were multiple victims. It could be there was a—the victim was a police officer. It could be that the murder occurred during a rape or an arson. But, there's something else-not just a murder, but a murder plus something. Now, you're also maybe asked to consider the opposite of that—or the flip side of that—the mitigating factors. That's something that the defendant might offer— doesn't have to, but he might. Things about his background, his age when it happened, things about the crime itself. Now not talking about this crime—just the nature of the crime in that case that we're talking about. Before you fixed the punishment, before you determine which punishment to go with, would you be able to consider all of those things in arriving at what you thought was the appropriate punishment?

L.W.: After I heard the case, yes, sir.

Commonwealth: Yes. Okay. Now, not knowing the facts about the case— just that there's a murder with an aggravator and you may or may not hear mitigators. Now, just a general case, Mr. Eustis asked you earlier if you could give serious consideration to all of those possible penalties. Do you feel like you would be able not to just say yeah, I'm automatically going to pick death or automatically going to pick life but that you could give serious consideration to all of them, all four of them and, and as long as you could give serious consideration to that, I think. And, you could also give, depending on the facts, serious consideration to a term of years.

You, you could do that, if the court instructed you to.

L.W.: I can do that.

D.M., in response to the court's initial inquiry during individual voir dire, also indicated that he could give serious and meaningful consideration to each of the penalty options from the lower term of years all the way up through the death penalty. Thereafter, upon questioning by Meece's counsel, he was asked and answered:

Eustis: Sometimes it gets a—confusing what we're doing here.

D.S.: It does. You're right, it is, it's a little confusing. It's the first time I've ever been on it, too, so it's—

Eustis: Oh, okay, alright. After the jury—after the—the judge explained once about the mitigation factors that the defense presents. That's a series of factors that are set out by the state in the statutes that includes, for example, uh, possibly, alcohol or drug involvement that could have affected his, his, uh, thinking—not necessarily enough to make him not guilty, but still a factor to be considered as to whether you're going to invoke that most serious penalty of death. Another one might be his, uh, extreme emotional disturbance. Factors like that. But, we've also been told by the Supreme Court to bring in everything about the man's background, because you're supposed to consider not only the crime, but the person himself. It's got to be individualized as to the person that's been found guilty. Can you accept that concept?

D.S.: Yeah.

Eustis: Okay. If the person's been found guilty of a willful, planned murder of more than one person, do you think that he, automatically should get the death penalty?

D.S.: Ah—no, I don't think automatically he should get the death penalty. I—

Eustis: Would he be—would that be the choice that you're starting with, and that you—that the defense has to work down?

D.S.: Are you saying first degree murder for a couple of murders? Is that what you're?

Eustis: Yes.

D.S.: Well, I believe first degree murder, the little that I know about it is premeditated to go out and do that, so I would say that would be death penalty would be the first consideration, yes.

Eustis: It would be? Uh, is that a situation, then, where you say that you start with the death penalty and now, defense, you have to convince me otherwise? Is that—

D.S.: Well I think we'd have to take it up as a group and what the whole group is saying—

Eustis: Yeah, but I mean for you [inaudible], as the evidence is coming in, before you start your deliberations.

D.S.: Well I think we have to find him—find whether he's guilty or innocent.

Eustis: We've already done that.

D.S.: Oh, we've already done that—found him guilty of first degree murder multiple murders.

Eustis: Correct.

D.S.: Well then I, I yeah I would think death penalty would probably would be the first choice, now.

Eustis: Okay.

Judge: Now, let him finish, Mr. Eustis, please.

D.S.: [Garbled, as Mr. Eustis and then the judge were talking over him—says something regarding the "only choice."]

Eustis: Oh, sorry.

Judge: Now let him finish his answer. He said would be the first choice. What else were you saying, sir?

D.S.: I just said that would be the first choice to consider. I wouldn't say that would be necessarily out of—if he's—automatically would be, you know, a choice because like you said, it would be whatever the circumstances I guess around it were.

Eustis: Okay. Uh, if, now that we have established that first-degree murder.

D.S.: Okay, there's no alcohol, no drugs, no nothing. They just, just went out and just shot a couple people. Premeditated—th[ey] already knew.

Eustis: Correct. But, would you still—but, the, the defense can present mitigations. But, you know, things about his background. Some people can't buy into that, though, you know, his background, his family, how he grew up, how he, how he situations like that—a

D.S.: Well, alright, but you've gotta be responsible for your actions no matter what don't ya?

Eustis: Yeah, that's true. So, you're saying that, so, some people can't—saying that background is not something that I can consider. That that's, uh, you know, I grew up bad, uh, I grew up tough and I didn't kill anybody. Is that what we're hearing here?

D.S.: Well, no. I would consider, I guess consider whatever evidence that you had to present. I mean, I'm not just gonna say he's automatically gonna get the death penalty, no.

Eustis: No, but I'm saying do you give serious consideration to a person's background and how he grew up, and what his surroundings were when he grew up?

D.S.: Well, yeah. You know, I mean.

Eustis: [Garbled—talking over each other.] Cause some people just say no, and that's okay, too. We can accept that. Because everybody's different. We all grew up different and have different answers.

D.S.: I, I, you know, I guess I'd have to know what, what you were actually referring to. Because, I mean, you're, there's a pretty broad scope of—

Eustis: Yeah, I realize that. But, that's the way we have to do it now. We can't be very specific.

D.S.: [Laughs.] Yeah, okay.

Eustis: Okay, let's say talk about the fact that maybe he came—maybe a person came from a broken home, uh, lived in a bad part of town, didn't, didn't have a father figure, or something like that. Are those factors that you think should be considered in making a determination?

D.S.: Well, I think they'd be considered, but I wouldn't think they'd play very much of a part. I mean, you know that depends I guess on the rest of his criminal background, I mean, if this was, I guess at what age this happened, and everything else.

Eustis: Yeah, okay, so the, okay. Thank you very much.

Thereafter, upon further examination by the Commonwealth during voir dire, the witness acknowledged that he would be able to consider all the ranges of punishment before deciding upon which punishment would be appropriate.

S.P. also acknowledged to the court during voir dire that he could give serious and meaningful consideration to the full penalty range. To be sure, he was asked by the court and answered:

Judge: I want to make absolutely certain that we understand each other, and for the record. Are you telling me you can give a serious, meaningful,

honest consideration to the imposition of the death penalty?

S.P.: Yes.

Judge: And, could you give that same consideration to the penalty of life in the penitentiary without any possibility of parole for at least twenty-five years?

S.P.: Yes.

Judge: And, to a sentence of life in the penitentiary?

S.P.: Yes.

Judge: Could you give the same serious, meaningful consideration to the minimum penalty, which would be a sentence in the state penitentiary of twenty years?

S.P.: Yes.

Judge: Sir?

S.P.: Yes.

Judge: Alright.

S.P. was a college professor. Later, Meece's counsel suggested that some people consider themselves "eye-for-eye" people, and asked S.P. if he was one of them. S.P. responded in the affirmative. S.P. then explained that if you are found guilty of a crime, there should be a "fitting punishment." He was then asked by Meece's counsel, and answered:

Eustis: In your mind [in the] intentional murder case, is the death penalty the only fitting response to an intentional multiple murder?

S.P.: I would say it depends on the circumstances.

Eustis: Such as?

S.P.: Um, if it was deliberate.

Eustis: Yes. Deliberate and planned.

S.P.: Deliberate and planned.

[Pause, followed by an objection by the Commonwealth.]

Judge: Well, the question is whether or not he can give the consideration to

each one of the possible punishments. Mr. Eustis, I believe you need to re-phrase the question, sir. Has to be whether or not—

Eustis: Would you—would you consider the death penalty for a deliberate, planned, intentional, multiple murder. Would you consider the death penalty the only appropriate sentence?

S.P.: Yes.

S.P. was then asked by defense counsel whether or not he had witnessed the incident between defense counsel and Meece that morning when he came into the courtroom. S.P. acknowledged he had heard Meece make some comment when he came into the courtroom, but that he did not recall what was said and it did not make an impression on him. S.P. was then questioned again by the Commonwealth, and was asked and answered:

Commonwealth: In an intentional murder case, with some aggravating circumstance—it could be that there was a burglary, it could be that there was multiple murders, it could be that the murder was committed against a police officer—in Kentucky there's a long number of aggravating circumstances that qualifies a murder offense for that range of punishments. My question would be, if the defendant's found guilty of an aggravated murder, and the court instructs you that that's the range of punishments to consider, would you consider that entire range of punishments before fixing the defendant's punishment?

S.P.: Could you just explain the aggravated part?

Commonwealth: Okay, an aggravator means that the murder occurred during a burglary, or that the murder occurred during a robbery, or that the murder was against a police officer, there's a long list, I mean, one or more could be present. Uh, you might also hear mitigating factors from the defendant—facts about his background, facts about the night itself that might support a lesser punishment. And, what we're wanting to know at this point is, without knowing what the facts would be, can you seriously consider that entire range of punishments?

S.P.: Yes, I can.

Commonwealth: Okay, from twenty years up to, and including, the death penalty.

S.P.: Yes.

Commonwealth: And you wouldn't automatically foreclose any one of those punishments before you heard the facts and before you knew about the case.

S.P.: Correct.

In denying the challenge for cause, the court noted:

He is a very intelligent man. You [Eustis] framed your question one way, Mr. Wright framed his another way, and as you say, this gentleman is highly intelligent. He has a Ph.D degree, he is a professor at the university and I believe he would be a fine juror for both sides. He would be fair, I believe. I believe he is willing to take the instructions, to analyze the instructions, and go by them. You're good lawyers. Mr. Wright is, and you are, Mr. Eustis. You can frame questions in a scenario and, by leading, you can obtain or elicit the answer that you're looking for—each one of you can. But, I'm judging this gentleman by his appearance here. I talked to him at the bench the other day, I believe he was asking to be excused because he was in school. This gentleman, here, I believe to be a totally fair and unbiased juror. The motion will be overruled.

C.H. also indicated that she could give serious and meaningful consideration to the range of penalties. C.H. was a teacher and had taught for nineteen years. During questioning by Meece's counsel, C.H. indicated that she had been in the courtroom when Meece entered and, thus, witnessed the incident between him and counsel. She noticed that Meece was upset with the other lawyer (the Commonwealth's Attorney) but did not hear what he said. The following exchange occurred between Meece's counsel and C.H. regarding that morning's events:

C.H.: [I]t wasn't a very good impression about what was going on and whatever was happening today wasn't very, you know, it just wasn't a very good impression of what was going on today.

Eustis: Okay.

C.H.: But, I can't, you know, I can't draw assumptions based on not knowing the facts of what happened, so.

Eustis: Would you say that it gave you any kind of a negative impression of Mr. Meece?

C.H.: Yes.

Eustis: Okay. Would that possibly affect the way you make the decisions the key decisions in this case?

C.H.: Probably not.

Eustis: Probably not. You're not sure?

C.H.: Not sure.

Eustis: It could?

C.H.: It could.

When challenged for cause upon the primary ground that her deliberations might be affected by the earlier spat in the courtroom between Meece and counsel, the court denied the challenge, noting:

Judge: Well, what they saw was caused by your client.

Eustis: Yes.

Judge: Mr. Eustis, now he's not going to come into this courtroom, stick his tongue out, for example, or make faces at a juror and expect to get that juror off. He's not going to come into this courtroom and do anything and expect to have some juror off because he doesn't want them. I don't know what was wrong with your client this morning. I don't know what he did except what you folks have told me. He came in and evidently said something to the Commonwealth's Attorney and had some other statements to make. He did whatever was done.

Eustis: Yes, sir.

Judge: He did whatever was done, and I think this lady would make a good juror. She's well educated, she's intelligent, and whatever he did, he did. But no one else did it. And, your motion will be overruled.

Eustis: ... just one thing. You said that he was trying to get her off. That's not the issue here—

Judge: I don't know if he is or not.

Eustis: Well, that's what you said. That's why I wanted it clarified.

Judge: I said he's not going to benefit by coming in and doing things. And that's what he's trying to do, in my humble opinion. He came in here. If there was any kind of a scene or a disturbance, he caused it—no one else.

Eustis: Yes, sir.

Judge: I don't know what was—

Eustis: Yeah, but if she was a juror that we really wanted, it wouldn't be of benefit to him.

Judge: I want a juror that will be fair and impartial to Mr. Meece and to the Commonwealth. I'm not wanting one that will favor either side. This lady here has a master's degree, she teaches, and has been now for several years. And I believe she would make a fine juror. She would be able to understand, she could be able to ana-

710

lyze the instructions and the evidence and she would be a good juror, in my opinion, for both sides. And that's why I'm overruling the motion.

In *Hodge v. Commonwealth*, we pointed out that the juror in question:

[A]cknowledged that he would consider the full range of penalties, but balked at the prospect of imposing the minimum sentence ... as punishment for committing two intentional murders. Nevertheless, he stated that he would not automatically exclude consideration of the minimum penalty and would consider the full range of penalties. While a juror is disqualified if he or she cannot consider the minimum penalty, *Grooms v. Commonwealth*, Ky., 756 S.W.2d 131 (1988), excusal for cause is not required merely because the juror favors severe penalties, so long as he or she will consider the full range of penalties. *Bowling v. Commonwealth*, Ky., 873 S.W.2d 175 (1993).

17 S.W.3d 824, 837 (Ky.2000). And for good reason, we reiterated:

"Voir dire examination occurs when a prospective juror quite properly has little or no information about the facts of the case and only the most vague idea as to the applicable law. At such a time a juror is often presented with the facts in their harshest light and asked if he could consider imposition of a minimum punishment. Many jurors find it difficult to conceive of minimum punishment when the facts as given suggest only the most severe punishment.... A per se disqualification is not required merely because a juror does not instantly embrace every legal concept presented during voir dire examination."

*Id.* (*quoting Mabe v. Commonwealth*, 884 S.W.2d 668, 671 (Ky.1994)).

██ ██ In *Hodge*, we found no error in the trial court's refusal to strike the juror for cause on the grounds aforementioned. Here, L.W., D.M., and S.P. all responded to the court's specific inquiries to the effect that they could give serious and meaningful consideration to each of the penalty options. Only while being led by Meece's counsel did any of them respond with any preferences or hesitations. Such responses—guided by adversarial counsel—are not unexpected, they are quite common in voir dire prior to final jury selections. Jurors are not experienced or knowledgeable in the law, nor are they expected to be. Their function is one of fact finding, guided under the auspices of the court's instructions as to the law. Aside from any determinations of bias, a critical analysis is whether a juror will follow the instructions on the law as given by the court and can give serious, meaningful, and fair consideration to the full range of penalties. *See Springer v. Commonwealth*, 998 S.W.2d 439, 456 (Ky.1999).

██ "In making this determination, the trial court is to consider the prospective juror's voir dire responses as well as his or her demeanor during the course of voir dire, and is to keep in mind that generally it is the [totality] of those circumstances and not the response to any single question that reveals impartiality or the lack of it." *Brown*, 313 S.W.3d at 596. As we reiterated in *Shane*, 243 S.W.3d at 338, "impartiality is not a technical question but a state of mind." Based on the foregoing, we find no abuse of discretion in the trial court's denial of Meece's challenges for cause in regard to L.W., D.M., and S.P.

██ Considering the objection to C.H., the trial court found that she was a highly educated and an intelligent individual who would make an outstanding juror. Acknowledging that she had somewhat of a negative impression of Meece's incident in the courtroom, the trial court denied the motion to strike for cause on grounds that

Meece should not benefit from his own conduct.

Here, C.H. did not hear what Meece said, but indicated she could tell that he was "upset with the other lawyer." She also noted that Meece's counsel made comments to him at the time but could not recall what those statements were. She did indicate, however, that the incident left her with a "negative impression," but stated it would probably not affect how she judged Meece if she were picked for the jury.

The incident referred to involved a testy exchange made by Meece to the Commonwealth's Attorney as Meece entered the courtroom early and at a time when several prospective jurors were in there. During the exchange, Meece was also admonished by his own counsel, although it does not appear that any of the jurors contested actually overheard, or could remember, what was said. It is clear, however, that the incident was not inadvertent and that it was instigated by Meece. Given the effect of the incident on C.H., and for that matter S.P., Meece also argues that he was improperly deprived of the peremptory strikes he used to excuse these jurors, due to the court's error in failing to excuse them under RCr 9.36(1). We disagree.

 A defendant is guaranteed the right to a fair and impartial jury. U.S. Const. amend. 6, 14; Ky. Const. §§ 2, 7, 11; RCr 9.36(1). To ensure this right, the defendant may challenge a juror for cause "[w]hen there is reasonable ground to believe that a prospective juror cannot render a fair and impartial verdict on the evidence...." RCr 9.36. Where the court fails to uphold these rights of a defendant, resulting in his or her use of a peremptory strike to remove such jurors from the panel, such failure is error under *Shane v. Commonwealth*, 243 S.W.3d 336 (Ky.2007). These rights, however, may be waived by the defendant's own intentional conduct.

*Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). In fact, to the extent such conduct is egregious enough, a defendant may be removed from the courtroom during his trial. *Id.*; RCr 8.28(2).

 *Shane*, upon which Meece relies, simply did not deal with the possibility of bias created by a defendant's own intentional conduct. In this regard, where a defendant's own intentional conduct creates the basis for the allegations of error, we have long recognized an exception to general rules for reasons that "[a] court must guard against allowing a defendant to profit from his own wrong in this way." *Allen*, 397 U.S. at 345, 90 S.Ct. 1057. This is so because "[i]t is essential to the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of all court proceedings in our country. The flagrant disregard in the courtroom of elementary standards of proper conduct should not and cannot be tolerated." *Id.* at 343, 90 S.Ct. 1057. Such a view protects "the interest of society in an orderly judicial process and is necessary to prevent the paralysis of criminal proceedings and turning them into a farce." *Scott v. Commonwealth*, 616 S.W.2d 39, 43 (Ky. 1981). The manner and method employed, however, to achieve such protection, must be measured by the need. *See Allen*, 397 U.S. at 343–47, 90 S.Ct. 1057.

Essentially here, Meece challenges Jurors S.P. and C.H. on additional grounds that his improper conduct made them think less of him, and thus, they could no longer be fair and impartial. Were such the rule, then, of course, a defendant could control the course of a trial by intentionally creating disturbances that caused juror excusals, necessitated continuances, and terminated trials, at their discretion, by mistrial. Such a rule would give to a defendant the right to *control* the trial,

rather than the right to a *fair* trial. Thus, such a rule would not further the interests of society in an orderly judicial process—a process that is necessary to ensure that each and every person receives a constitutionally mandated fair trial.

For this reason, we find no abuse of discretion in the court's failure to excuse S.P. or C.H. on this issue.

### *(c.) Now Challenged for Cause— But Unchallenged at Trial*

Meece further argues that the trial court committed error when the trial court failed to remove jurors C.C., N.J., B.H., and J.M. for cause, suggesting they were unqualified to sit on this case. However, when asked by the trial court following their individual voir dire as to whether he had any motions as to these jurors, Meece's counsel responded "no." We find no error here.[49]

■■■ C.C. indicated that he could give serious and meaningful consideration to the full range of penalties. He then stated that if he found Meece guilty of intentional murder, he would pick one of the top two sentences. He then indicated that he may be "reading too much into the court's hypothetical" and stated the sentence imposed would depend on the evidence. After clarification by the court, he agreed that he could consider the full penalty range. Thereafter, during questioning by the Commonwealth and Meece's counsel, C.C. indicated his willingness to consider mitigating evidence, as well as aggravating evidence and made it clear to Meece's counsel that he was definitely not an "automatic death penalty guy." He expressly stated that he could foresee a set of facts or circumstances for which a lesser penalty of twenty to fifty years would be appropriate for an aggravated murder and pointed

out that he would consider all the evidence before considering the entire range of the penalties. No motion was made by Meece's counsel to strike C.C. Given this and C.C's statement that he was definitely not an "automatic death penalty guy" it was obviously Meece's strategy to keep him on the jury. Given the totality of the circumstances, the trial court did not abuse its discretion in allowing C.C. to remain on the jury.

■■■ B.H. was informed by Meece's counsel that some people refuse to consider certain mitigating factors such as a person's background or upbringing and was then asked whether he was that kind of person. He replied that "he would say that it is a possibility of being considered," but he would have to see what the evidence was. Thereafter, he agreed with counsel that he accepted the concept that mitigating factors such as background are to be considered before choosing which sentence to impose and reiterated that he was not an "eye-for-eye" kind of person and would need to hear all of the evidence before setting the sentence. Again, when asked if there were any motions toward this juror, Meece's counsel responded, "no."

Given the totality of his responses, B.H. was obviously willing and able to considered mitigating evidence presented before choosing a sentence. Thus, he did not hold views that "would prevent or substantially impair" the performance of his duties as a juror, and the trial court properly permitted him to serve in this case. *See Wainwright*, 469 U.S. at 414, 105 S.Ct. 844. Moreover, given his response that he was not an "eye-for-eye" kind of person, his selection by Meece was obviously strategy. No error exists as to B.H.

---

**49.** These jurors sat on the jury which convicted and sentenced Meece, as he made no per-

emptory challenge against them.

The next juror, J.M., also indicated that she believed background mitigation "probably should" be considered and stated that she personally thought that this type of evidence was important. She thoroughly indicated that she was open-minded to such evidence and was also not an "eye-for-eye" type of person. Again, when asked if there were any motions toward this juror, Meece's counsel responded, "no." J.M. was obviously qualified and her selection was obviously strategy for Meece. There was no error here.

M.J. indicated that she had heard part of a story about the case on the Sunday night news. From that story, she learned that three people had been murdered, and that a woman, a sister and daughter to the victims, was involved. She believed that the woman implicated had pled guilty but recently "recanted her plea." She was not aware of Meece's involvement in the murders and expressly indicated that she had not formed any opinion in the case and was willing and able to give Meece the presumption of innocence.

 "There is no per se rule that mere exposure to media reports about a case merits exclusion of a juror. To the contrary, in order to merit disqualification of a juror, the media reports must engender a predisposition or bias that cannot be put aside, requiring the juror to decide a case one way or the other." *McQueen v.*

*Scroggy*, 99 F.3d 1302, 1319 (6th Cir.1996). Even the fact that a juror has read news stories about a case during the course of the trial is not automatically grounds to exclude a juror or declare a mistrial. *Byrd v. Commonwealth*, 825 S.W.2d 272, 275 (Ky.1992) *overruled on other grounds by Shadowen v. Commonwealth*, 82 S.W.3d 896 (Ky.2002). Having reviewed the totality of her answers, we again conclude the trial court did not abuse its discretion as to this juror. Again, however, we must acknowledge the obvious strategy in Meece's failure to object to this juror given her limited recollection of Wellnitz's plea and sentencing.

 Thus, even aside from Meece's strategy,[50] we find no error in C.C.'s, M.J.'s, B.H.'s, and J.M.'s selection for the jury.

### (d.) Failure to Videotape

 Meece also argues, without citation to authority, that the failure to videotape the individual voir dire of the jurors violated his due process rights to a record appropriate for a meaningful appellate review.[51] Meece contends that the failure to videotape the jurors conceals from the record their unrecorded demeanor, which could be a factor in the trial court's analysis of their responses.

---

50. As indicated, these allegations were unpreserved, as Meece, unlike other jurors to whom he objected, raised no objection to the qualifications of these jurors. This was obviously a result of strategy as three of these jurors expressly stated they were not "eye-for-eye" jurors and the other had read of Wellnitz's plea and sentencing. " 'In the absence of exceptional circumstances, a defendant is bound by the trial strategy adopted by his counsel even if made without prior consultation with the defendant. The defendant's counsel cannot deliberately forego making an objection to a curable trial defect when he is aware of the basis for an objection.' " *West v. Common-*

*wealth*, 780 S.W.2d 600, 602 (Ky.1989) (*quoting Salisbury v. Commonwealth*, 556 S.W.2d 922, 927 (Ky.App.1977)). Ordinarily, we do not review errors of strategy on direct appeal under *Sanders v. Commonwealth*, 801 S.W.2d 665, 668 (Ky.1990); *See also Soto*, 139 S.W.3d at 848 ("Counsel's decisions during voir dire are generally considered to be matters of trial strategy." (*quoting Hodge v. Commonwealth*, 17 S.W.3d 824, 837 (2000))).

51. Meece, in his brief, acknowledges that "[t]here is no reason to think the trial court had any bad motive" in limiting the record to an audiotape.

The individual voir dire of the jurors was not videotaped, but it was audiotaped. Further, individual voir dire was conducted by counsel in the presence of the court and the audiotaped record is sufficiently clear to indicate the difficulty that C.S., D.S., and K.D. were having with the concept of the death penalty. In fact, no issues were raised at the bench conference in regard to the failure to videotape the demeanor of C.S., D.S., and K.D. This objection was made the day after C.S.'s and D.S.'s individual voir dires, at which time the clerk of the court pointed out that there were no video cameras focused on the jury box—only on counsel table, the witness chair, and the court. According to the trial court clerk, the only way a videotape could be taken of any juror was if he or she was placed in the witness chair.

In ruling on this motion, the court noted that sixty-nine jurors had already been individually voir dired on audiotape only, and since the court had promised the jurors that they were not normally on videotape in any trial, he was not going to put them on videotape in this instance. Thus, the request was denied. Of the three jurors of whom Meece now complains, only K.D.'s individual voir dire occurred after the request for videotaping.

This Court has vested the trial court with broad discretion to oversee the entire process of jury selection. *Fields*, 274 S.W.3d 375; *Soto*, 139 S.W.3d 827. In this regard, this Court has never promulgated a rule or procedure that *directs* jurors be visibly shown in a videotape of the proceedings. Moreover, until recent years, such proceedings were stenographically transcribed.

Thus, we "adopted videotaping technology as a means to further the ends of justice," *Deemer v. Finger*, 817 S.W.2d 435, 437 (Ky.1990), and have not, to date, directed that the jury be included within the video (rather, only the audio), nor have

we provided the means to do so, as this Court has long felt that preservation of the colloquy between the court, counsel, and the jury is sufficiently preserved by the audiotape. Thus, we find no error.

### iii. Death Qualification of Jurors is Constitutional

Here, Meece asserts that the process of death qualification violates fundamental guarantees of equal protection and due process, and denies a defendant a representative jury of his peers. Again, however, both this Court and the United States Supreme Court have rejected this argument. *Buchanan v. Kentucky*, 483 U.S. 402, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987); *Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986); *Thompson*, 147 S.W.3d at 53; *St. Clair*, 140 S.W.3d at 553; *Caudill*, 120 S.W.3d at 678; *Sanders v. Commonwealth*, 801 S.W.2d 665 (Ky.1990). Thus, this argument is without merit.

### b. Other Jury Issues

### i. Jurors were Not Excused Because of Their Religious Beliefs

Meece also contends that as many as thirteen prospective jurors were improperly excused due to their religious beliefs. Having viewed the record, we find this assertion to be incorrect.

To the contrary, the trial court never inquired as to what religion any of these jurors practiced. The inquiry was focused on whether or not each prospective juror could give serious and meaningful consideration to each available penalty, including the death penalty. Where they could not, they were excused. *See Mabe*, 884 S.W.2d at 671; *Harper v. Commonwealth*, 694 S.W.2d 665, 668 (Ky. 1985) *overruled on other grounds* by *Barnett v. Commonwealth*, 317 S.W.3d 49 (Ky.

2010). And, pursuant to *Wainwright v. Witt*, 469 U.S. 412, 420, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), it is the duty of the trial court to determine whether a perspective juror holds views that "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." While it is clear that the Equal Protection Clause of the United States Constitution prohibits the use of peremptory challenges on the basis of race, *see Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) *holding modified* by *Powers v. Ohio*, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), and gender, *see J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 130–31, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), no precedent exists that dictates an extension of these principles in such as a manner as to conflict with the principle of *Wainwright*, 469 U.S. at 420, 105 S.Ct. 844. Thus, we find no error.

### ii. Meece's Supplemental Motion for New Trial Alleging Juror Misconduct

Following the court's oral entry of sentence on October 20, 2006, Meece filed an additional (second) motion for new trial, alleging the possible misconduct of a juror during an interview given to WLEX–TV in Lexington, Kentucky on the evening of the sentencing.[52] This second pro se motion for new trial was filed October 30, 2006

(ten days after oral sentencing) and followed an earlier, more extensive motion for a new trial which Meece had filed on October 19. The October 19 motion was overruled during the sentencing hearing.

The formal entry of the court's sentence (from October 20) occurred on November 13, 2006. The judgment and sentence did not address the October 20 motion. Thereafter, Meece filed a motion to proceed *in forma pauperis* on November 16, 2006, which was granted on November 27, 2006. His notice of appeal was filed of record on November 27, 2006. According to the record, no ruling has ever been sought or made in the trial court concerning this second motion for new trial alleging possible juror misconduct in the television interview. Thus, even should we desire to do so, there is no record upon which we could review this alleged error.

Although "[a] juror cannot be examined to establish a ground for a new trial, except to establish that the verdict was made by lot," RCr 10.04, we noted, in *Bowling v. Commonwealth*, 168 S.W.3d 2, 7 (Ky.2004), that "[t]o obtain a new trial because of juror mendacity, 'a party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause.'" *Bowling*, 168 S.W.3d at 9 (*quoting Adkins v. Commonwealth*, 96

---

52. Meece alleges in this supplemental motion for new trial, filed under the auspices of CR 59.01, that:

It has come to the attention of the defendant that a juror was interviewed by ... WLEX ... following this court's sentencing on 10/20/06, and during the interview admitted to disregarding the admonishments of this court during trial, having decided the defendant was guilty right from the start and then having formed, and possibly expressed an opinion prior to hearing all the evidence and testimony. Clearly, it is misconduct by a juror to disregard the in-

struction of the court, and deprived the defendant of a fair trial in doing so.

Therefore, comes the defendant [Meece], pro-se and moves the court for a new and fair trial under the laws and constitution of this Commonwealth and this United States. As the record cannot and does not show the interview, the defendant respectfully moves the court for the necessary and required hearing with counsel, the compelled presence of the videotaped interview, and of the presence of the juror in question.

The supplemental motion was signed by Meece and contained no affidavits.

S.W.3d 779, 796 (2003) (*quoting McDonough Power Equip., Inc. v. Greenwood,* 464 U.S. 548, 556, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984))). Furthermore, " '[t]he cases in which juror statements have been considered generally have involved deliberate or inadvertent nondisclosure of pertinent historical facts during voir dire; courts have been much more hesitant to consider statements that jurors failed to put personal prejudices aside during deliberations.' " *Id.* (*citing Brofford v. Marshall,* 751 F.2d 845, 853 (6th Cir. 1985)).

Here, although Meece's second motion for a new trial, grounded on the alleged WLEX interview, was filed before formal entry of his judgment and sentence on the jury verdict, our Rules of "Procedure do not contemplate or permit the staying of the time for taking an appeal indefinitely by the filing of a series of motions for a new trial." *Taylor v. Warman,* 331 S.W.2d 899, 900 (Ky.1960). Nor does RCr 10.06(2), allowing a party to "move the appellate court for a stay of the proceedings in the appellate court," apply, as Meece's second post-trial motion was "filed before the ... appeal." *Johnson v. Commonwealth,* 17 S.W.3d 109, 113 (Ky. 2000).

Thus, we are left with Meece's allegations which raise only the possibility of such conduct and with no record by which to substantiate it. We also note that Meece was not joined in the motion by his appointed counsel and that no subsequent motions were made to bring the matter to the trial court's attention.[53]

There being no record from which we may conduct a fair review, we decline to address this issue further in the context of this direct appeal.

## D. Instructional Issues

### 1. Guilt Phase

#### a. Jury Instructions

Meece argues that the trial court's jury instructions for first-degree robbery and first-degree burglary were erroneous as they failed to require the jury's determination of whether a "firearm" was used and whether it constituted a "deadly weapon." He argues *United States v. Gaudin,* 515 U.S. 506, 510–15, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995), and *Apprendi v. New Jersey,* 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) which certainly hold that the jury should determine the essential elements of an offense, including application of law to fact, such as whether or not a pistol is a "deadly weapon."

Robbery in the first degree, KRS 515.020, is committed:

> [W]hen, in the course of committing theft, [a person] uses or threatens the immediate use of physical force upon another person with intent to accomplish the theft and when he:
>
> (a) Causes physical injury to any person who is not a participant in the crime; or
>
> (b) Is armed with a deadly weapon; or
>
> (c) Uses or threatens the immediate use of a dangerous instrument upon any person who is not a participant in the crime.

Here, the jury was instructed that it must find beyond a reasonable doubt:

> A. That in Adair County, Kentucky, on or about February 26, 1993, he stole a Sentry Model 1170 fire safe from Joseph

---

**53.** The Commonwealth asserted in its Appellee's brief that "[i]f there were any substance to Meece's allegation, DPA would have acted on it immediately ...," suggesting that the question would be cleared up in Meece's reply brief. However, Meece's reply brief responded only that DPA's "post-trial investigation ... [is] outside the appellate record."

Wellnitz, Elizabeth Wellnitz, and/or Dennis Wellnitz;

AND

B. The in the course of so doing and with the intent to accomplish the theft, he used physical force upon ·Joseph Wellnitz, Elizabeth Wellnitz, and/or Dennis Wellnitz with a firearm;

AND

C. That when he did so, he was armed with a firearm.

 Burglary in the first degree, KRS 511.020 is committed:

[W]hen, with the intent to commit a crime, [a person] knowingly enters or remains unlawfully in a building, and when in effecting entry or while in the building or in the immediate flight therefrom, he or another participant in the crime:

(a) Is armed with explosives or a deadly weapon; or

(b) Causes physical injury to any person who is not a participant in the crime; or

(c) Uses or threatens the use of a dangerous instrument against any person who is not a participant in the crime.

In this regard, the jury was instructed that it must find beyond a reasonable doubt:

A. That in Adair County, Kentucky, on or about the 26th day of February, 1993, ... he entered or remained in the dwelling of Joseph Wellnitz, Elizabeth Wellnitz, and/or Dennis Wellnitz without ... permission ...

AND

B. That in so doing, he knew he did not have such permission;

AND

C. That he did so with the intention of committing a crime therein;

AND

D. That when in effecting entry or while in the dwelling or in immediate flight therefrom, he caused physical injury to Joseph Wellnitz, Elizabeth Wellnitz, and/or Dennis Wellnitz, and/or he used a deadly weapon against Joseph Wellnitz, Elizabeth Wellnitz, and/or Dennis Wellnitz;

AND

E. That Joseph Wellnitz, Elizabeth Wellnitz, and Dennis Wellnitz were not participants in the crime.

Thus, Meece argues that the robbery instruction failed to require a finding that the "firearm" used was a deadly weapon. On the burglary instruction, he argues that the jury was not required to make a determination whether a "firearm" was used and whether it constituted a "deadly weapon." [54] These allegations of error were not preserved, thus, they will be reviewed under the standards previously indicated.

 In the first-degree robbery instruction, the court gave a combined instruction: robbery in the first degree under KRS 515.020(1)(b) ("armed with a deadly weapon" (a firearm)) and KRS 515.020(1)(c) ("uses ... a dangerous instrument [a firearm] upon any person who is not a participant in the crime"). It did not use, however, the term "deadly weapon" or the term "dangerous instrument." "Though not every 'dangerous instrument' is a 'deadly weapon,' a 'deadly weapon' ordinarily is a 'dangerous instrument' as well." *Whorton v. Commonwealth,* 570 S.W.2d 627, 631 (Ky.1978) *rev'd on other grounds* by *Kentucky v. Whorton,* 441 U.S. 786, 99 S.Ct. 2088, 60 L.Ed.2d 640 (1979) and *overruled on other grounds* by *Polk v. Commonwealth,* 679 S.W.2d 231 (Ky.1984). Here, the term used by the court—a "fire-

---

**54.** Aside from the issue raised, we note that a burglary in the first degree is completed when physical injury occurs to any person who is not a participant in the crime. Each of the Wellnitzes died of gunshot wounds suffered during the crime.

arm"—is commonly understood as a "weapon capable of firing a missile, esp. a pistol or rifle using an explosive charge as a propellant." *Webster's II New College Dictionary*, p. 429 (3d. ed.2005).

■■■ In a similar case, *Thacker v. Commonwealth*, 194 S.W.3d 287, 290–91 (Ky.2006), we acknowledged that "[i]n [*United States v. Gaudin*, 515 U.S. 506, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995) ], the Supreme Court held that the jury should have been entitled to decide the entire essential element, including the application of law to fact," i.e., whether the weapon used was in fact a "deadly weapon" or a "dangerous instrument." However, following *Neder v. United States*, 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999), we acknowledged that the instructional error was harmless. *Thacker*, 194 S.W.3d at 291. Here, the trial court erred in a similar manner, and, again, following precedent, we find this error to be harmless in this instance.

That is not to say we will continue to do so should trial errors such as this continue. The finding of harmless error should not be used blindly as a means to continue a practice this Court has previously condemned as error. *Id.* ("This ... ensures that the jury ultimately determines the essential elements of the offense, and acts in accordance with the law.")

In the trial court's instructions for first-degree burglary, the court gave a combined instruction under KRS 511.020(1)(a) ("armed with ... a deadly weapon") and KRS 511.020(1)(b) ("causes physical injury to any person who is not a participant in the crime"), as well as KRS 511.020(1)(c) ("uses ... a dangerous instrument against any person who is not a participant in the crime"). Again, the evidence fully supported either of these theories, however, as to the court's two theories involving the "deadly weapon," (i.e., armed with or its use) the jury was not allowed to make the

determination as to whether the firearm was a "deadly weapon." "Based on the structure of the jury instruction in this case, it appears that the jury was only allowed to make a determination on whether [Meece used] the object in question and that the judge presupposed that the object was a deadly weapon. We have previously found this to be error." *Wright v. Commonwealth*, 239 S.W.3d 63, 67 (Ky.2007).

However, again, in *Wright*, we acknowledged that "[a]n error regarding an erroneous jury instruction that omits an essential element of the offense is subject to harmless-error analysis." *Id.* at 68 (*citing Neder*, 527 U.S. 1, 119 S.Ct. 1827). Moreover,

As long as it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty" an actual jury finding on that element is not mandated and an appellate court can find the error harmless. *Neder*, 527 U.S. at 18, 119 S.Ct. at 1838 In this matter it is beyond question that the jury would have found the pistol carried by [Meece] to be a deadly weapon. *See Thacker*, 194 S.W.3d at 291 ("there is little doubt that the jury would have found a .22–caliber revolver to be a deadly weapon."). Not only is it common knowledge that pistols are deadly weapons, but the pistol in this case was fired, [causing three deaths].

*Wright*, 239 S.W.3d at 68.

Applying our analysis in *Thacker* and *Wright, supra,* there is no doubt, given the evidence in this case, that these errors were harmless. Again, however, we caution the bench and bar that the principles of *Gaudin* are to be followed.

### *2. Sentencing Phase Proceedings and Instruction*

■■■ Meece also argues the trial court erred in connection with the penalty phase instructions.

### a. Non–Unanimous Mitigation

The instructions regarding mitigating circumstances [55] directed the jury that:

In fixing a sentence for the Defendant for the offenses of Murder, you shall consider such mitigating or extenuating facts and circumstances as have been presented to you in evidence and you believe to be true, including, but not limited to such of the following as you believe from the evidence to be true:

1. The youth of the Defendant at the time of the crime [The Defendant's age at the time he committed the offense, regarding the youth of the Defendant as a mitigating circumstance.]

2. Any other circumstance or circumstances arising from the evidence which you, the jury, deem to have mitigating value.

In addition to the foregoing, you shall consider also those aspects of the Defendant's character, and those facts and circumstances of the particular offenses of which you have found him guilty, about which he has offered evidence in mitigation of the penalty to be imposed upon him and which you believe from the evidence to be true.

Meece contends that this instructional format misleads the jury into believing that the requirement of unanimity also applied to any mitigating circumstances, thereby preventing their application upon his behalf in violation of constitutional standards commanding a fair trial, due process, and reliable sentencing. *See Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *Proffitt v. Florida,* 428 U.S. 242, 258, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); *Gregg,* 428 U.S. at 193, 96 S.Ct. 2909. We disagree, as " '[t]he instructions did not imply that unanimity was required on mitigators and there is no requirement that a jury be instructed that their findings on mitigation need not be unanimous.' " *Hunt v. Commonwealth,* 304 S.W.3d 15, 50 (Ky. 2009), *as corrected* (Jan. 6, 2010), *as modified on denial of reh'g* (Mar. 18, 2010) (*quoting Mills v. Commonwealth,* 996 S.W.2d 473, 492 (Ky.1999)); *See also Soto,* 139 S.W.3d 827, 870; *Caudill v. Commonwealth,* 120 S.W.3d 635, 674–75 (Ky.2003); *Bowling,* 873 S.W.2d at 180.

Here, Meece asserts the court erred by not defining "mitigating circumstances," failing to include a "standard of proof" for such evidence, and failing to make it clear to the jury how such evidence may be used in rejecting death as a penalty. However, contrary to this assertion, the jury was instructed on mitigating circumstances under instruction three. *See, supra.*

Moreover, because KRS 532.025(2) "is stated in mandatory terms and includes the language, 'any mitigating factor ... which *may* be supported by the evidence' .... the quantum of evidence necessary to sustain a penalty phase [mitigating] instruction is clearly less" than that required

---

**55.** The preliminary instructions read:

You have tried the Defendant and have returned a verdict finding him guilty of the Murder of Joseph Wellnitz; guilty of the Murder of Elizabeth Wellnitz; and guilty of the Murder of Dennis Wellnitz. From the evidence placed before you in that trial, you are acquainted with the facts and circumstances of the crime itself. You have now received additional evidence from which you shall determine whether there are mitigating or aggravating facts and circumstances bearing upon the question of punishment, following which you shall fix a sentence for the Defendant.

Further, the reasonable doubt instruction provided: "If upon the whole case you have a reasonable doubt whether the Defendant should be sentenced to death, you shall instead fix his punishment at a sentence of imprisonment."

Although the form instructions used required a unanimous finding as to the aggravating circumstances, no wording was included requiring a unanimous finding as to any mitigating circumstances.

for a complete defense in the guilt phase. *Hunter v. Commonwealth*, 869 S.W.2d 719, 726 (Ky.1994). And, while aggravating circumstances are required to be proven beyond a reasonable doubt, mitigating circumstances may be found if "believe[d] to be true." Thus, there is no probability that jurors could erroneously believe that a defendant must prove mitigating circumstances beyond a reasonable doubt.

Moreover, considering the instructions given, "there is no reasonable possibility that the jury misunderst[ands] its role in the capital sentencing procedure or misunderst[ands] the meaning and function of mitigating circumstances." *Peek v. Kemp*, 784 F.2d 1479, 1494 (11th Cir.1986); *See also Skaggs v. Commonwealth*, 694 S.W.2d 672, 679 (Ky.1985) ("A careful examination of the entire jury charge indicated that the jury knew it could recommend a [lower] sentence even if it found an aggravating circumstance beyond a reasonable doubt."). Thus, we find no error here.

### b. Written Mitigation Findings

■■ Meece also contends that the penalty phase instructions were erroneous because they failed to require the jury to prepare written mitigation findings, suggesting that *Smith v. Commonwealth*, 599 S.W.2d 900 (Ky.1980) should be overruled. We disagree, and "find no compelling need to reconsider this settled issue," *Hunt*, 304 S.W.3d at 51, as we have previously reiterated, "[t]here is no requirement that the jury make written findings on mitigation." *Skaggs*, 694 S.W.2d at 680.

### c. Non–Statutory Aggravator Findings

■■ Meece contends that it was error to fail to include an instruction requiring the jury to make findings concerning non-statutory aggravators. However, the court's instructions specifically set out the aggravating circumstances in instruction number four. They were: the Murder was committed during the commission of a Burglary in the First Degree; or the Murder was committed during the commission of a Robbery in the First Degree; or the Defendant committed the offense of Murder for profit; or the acts of killing were intentional and resulted in multiple deaths.

■■ Moreover, the jury was instructed under instruction five that they could not:

[F]ix [Meece's] sentence at death, or at confinement in the penitentiary for life without the benefit of probation or parole until he has served a minimum of twenty-five (25) years of his sentence, unless you are satisfied from the evidence beyond a reasonable doubt that *one* of the statements listed in Instruction No. 4 (Aggravating Circumstances) is true in its entirety, in which event you must state in writing, signed by the foreperson, that you find the aggravating circumstance or circumstances to be true beyond a reasonable doubt.

(Emphasis added). Thereafter, the jury unanimously found that all four of the stated aggravating circumstances existed beyond a reasonable doubt. Clearly, then, in this Commonwealth, "[t]he death penalty may not be imposed without a finding of a statutory aggravating factor beyond a reasonable doubt." *Hunt*, 304 S.W.3d at 51. Thus, there is no merit to this argument.

### d. Consideration of Aggravators

Meece also contends that the instructions did not specifically limit aggravating evidence to the facts enumerated in the instructions. This argument is vague and unsupported by the record as previously disclosed. In fact, the instruction specifically listed the aggravators and required their finding beyond a reasonable doubt.

### e. Reciprocal Use of Aggravating Factors

▮▮▮ Here, Meece complains that the use of multiple aggravators for each of the three murders creates a significant risk that the jury may give undue weight to the mere number of aggravators found. He further suggests that when the same aggravating factors apply in separate charges, he is essentially condemned multiple times for the same culpable act. However, we recognized in *Bowling v. Commonwealth*, 942 S.W.2d 293, 308 (Ky. 1997):[56]

> Simply because the aggravating circumstance duplicates one of the underlying offenses does not mean that the defendant is being punished twice for the same offense. The underlying offenses were only factors to be considered as to whether the punishment for murder should be death. Appellant was not subjected to double jeopardy or multiple punishment for the same offense.

*See also Furnish*, 95 S.W.3d at 51 ("Appellant argues that the improper cumulation of aggravating circumstances caused the jury to give undue weight to the mere number of aggravators and constitutes double jeopardy. We disagree."). Nor do we find it to constitute cruel and unusual punishment.

### f. Verdict Form

▮▮▮ Meece also contends that the form of the verdict improperly results in the imposition of death or a LWOP–25 if an aggravator is found beyond a reasonable doubt. Again, this argument is meritless.

Instruction number five advised the jury that they could fix Meece's punishment for the separate murders of the Wellnitz family at anywhere between a sentence for a term of years up to death, and then stated:

> But you cannot fix his sentence at death, or at confinement in the penitentiary for life without the benefit of probation or parole until he has served a minimum of twenty-five (25) years of his sentence, unless you are satisfied from the evidence beyond a reasonable doubt that one of the statements listed in Instruction No. 4 (Aggravating Circumstances) is true in its entirety, in which event you must state in writing, signed by the foreperson, that you find the aggravating circumstance or circumstances to be true beyond a reasonable doubt.

Thus, "[t]he instructions when considered as a whole, make it clear that the jury was not required to impose a death sentence merely upon a finding of aggravating circumstances." *Hunt*, 304 S.W.3d at 51.

### g. The Definition of "For Profit"

▮▮▮ Meece complains here of the addition of the definition of "for profit" as suggested in Cooper, Kentucky Instructions to Juries § 12.06, to the effect that: " '[f]or profit' means with a motive of 'a hope to obtain financial gain' or 'a hope to avoid financial loss.'" Although KRS 532.025(2)(a)(4) contains no definition of the language "for the purpose of receiving money or any other thing of monetary value, or for other profit," we find no error in the use of this definition under the evidence adduced in this case as the statutory language imposes no statutory recitation as to the time one is expected to receive value (or that he must actually receive value) for the commission of the crime—it says only that the crime be committed "for the purpose of receiving money or any other thing of monetary value, or

---

**56.** Meece also asks that we reconsider our holding in this case—a request for which we find no support.

for other profit." Thus, it requires an "expectation" only—and a "hope" falls within these bounds.

### h. Non–Death Verdict Possible Even if Aggravators But No Mitigators Found

 Meece also suggests the jury should have been instructed that it could have returned a sentence of less than death even if it found aggravators but did not find the existence of any mitigators. Again, we disagree, as the instructions here were adequate to so apprise the jury. *See Caudill*, 120 S.W.3d at 674 ("There was no need to instruct the jury that it could impose a life sentence even if it found an aggravating factor beyond a reasonable doubt").

Moreover, under a similar instruction, we have previously found that "[t]he jury was well aware that it need not sentence [Meece] to death even if it found an aggravating circumstance." *Skaggs*, 694 S.W.2d at 679. Furthermore:

> "Authorized Sentences," read together with the verdict forms and as further explained during closing arguments, adequately apprised the jury of the available range of penalties and the role of the aggravator in the sentencing scheme. "An instruction may not be judged in artificial isolation but must be considered in the context of the instructions as a whole and the trial record." *Estelle v. McGuire*, 502 U.S. 62, 72, 112 S.Ct. 475, 482, 116 L.Ed.2d 385 (1991).

*Caudill*, 120 S.W.3d at 674. And, here, in voir dire, the jurors were specifically told this by the trial court. Thus, these instructions did not violate Meece's due process rights or reliable sentencing rights. *See Smith*, 599 S.W.2d 900.

### i. Reasonable Doubt

On this issue, Meece argues that the reasonable doubt sentencing instruction impermissibly suggested that Meece could be sentenced to a lesser punishment "only if there were a reasonable doubt death was the proper penalty." We disagree. When read as a whole, and as explained at trial, the format of the instructions leaves little doubt that all of the sentences lesser than death were available for the jury. *See Caudill*, 120 S.W.3d at 674. Thus, we find no error.

### j. Parole and Consequences of Verdict

Meece further argues that the jury should have been instructed that, if sentenced to death, Meece would be "killed by lethal injection" and that an instruction should have been given to accurately inform the jury about parole; issues for which Meece gives no citations to authority.

 Plainly, a jury need not be told that "death means death," or that a condemned inmate is not eligible for parole, or that life without the possibility of parole for twenty-five years means what it says. *People v. Smith*, 30 Cal.4th 581, 134 Cal. Rptr.2d 1, 68 P.3d 302, 339 (2003); *State v. Bush*, 942 S.W.2d 489, 522–23 (Tenn.1997); *State v. Jones*, 474 So.2d 919 (La.1985); *State v. Brown*, 306 N.C. 151, 293 S.E.2d 569 (1982). We should "give the jury some credit for having some amount of common sense." *People v. Marlow*, 34 Cal.4th 131, 17 Cal.Rptr.3d 825, 96 P.3d 126, 140 (2004). Moreover, we would point out that KRS 532.025 "does not allow the jury to hear information on parole eligibility." *Chumbler v. Commonwealth*, 905 S.W.2d 488, 497 (Ky.1995). *See also Perdue v. Commonwealth*, 916 S.W.2d 148, 163 (Ky.1995) ("[U]nder KRS 532.025, when the death penalty is sought, evidence of minimum parole eligibility guidelines may not be introduced at all."). We find no error here.

### k. Passion and Prejudice

 Citing to KRS 532.075(3)(a), Meece argues that an instruction should have been given preventing the imposition of the death penalty under the influence or passion, prejudice, or other arbitrary factors. The statute, however, requires this Court to make this determination. Moreover, we have previously stated that "[a]n instruction to the jury to avoid passion or prejudice in fixing the death penalty is not required" during the penalty phase of a capital murder trial. *Mills*, 996 S.W.2d at 493. Thus, no instructional error occurred.

### l. Any Doubt

 Meece also argues that a jury instruction should have been given that, "if any juror had 'any doubt' as to the appropriate punishment, Meece should not be sentenced to death." This Court has recently addressed a similar issue in *Brown*, 313 S.W.3d 577 at 594, n. 2, 595, n. 3, wherein this Court determined that even a reasonable doubt instruction for imposition of the death penalty is no longer required and should not be given. Meece now asks that such language be reduced to just "any doubt." Again, we disagree and find no error.

### m. The Trial Court's Refusal to Include Life Without Parole as an Authorized Punishment

 On three separate occasions prior to trial (September 21, 2004, May 31, 2005, and August 11, 2006), Meece specifically requested, orally and in writing, that life without parole (LWOP) *not* be included in the range of sentences to be submitted to the jury in his case. Thus, although the jury was asked on voir dire whether they could consider the full sentence range from twenty years to death, including life without the benefit or probation or parole for a minimum period of twenty-five years, they were *not* asked if they could consider life without parole.[57] Following the verdicts of guilty on all three murder charges, Meece changed his mind and then requested LWOP *be included* as a sentencing option in his penalty-phase instructions.[58]

During discussions concerning his late request for LWOP, the court noted Meece's previous requests that the sentence not be given; as a result, the jury was not voir dired, generally or individually, as to LWOP as they were on the other sentencing options. The court then noted there could very well be some jurors who could not accept a sentence of LWOP, but since the question was never asked, this would never be known. In this regard, the court also noted that, in *Commonwealth v. Phon*, 17 S.W.3d 106 (Ky.2000), the decision to instruct on LWOP was made by the trial court *prior* to selection of the jury. Subsequently, the trial court denied Meece's motion to include LWOP in the sentencing instructions.[59]

Meece contends, on the other hand, that while he did not want LWOP included in

---

57. In its sentencing, however, the trial court *did* consider a LWOP sentence, but deemed it inappropriate given the crimes committed.

58. During sentencing deliberations, the jury sent the trial court several questions which the court did not answer, namely:

With regard[ ] to punishment option # 2 confinement in the penitentiary for life; is that life without any possibility of parole? Or are they still eligible for parole?

With the murder charges with option # 3 no benefit or parole until a minimum of 25 years served—is that 25 years for each for a total of 75 years or all 3 total 25 years[?]

59. Meece also argues that the failure to include the LWOP instruction deprived him of reliable capital sentencing, an argument with which we also disagree.

724

the penalty range initially, once he actually heard the evidence against him, he specifically and unqualifiedly requested that it be included. Moreover, because each juror was specifically asked if he or she could consider the full sentencing options from twenty years to death, and LWOP falls within that range, voir dire was adequate to ferret out any jurors who could not consider LWOP. Thus, Meece asks that his sentence be reversed, and this matter be remanded for a new sentencing phase in which the jury is instructed to consider the full penalty range, including LWOP.

We did hold in *Phon* that "upon the unqualified consent of the defendant, a sentence of life without parole may be lawfully imposed for capital crimes committed before [its enactment on] July 15, 1998." *Id.* at 108. And, these crimes also occurred prior to its enactment in 1998, i.e., 1993. What we did not answer, however, was *when* the request must be made.

Although the jurors here were asked whether they could consider sentencing Meece to a term of years, life, LWOP–25, or death, this is not to say that those same jurors would automatically be able to consider life without the possibility of parole, as it is possible that a juror could believe incarceration without the possibility of parole to be a harsher punishment than death, as some today argue. In this same vein, it is also possible that some jurors would not be able to seriously consider a sentence of death if given the option of guaranteeing that a defendant would never be released on parole. Thus, it is possible that the inclusion of LWOP in the range of punishment could have impacted the ability of some of the jurors to consider the full range of punishment, an answer we will never know, as they were not asked due to Meece's refusal to allow the application of LWOP prior to the jury's determination of guilt.

"When the Commonwealth seeks the death penalty, individual voir dire out of the presence of other prospective jurors is required if questions regarding capital punishment ... are propounded. Further, upon request, the Court shall permit the attorney for the defendant and the Commonwealth to conduct the examination on these issues." RCr 9.38. Pursuant to RCr 9.36(1), both the Commonwealth and the defense are permitted to make challenges for cause, and "[w]hen there is reasonable ground to believe that a prospective juror cannot render a fair and impartial verdict on the evidence, that juror shall be excused as not qualified." Thereafter, each of the parties is given the opportunity to exercise peremptory challenges. RCr 9.36(2), (3) ("Peremptory challenges shall be exercised simultaneously ...."; "[a]ll challenges must be made before the jury is sworn"; and "[n]o prospective juror may be challenged after being accepted unless the court for good cause permits it.").

██ In balancing the rights of the parties to a proper voir dire and selection of a jury, we recognize that "[t]he right of *each* side to an impartial jury is of great importance." *Gossett v. Commonwealth,* 426 S.W.2d 485, 487 (Ky.1968) (emphasis added). Moreover, we have recently noted in *Shane,* "[i]f a right is important enough to be given to a party in the first instance, it must be analyzed to determine if it is substantial, particularly where deprivation of the right results in a final jury that is not the jury a party was entitled to select." 243 S.W.3d at 340. Thus, we insist that the process be fair to both parties.

This may be true in this regard only if the request for the application of a mitigating penalty enacted after the occurrence of the event pursuant to KRS 446.110 is requested prior to the empanelling of the jury. This was not done in this case and

Meece had many opportunities to do it. Yet, it was his strategy that he did not.[60] Thus, we find no error with the trial court's denial of the LWOP sentencing option in this case.

### E. Death Penalty

#### 1. Use of Aggravators to Enhance the Sentence of Death

Although the grand jury did not return an indictment that charged the murders were aggravated by the penalty enhancers used at trial, the Commonwealth filed a Notice of Statutory Aggravating Circumstances listing them within a month following the return of the indictment. This notice indicated the Commonwealth's intent to rely upon four of the aggravators found in KRS 532.025(2)(a), as previously noted.

Upon the foregoing, Meece now argues that "[t]he formality, timing and specificity of notice mandated by the U[.]S[.] Constitution were not met in [his] case," a point on which we disagree and which we find to be meritless. Meece also contends that "[a]dditionally, the indictment failed to give the court jurisdiction to try Meece for aggravated murder and subject him to enhanced penalties." For these propositions, Meece cites to *Jones v. United States*, 526 U.S. 227, 243, n. 6, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999), *Apprendi*, 530 U.S. 466, 120 S.Ct. 2348, and *Ring v. Arizona*, 536 U.S. 584, 602, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). Again, we find no merit in this allegation of error.[61]

■ Nor are we influenced by the logic of *People v. Lucas*, 321 Ill.App.3d 49, 254 Ill.Dec. 163, 746 N.E.2d 1211 (2001) *appeal denied, judgment vacated,* 202 Ill.2d 686, 270 Ill.Dec. 456, 783 N.E.2d 31 (2003), or *State v. Fortin*, 178 N.J. 540, 843 A.2d 974 (2004). As we said in *St. Clair v. Commonwealth*, 140 S.W.3d 510, 534 (Ky. 2004):

> We find no merit in Appellant's contention that the Commonwealth was precluded from seeking the death penalty because the ... Grand Jury's indictment did not identify the aggravating circumstance. Although "a defendant cannot be made to face the sentencing phase of a capital trial unless he or she is first given sufficient notice of the Commonwealth's intention to seek the death penalty[,]" *Commonwealth v. Maricle*, Ky., 15 S.W.3d 376, 379 (2000), "[t]here is no authority supporting [Appellant's] claim that an aggravating circumstance must be described in the indictment." *Wheeler [v. Commonwealth]*, 121 S.W.3d [173, 185 (Ky.2003)]. *See also Garland [v. Commonwealth]*, 127 S.W.3d [529, 546 (Ky.2003)]; *Furnish*, 95 S.W.3d at 41. The Commonwealth complied with KRS 532.025(1)(a) by providing Appellant with written notice "prior to trial"—in fact, approximately two and a half (2 ½) years prior to trial—of the evidence in aggravation that it intended to introduce.

*St. Clair*, 140 S.W.3d at 559–60; *See also Hunt*, 304 S.W.3d at 54.

---

**60.** The jury would know that his accomplice, Wellnitz, got a plea of LWOP–25. This fact would be in play with the jury as an issue of "fairness" for Meece or as possible resentment against the Commonwealth for agreeing to Wellnitz's plea. *See Perdue,* 916 S.W.2d at 161–62 ("In the present case, the excused juror expressed an unwillingness to impose the death penalty against appellant because of his knowledge that Sue Melton received only twenty years for her murderous activities.").

Thus, if presented only with LWOP–25 and death on the high end, a jury could possibly pick LWOP–25. Admittedly, trial is a gamble of thoughts and strategies based on evidence and only those who finish know the result.

**61.** Meece admits in his brief that "the requirement of [including the aggravators in the] grand jury indictment has not been applied to the states by the [United States] Supreme Court...."

Moreover, we have also analyzed and answered this question in *Soto,* 139 S.W.3d at 840–43, wherein we stated, "while Appellant's interpretation of *Jones, Apprendi,* and *Ring* may be an accurate prediction of the future course of federal law, we decline to adopt that interpretation and, instead, apply existing Kentucky law to [t]his issue."

### 2. Meece's Death Sentence was not Arbitrary or Disproportionate

 Noting his "motherless, lost childhood" and "minimal criminal record," Meece asserts the death penalty as applied to him was arbitrary and disproportionate. He also argues that there are "more deserving" cases in which death was not imposed, and therefore, death is not proper for him. Following an exhaustive review of the record, we disagree.

 Lesser sentences imposed upon other defendants by a judge or jury are not relevant in determining the validity of a death sentence or other sentence. *See Marshall v. Commonwealth,* 60 S.W.3d 513, 523 (Ky.2001); *Caudill,* 120 S.W.3d at 672. Moreover, the finding of aggravating circumstances:

> satisfies the Constitutional demands and "provide[s] a meaningful basis for distinguishing the few cases in which [the penalty] is imposed from the many cases in which it is not," *Godfrey v. Georgia,* 446 U.S. 420, 427, 100 S.Ct. 1759, 1764, 64 L.Ed.2d 398, 406 (1980) (*quoting Furman v. Georgia,* 408 U.S. 238, 313, 92 S.Ct. 2726, 2764, 33 L.Ed.2d 346 (1972) (White, J., concurring)). The statute not only provides "some 'common-sense core of meaning ... that criminal juries should be capable of understanding[,]'" *Tuilaepa* [*v. California*], 512 U.S. [967, 114 S.Ct. 2630, 2632, 129 L.Ed.2d 750, 760 (1994)] (*quoting Jurek v. Texas,* 428 U.S. 262, 279, 96 S.Ct. 2950, 2959, 49 L.Ed.2d 929 (1976)) (White, J., concur-

ring in judgment), but, in our view, contains clear objective standards from which a jury may determine a defendant's eligibility for a capital sentence. Simply put, KRS 532.025(2)(a)(*l* ) does not permit "[t]he standardless and unchanneled imposition of death sentences in the uncontrolled discretion of a basically uninstructed jury," *Godfrey,* 446 U.S. at 429, 100 S.Ct. 1759, 1765, 64 L.Ed.2d at 407, which the constitution prohibits.

*St. Clair,* 140 S.W.3d at 570. Here, the evidence was more than sufficient and the jury's findings supported a sentence of death. Thus, Meece's death sentence was neither arbitrary, nor disproportionate to the evidence adduced.

Moreover,

> The Commonwealth, through its death penalty statutes, has established a proportionality review process. KRS 532.075(3)(c). Under KRS 532.075(1), "[w]henever the death penalty is imposed for a capital offense ... the sentence shall be reviewed on the record by the Supreme Court." Further, Subsection (3)(c) provides that "with regard to the sentence, [this] court shall determine ... [w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."

(Emphasis added). *Hunt,* 304 S.W.3d at 52.

Pursuant to these requirements, we have reviewed the record and have determined that the death sentence rendered in this case was not imposed under the influence of prejudice, passion, or any other arbitrary factor. Moreover, the sentence is not disproportionate to the penalty imposed in similar cases which we have reviewed as required. For reference, see the list found in *Hodge,* 17 S.W.3d at 855. *See also Parrish v. Commonwealth,* 121

S.W.3d 198, 208 (Ky.2003); *Fields*, 274 S.W.3d at 420; *Hunt*, 304 S.W.3d at 52. All cases maintained by the Kentucky Supreme Court on our list have been reviewed, and we conclude from the facts and findings in this case, consistent with our review, that they justify the imposition of capital punishment.

### 3. The Death Penalty is Constitutional

Meece also asserts five grounds which he contends invalidates the imposition of the death penalty in this Commonwealth. We will address each separately.

#### a. KRS 532.025 is Constitutional

▬▬▬▬ Relying upon *Jacobs v. Commonwealth*, 870 S.W.2d 412 (Ky.1994) and *Harris v. Commonwealth*, 793 S.W.2d 802 (Ky.1990), Meece argues that KRS 532.025 is unconstitutional for reasons that it makes all murder defendants death eligible, because murder is a capital offense. This, Meece asserts, unhinges the Commonwealth's capital sentencing scheme from the procedural and constitutional controls on the decision-makers' judgments mandated by *Tuilaepa*, 512 U.S. 967, 114 S.Ct. 2630 and *Arave v. Creech*, 507 U.S. 463, 474, 113 S.Ct. 1534, 123 L.Ed.2d 188 (1993). This argument is without merit, as we stated in *Young*, 50 S.W.3d at 162, "[a]bsent a statutory aggravating circumstance specifically applicable to the defendant or the defendant's own conduct, he/she cannot be subjected to the death penalty."

#### b. There is Adequate Statutory Guidance for Imposition of the Death Penalty in the Commonwealth

· Meece also contends that the statutory scheme by which he was sentenced to death provides no standards to guide the sentences in its decisions. In this respect, he makes several different arguments; all of which we have previously rejected.

Thus, we repeat what we have previously held:

> The constitutionality of the death penalty has been repeatedly recognized. *Thompson*, 147 S.W.3d at 55. Further, KRS 532.025 provides adequate standards to guide the jury in its consideration and imposition of the death penalty. *Hodge*, 17 S.W.3d at 854. Finally, the death penalty is not imposed arbitrarily or capriciously in Kentucky. *Tamme*, 973 S.W.2d at 40–41.

*Fields*, 274 S.W.3d at 419.

#### c. The Death Penalty in Kentucky is Not Applied in a Discriminatory Manner

Meece alleges that the death penalty is applied in a discriminatory manner in Kentucky. However, both we and the Sixth Circuit have rejected this argument. *McQueen v. Scroggy*, 99 F.3d at 1333; *Epperson v. Commonwealth*, 197 S.W.3d 46, 62–63 (Ky.2006). And, we are not persuaded to hold otherwise now.

#### d. Prosecutorial Discretion Does Not Make Arbitrariness Inherent in Kentucky's Capital Sentencing Scheme

Here, Meece asserts that Kentucky's capital sentencing scheme is inherently arbitrary due to the alleged unlimited discretion enjoyed by prosecutors in determining whether to seek the death penalty in a given case. Again, we disagree and respond that "the death penalty is not imposed arbitrarily or capriciously in Kentucky." *Fields*, 274 S.W.3d at 419 (*citing Tamme*, 973 S.W.2d at 40–41); *See also Hunt*, 304 S.W.3d at 55.

#### e. Statistical Evidence of Wrongful Convictions

Citing to statistical evidence concerning wrongful convictions nationwide, Meece, in his own defense—disconnected from the

gruesome facts of this case—argues that we should now—in his case—find capital punishment unconstitutional.

In America, courts go to great lengths to protect the innocent and we do not stop with just one review as is evidenced by the statistics cited. With this history and review of process in mind, "precedents of the [United States] Supreme Court prevent us from finding capital punishment unconstitutional based solely on a statistical or theoretical possibility that a defendant might be innocent." *United States v. Quinones*, 313 F.3d 49, 63 (2d Cir.2002).

### 4. Kentucky's Method of Proportionality Review is Constitutional

Here, overlapping a previous argument, Meece contends that this Court's proportionality review process, as prescribed by KRS 532.075(1) is unconstitutional for reasons that "this Court does not compare cases in which the death penalty was imposed to the penalty imposed in similar cases." In this sense, he alleges that "[t]his Court's universe of cases has been limited solely to those cases in which the death penalty was imposed; not to other 'similar cases' in which death was not imposed." Further, he asserts that "[i]t is also limited to only those cases which have been affirmed on appeal." He further contends that he is entitled to access this Court's KRS 532.075(6) database. Again, we disagree as to all assertions.

As we noted in *Hunt*, 304 S.W.3d at 52–53:

"Kentucky's proportionality review is constitutional and comports with statutory requirements and the federal Constitution." *Fields v. Commonwealth*, 274 S.W.3d 375, 419 (Ky.2008). We discern no reason to reevaluate this settled issue.

Moreover, "[t]here is no right to access this Court's KRS 532.075 review data." *Id.* (citing *Ex parte Farley*, 570

S.W.2d 617, 624 (Ky.1978)).... *See also* ... *Harper v. Commonwealth*, 694 S.W.2d 665, 670–71 (Ky.1985) (".... We state in our opinions all matters considered by us, and in no way are mysterious and secret records or data taken into account in our deliberations. The time and effort expended in arguing this point [time after time] would suffice to compile all the data we consider.")....

*Hunt*, 304 S.W.3d at 52–53. Thus, we again find no error.

### 5. Lethal Injection and Electrocution are Constitutional

Again, similar to many cases we have considered, Meece also asserts that lethal injection and electrocution are unconstitutional. Again, given our previous decisions and those of the United States Supreme Court, *Baze v. Rees*, 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008); *Chapman v. Commonwealth*, 265 S.W.3d 156 (Ky.2007); *Baze v. Rees*, 217 S.W.3d 207, 211–12 (Ky. 2006); and *Epperson*, 197 S.W.3d 46 at 64, we disagree. They are plainly constitutional.

### 6. Residual Doubt

Meece also contends that residual doubt bars the death sentence. Again, we have addressed this issue on many occasions and see no reason to depart from our consistent holding that residual doubt plays no role in appellate review. *See, e.g., Hunt*, 304 S.W.3d at 55; *See also Tamme*, 973 S.W.2d at 40; *Epperson*, 197 S.W.3d at 65 ("The United States Supreme Court and this Court have held that residual doubt is not a mitigating circumstance for the death penalty.").

### F. Cumulative Error

Lastly, Meece contends that the cumulative effect of the errors found requires reversal. Our review of the entire case,

however, reveals that Meece has received a fair trial, and there is no cumulative effect, or errors, that mandate reversal in this case. *See Hunt,* 304 S.W.3d at 55–56; *See also Funk,* 842 S.W.2d 476; *Bowling v. Commonwealth,* 942 S.W.2d 293, 308 (Ky.1997).

### IV. Conclusion

For the foregoing reasons, the judgment and sentence of the Warren Circuit Court is affirmed.

All sitting. All concur.